UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

IN RE:

                                                    Case No. 20-15173-RAM

MIDTOWN CAMPUS PROPERTIES, LLC,

    Debtor.                                          Chapter 11 Case
_____/

**SAUER, INCORPORATED'S OBJECTION TO CERTAIN OF THE PROPOSED
TERMS OF DEBTOR IN POSSESSION FINANCING**

Creditor Sauer, Incorporated ("Sauer"), the General Contractor for the Project set forth and described in the *Debtor's Emergency Motion (I) for Authorization to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§105, 361, 362, and 364, (II) to Grant Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. 361 and 507, and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001* (the "Financing Motion") (D.E. 26) that was filed by Debtor Midtown Campus Properties, LLC (the "Debtor"), hereby submits the following objection to certain of the proposed terms requested in the Financing Motion, and in support thereof, states as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

1.    Sauer is a full service general contractor that provides best-in-class services for all manner of public and private construction projects. As it pertains to this case, Sauer is the general contractor[1] for the Project set forth and described in the Motion, namely, the One College Park Project in Gainesville, Florida. The Project is a mixed-use property consisting of 310 units with

---

1    Sauer was not the original general contractor of the Project. Rather, Sauer contracted to serve as the replacement contractor in August, 2017 after issues between the prior general contractor and the Debtor arose.

589 beds totaling 298,328 square feet of habitable apartment and dorm room space, as well as commercial retail space, and an adjacent parking garage.

2. The Debtor commenced this bankruptcy case on May 8, 2020 (the "Petition Date"), when it filed a *Voluntary Petition for Relief* (the "Petition")(D.E. 1) with this Court under chapter 11 of the Bankruptcy Code.  As of the Petition Date, Sauer was and has been acting pursuant to a Construction Contract and amendment thereto (the "Completion Contract") it had with the Debtor to complete the Project after Sauer replaced the original general contractor.[2]  In addition, Sauer, the Debtor, and Fidelity Title Insurance Company were parties to a Retainage and Lien Waiver Escrow Agreement (the "Escrow Agreement") that was made effective as of January 31, 2019.  As the General Contractor, Sauer, as well as a number of its subcontractors, have valid pre-petition mechanics' liens on the Debtor's property for work that they have performed and provided to the Project.

3. In support of the Financing Motion and its other first day motions, the Debtor also filed the *Declaration of Oscar Roger, as Manager of Midtown Properties, LLC, in Support of Chapter 11 Petition and First Day Motions* (the "Declaration")(D.E. 15).  According to the Declaration and the Debtor, the Debtor's chapter 11 filing was the result of a number of factors, including delays from Hurricane Irma and the recent pandemic resulting from the spread of Coronavirus, and disputes that the Debtor has with Sauer.[3]

---

[2] Sauer submits that the Completion Contract is an executory contract within the ambit of 11 U.S.C. §365, for which the Debtor should be required to make an expedited decision on whether to assume or reject it.  Sauer will be separately filing a motion asking the Court to set a deadline for such a decision in this case.

[3] This is further reflected in the Financing Motion wherein the Debtor states that it "believes it has substantial claims against Sauer related to its actions and omissions prior to the Petition Date in respect of construction of the Project."  Financing Motion, p. 27, ¶11.  Sauer disputes Mr.

4.      On May 15, 2020, the Debtor filed the Financing Motion, in which it seeks authority to obtain post-petition Debtor in Possession financing from an entity called BMI Financial Group, Inc. ("BMI" or "DIP Lender"). According to the Financing Motion, BMI appears to be an insider of the Debtor as it affiliated with one of the Debtor's equity members, Antonio M. Sierra.

5.      The material terms of the proposed financing are set forth in the Financing Motion, and the underlying Term Sheet is attached to the motion as Exhibit "B." The proposed Loan Amount is up to $5,200,000, with an amount equal to $1,400,000 to be provided during the Interim Period, *i.e.* the time between the filing of the motion and the date of a final hearing thereon which must take place by June 15, 2020.[4] From the $5,200,000 amount, the Debtor estimates that "the expected costs needed to complete the Project (including hard costs, soft costs, marketing cost, and ground lease payments) is approximately $4,000,000." Declaration, ¶21.

6.      The estimated $4,000,000 amount to complete the Project is broken down in the Notes and Assumptions that are included in the 13 Week Budget (the "Budget") attached to the Financing Motion as Exhibit "C," and is shown as follows:

|  |  |  |
|---|---|---|
| a. | Hard Costs | $ 3,203,139 |
| b. | Soft Costs | $    465,553 |
| c. | Marketing | $    260,292 |
| d. | Ground Lease | $     71,017 |

Financing Motion, Exhibit C, at p. 57.

---

Roger's and the Debtor's characterizations of any delays and problems that ultimately resulted in the Debtor deciding to file for chapter 11 bankruptcy protection, or that the Debtor has any valid claims against Sauer, and those matters will be addressed by Sauer with the Court at the appropriate time.

4      All amounts borrowed will interest at a fixed rate of 9% per annum.

3

7. The Debtor indicates that it is seeking approval of the DIP financing pursuant to 11 U.S.C. §§ 364(c)(2), 364(c)(3), and 364(c)(1).  *See* Financing Motion at pp. 3, 27, and 28.

8. The Debtor is not directly asking for approval of the financing pursuant to 11 U.S.C. §364(d)(1).  That being said, the actual terms of the proposed financing appear to go beyond that which are permitted and set forth in §§364(c)(1) and (c).  And, the title of the motion makes reference to adequate protection, something that is found in §364(d)(1), but it does not appear that any such adequate protection is being provided in the motion.

9. Specifically, in the Declaration, Mr. Roger states that the "DIP Lender is not seeking to prime any pre-petition secured creditor."  Declaration, ¶38.  Notwithstanding that statement, Mr. Roger further states:  "rather [the DIP Lender] is seeking (i) first liens on any of the Debtor's assets that are not subject to any **perfected, non-avoidable pre-petition** lien, (ii) junior liens on any of the Debtor's assets that are subject to any **perfected, non-avoidable pre-petition** lien, and (iii) a super-priority administrative expense claim in the Debtor's chapter 11 Case, in each case pursuant to Section 364(c) of the Bankruptcy Code."  *Id.*  (Emphasis added).  This language is further reflected in the Financing Motion.  *See* Financing Motion at p. 27, Summary Description of material terms (Liens and Superpriority Claim).

10. The portion of the actual hard costs that the Debtor states is needed to complete the Project is broken down in the Budget over a 13 week period, plus the amount needed after that time.  According to the Budget, starting with May 15, 2020, the Debtor budgets the use of $142,500 per week for Hard Costs to be paid to "Contractors and subcontractors" through July 3, 2020, at which time the amount will be reduced to $107,060 per week through the end of the

Budget on August 7, 2020.[5]   That being said, the proposed Budget does not break down what is to be paid to Sauer as the Contractor or to its subcontractors,[6] or to those subcontractors who the Debtor had been paying directly prior to the Petition Date, *i.e.* the Debtor's Subcontractors.[7]

11.   At the present time, on weekly basis, the construction costs being incurred by Sauer and Sauer's Subcontractors is approximately $90,000 to $100,000 per week.   Sauer does not know what amount the Debtor is paying to the Debtor's Subcontractors directly.   And, the Financing Motion does not reflect how the weekly amounts attributable to Hard Costs are to be allocated among Sauer and all the subcontractors.

12.   In addition, it is clear that the Debtor is gearing up for litigation against Sauer as the Budget attached to the motion reflects an estimation of legal fees to Becker & Poliakoff in the amount of $225,000 "in connection with a contractor litigation expected be filed."   Financing Motion, Budget at p. 57 n. 6.   In addition to that, the Debtor is budgeting another $150,000 for an expert fee.  *Id*.

---

[5]   At the conclusion of the 13 week period, the Debtor estimates an additional hard cost amount of $1,527,840. Financing Motion, Budget, n. 1.

[6]   Sauer was paying subcontractors with whom it had direct contracts for work on the Project (" Sauer's Subcontractors").  Other scopes of work were performed by subcontractors with whom Sauer does not have a contract and who are paid directly by the Debtor (the "Debtor's Subcontractors").   Sauer's Subcontractors submit applications for payment to Sauer upon completion of work, which is then incorporated into Sauer's application for payment to the Debtor.  The Debtor, pursuant to the Completion Contract, compensates Sauer, and by extension, Sauer's Subcontractors, upon approval of a submitted payment application.  Sauer does not submit payment applications on behalf of the Debtor's Subcontractors, nor do the Debtor's Subcontractors submit payment applications to Sauer.  While it is unknown to Sauer what financial arrangements are in place between the Debtor and the Debtor's Subcontractors, the Debtor is nonetheless responsible for funding the compensation for all subcontractors, alike.

[7]   Mr. Roger's Declaration states that the "Debtor must have access to loan proceeds to pay its subcontractors."   Declaration at ¶40.   No reference is included with respect to use of the loan proceeds to pay Sauer or Sauer's Subcontractors.

**OBJECTIONS TO MOTION**

13. As an initial matter, Sauer objects to the granting of any post-petition lien that effectuates or purports to effectuate a priming of any valid mechanics' liens that may exist on the Debtor's property that Sauer or any of the subcontractors may have. The Declaration states that the DIP lender is not seeking to prime any secured creditor." Declaration, ¶38. But the terms of the DIP financing do appear to be trying to do just that by then limiting the purported no priming of any valid mechanics' lien to only those what are "perfected and non-avoidable . . . as of the Petition Date."

14. As the Court is aware, mechanics' liens are treated differently under both state law and under the Bankruptcy Code. Under Florida law, the date of priority for a mechanics lien is not tied to when a claim of lien is filed or recorded, but rather, it is tied to the date when the work was commenced. *See Fla. Stat*. §§713.05 and 713.07. More importantly, even a post-petition recordation of a claim of lien by the holder of a mechanics' lien relates back to the pre-petition date. *See, e.g. In re Maas*, 69 B.R. 245, 247 (Bankr. M.D. Fla. 1986). Thus, such a lien would defeat the rights of a trustee or a debtor in possession, such that a post-petition recording of a claim of lien "would be a permissible post-petition filing for purposes of perfecting the lien." *Id*.[8]

15. For this reason, it is entirely permissible for the holder of a mechanics' lien to post-petition take the appropriate steps that are necessary under state law to perfect its existing mechanics' lien without violating the automatic stay imposed by 11 U.S.C. §362, and without

---

8    *See* 11 U.S.C. 546(b)(1)(rights and powers of a trustee under 544, 545, and 549 are subject to any general applicable law that (A) permits perfection of an interest to be effective against an entity that acquires rights in such property before the date of perfection; or (B) provides for the maintenance or continuation of an interest in property to be effective against an entity that acquires rights in such property before the date on which action is taken to effect such maintenance or continuation).

being subject to avoidance by a trustee or debtor in possession the powers under 11 U.S.C. §545. *See, e.g., In re WWG Industries, Inc.*, 772 F.2d 810 (11th Cir. 1985); *In re Durango Georgia Paper Company*, 356 B.R. 305, 309 (S.D. Ga. 2005)(if a creditor has a right of delayed perfection under applicable law, Section 546(b)(1) preserves this right and makes it available to the creditor during bankruptcy.).

16.     In this case, the proposed DIP financing, as set forth in the Financing Motion, appears to be trying to effectuate an end around the priority lien rights that Sauer and all other holders of mechanics' liens have under 11 U.S.C. §546(b)(1) and state law, *i.e.* the right to perfect their liens (or maintain their perfection) post-petition under Florida state law.  That being said, Sauer's undersigned counsel has spoken with counsel for the Debtor who advised that the intention of the proposed financing is not to impact the rights of any of the mechanics' lienors, including their rights under 11 U.S.C. §546(b)(1) and state law.

17.     The mechanics' lien rights of Sauer and all subcontractors should not be impacted or primed in any way to any lien provided to BMI.  To the extent that the Court determines it is appropriate to approve the interim funding at this time, any Order should only provide BMI with a lien in accordance with the language as set forth in §364(c) of Bankruptcy Code, *i.e.* §364(c)(2)("secured by a lien on property of the estate that that is not otherwise subject to a lien"); or (c)(3)("secured by a junior lien on property of the estate that is subject to a lien").  And, any such Orders should make clear that any lien provided to BMI for the DIP financing is junior to all existing mechanics' liens based on their existing priorities under state law, and subject to the mechanics' lienors' rights under 11 U.S.C. §546(b)(1) which are preserved.

18. Sauer disputes the Debtor's contention that the remaining Hard Costs to complete the Project is only $3,203,139, and believes that the amount is substantially higher.[9] The proposed Budget during the interim period pending a final hearing by June 15, 2020 reflects an allocation of the DIP financing of $142,500 per week for payments to contractors and subcontractors. But it does not set forth what those amounts (or the total amount) are supposed to cover. Pending a final hearing, Sauer submits that of the budgeted amounts, sufficient funds should be earmarked specifically to pay Sauer and Sauer's Subcontractors[10] to ensure that they are paid for their continued post-petition work.[11] Based on discussions that Sauer's undersigned counsel and Debtor's counsel have had, during the Interim Period, representatives of the Debtor and Sauer can discuss the specifics of the work to be performed during this time period to ensure that neither Sauer nor any subcontractor runs the risk of not being paid for post-petition work. In the absence of any such agreement on work to perform or a specific allocation of the DIP financing interim funds to Sauer and its subcontractors as suggested above, Sauer should not have any responsibility to perform post-petition and run the risk non-payment.

---

[9] Sauer also disputes that other various conditions of the DIP financing can be met, including but not limited to, the scheduling dates and milestones set forth for completion of various phases of the Project.

[10] Again, in his Declaration, Mr. Roger says that the Debtor must have access to loan proceeds to pay "its subcontractors." Declaration, ¶40. This limitation is not sufficient and should not be approved by the Court.

[11] At the present time, a number of Sauer's Subcontractors are still owed sums for work they performed in February and March (and April) for which Sauer has not yet been paid by the Debtor. Sauer cannot guaranty that these subcontractors are willing to continue working post-petition without assurances of getting paid for this already performed work. And, Sauer should not be required to finance three months of their pre-petition work to ensure that they stay on post-petition.

19. In addition, at this early stage of the case, recognizing that the proposed DIP Lender is an affiliate of one of the Debtor's members, it appears premature to determine that the DIP Lender is a good faith lender, as requested in the motion.[12] Sauer submits that any such final determination appears to be premature, and can be made in connection with a Final Hearing.

For the foregoing reasons, Sauer objects to certain of the relief as currently proposed in the Financing Motion, and requests that any approval of the DIP financing, including on an interim basis pending the Final Hearing, include the protections to Sauer and the subcontractors as set forth herein.

Dated: May 19, 2020.

Respectfully submitted,

**SHAWDE & EATON, P.L.**
Attorneys for Sauer, Incorporated
1792 Bell Tower Lane
Weston, Florida 33326
Telephone: (954) 376-3176

By: */s/ John D. Eaton*
John D. Eaton
Florida Bar No. 861367
jeaton@shawde-eaton.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 19th day of May, 2020, a true and correct copy of the foregoing Objection was served via CM/ECF transmission on all parties currently on the list to receive e-mail notice/service for this case.

By: */s/ John D. Eaton*
John D. Eaton

---

12 In the summary of the Term Sheet in the motion, one of the limitations on use of the DIP financing is with respect to "asserting, commencing, prosecuting any claim or cause of action, including Chapter 5 claims against the DIP Lender." Sauer does not know if any such claims exist.