**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

IN RE:

MIDTOWN CAMPUS PROPERTIES, LLC,

     Debtor.

_____/

SAUER INCORPORATED,

     Plaintiff,

v.

MIDTOWN CAMPUS PROPERTIES, LLC, and
FIDELITY NATIONAL TITLE INSURANCE
COMPANY,

     Defendants.

_____/

Case No. 20-15173-RAM

Chapter 11 Case

Adv. No.

**COMPLAINT FOR DECLARATORY JUDGMENT TO DETERMINE**
**INTERESTS IN ESCROW ACCOUNT**

Creditor Sauer Incorporated ("Sauer"), the pre-petition General Contractor for the Project

set forth and described below, pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§

2201 and 2202, Federal Rules of Bankruptcy Procedure 7001(2) and (9), files this Complaint

seeking a declaratory judgment to determine the respective interests of Sauer, and Defendants

Midtown Campus Properties, LLC and Fidelity National Title Insurance Company, to the funds in

a pre-petition bank account, namely, an Escrow Account at Bank of America for which Defendant

Fidelity National Title Insurance Company is the Escrow Agent.  In support thereof, Sauer states

as follows:

## JURISDICTION, PARTIES, AND VENUE

1.    This is an adversary proceeding filed pursuant to 11 U.S.C. §541 and Federal Rules of Bankruptcy Procedure 7001(2) and (9).

2.    This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A) and (O).

3.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1334(b).

4.    Venue is proper in this Court pursuant to 28 U.S.C. 1409 because the chapter 11 bankruptcy case of Defendant Midtown Campus Properties, LLC (the "Debtor" or "Midtown") is pending in this District.

5.    Sauer is a full service general contractor and was, at the time the Debtor filed its chapter 11 Petition in this Court, the general contractor with respect to completing the construction of the One College Park Project in Gainesville, Florida (the "Project").    The Project is a mixed-use property consisting of 310 units with 589 beds totaling 298,328 square feet of habitable apartment and dorm room space, as well as commercial retail space, and an adjacent parking garage.

6.    Midtown is a debtor in a chapter 11 bankruptcy case pending in this Court.

7.    Fidelity National Title Insurance Company ("Fidelity") is the Escrow Agent pursuant to a Retainage and Lien Waiver Escrow Agreement (the "Escrow Agreement") that was made effective as of January 31, 2019.[1]

8.    Sauer, the Debtor, and Fidelity are parties to the Escrow Agreement.    A true and correct copy of the Escrow Agreement is attached hereto as **Exhibit 1.**

---

[1]    "Fidelity Title Insurance Company" is the actual named escrow agent in the Escrow Agreement.  However, "Fidelity National Title Insurance Company" is the only entity that is registered with the Florida Division of Corporations, and no entity called "Fidelity Title Insurance Company" is registered with the Florida Division of Corporations.  For that reason, Fidelity National Title Insurance Company is the named party defendant herein.

2

## GENERAL ALLEGATIONS

### Sauer's Relationship to Midtown and the Project

9.      The Debtor commenced this bankruptcy case on May 8, 2020 (the "Petition Date"), when it filed a *Voluntary Petition for Relief* (the "Petition") (D.E. 1) with this Court under chapter 11 of the Bankruptcy Code.

10.      As it pertains to this chapter 11 case, as of the Petition Date, Sauer was a general contractor for the completion of the Project.

11.       Midtown is the "Owner" of the Project, though its interest in the subject underlying real property is derived from a 99-Year Ground Lease with St. Augustine Parish Land, LLC.

12.      Sauer was not the original general contractor of the Project.

13.      Bradenton Cove Construction, LLC ("BCC") initially contracted with Midtown to construct the Project. After the Project was underway and issues arose with BCC, Midtown hired Sauer to take over the Project from BCC.

14.      Sauer entered into a contract with Midtown on or about August 1, 2017, consisting of: (1) the revised A1A A102-2007; (2) AIA A201-2007; (3) the "Addendum to Completion Contract for One College Park" (the "Addendum");  and (4) the Amendment to the Addendum (which portion may be separately referred to as the "Amendment"). Collectively, the four (4) components referenced in this Paragraph are referred to as the "Completion Contract."    A true and correct copy of the Completion Contract was attached to a Motion that Sauer filed in the Debtor's main bankruptcy case and is available at Main Case D.E. 60-1.[2]

---

2        "Main Case D.E." refers to docket entries in the Debtor's main bankruptcy case.

15.     Pursuant to the terms of the Completion Contract, Sauer entered into subcontracts with subcontractors and purchase orders with suppliers to provide services and materials necessary to construct the Project.

16.     Pursuant to the terms of Completion Contract, Sauer's subcontractors and suppliers would submit payment applications and/or invoices to Sauer, and Sauer would, in turn, submit those requests to Midtown as part of Sauer's monthly payment application.

17.     Pursuant to the Completion Contract, Midtown was required to pay Sauer for services and materials rendered in a specified payment application period, and Sauer would then reimburse its subcontractors and suppliers.

**Retainage Withheld from Payments for Sauer's Subcontractors and Suppliers**

18.     Sauer's monthly payment applications to Midtown requested reimbursement for value provided to the Project by Sauer, as well as value of services, labor, and materials provided by Sauer's subcontractors and suppliers.

19.     Section 12.1.8. of the Completion Contract states, in part, that "[t]he Owner and Contractor shall agree upon . . . the percentage of retainage held on Subcontracts, and the Contractor shall execute subcontracts in accordance with those agreements." (Main Case D.E. 60-1).

20.     Midtown and Sauer agreed that Midtown would withhold 10% retainage from subcontractors and suppliers downstream from Sauer.

21.     Sauer included a 10% retention provision in Paragraph 7 of its subcontracts.

22.     Pursuant to the agreement outlined in Paragraph 20, when Sauer submitted applications for payment to Midtown, the applications sought the value of the work performed in

the respective time period less, 10% of the value provided by Sauer's subcontractors and suppliers (hereinafter referred to as "Retainage").

### Midtown's 2019 Project Refinancing

23.     The construction for the Project was originally financed with a construction loan the Debtor obtained from Capital Bank. However, in January, 2019, Midtown refinanced the Project from the proceeds of the issuance of $77,820,000 in Florida Development Finance Corporation Student Housing Revenue Bonds pursuant to a Trust Indenture between the Florida Development Finance Corporation and U.S. Bank National Association ("U.S. Bank"), as indenture trustee.

24.     Midtown's refinance negotiation was extremely hurried, and Midtown enforced a deadline of January 31, 2019, to complete all paperwork related to the refinance. Sauer diligently and timely attempted to meet each deadline set by Midtown to effectuate its refinance.

25.     As part of the 2019 refinancing process, Midtown terminated the active Notice of Commencement tied to the prior lender, Capital Bank.

26.     In the re-recorded *Notice of Termination of Notice of Commencement* recorded in the Alachua County Official Records on February 1, 2019, Book 4660, Page 1058 (the "Termination of NOC"), Oscar A. Roger as Manager of Midtown, stated under oath that "[a]ll lienors have been paid in full/bonded off on or before January 31, 2019, under the agreement with the undersigned."

27.     Sauer likewise executed a *Conditional Waiver and Release of Lien Upon Payment* (the "Conditional Waiver and Release") to effectuate the refinancing, which was recorded with the Termination of NOC and specifically carved out the Retainage related to work completed through January 31, 2019, in the amount of $1,385,421.44, from the conditioned payment.

28.     Midtown and Sauer agreed Midtown would place the $1,385,421.44 Retainage it withheld from Sauer's payment applications into escrow, thereby ensuring Sauer and its subcontractors remained protected from nonpayment related to the pre-refinance Retainage.

**The Escrow Agreement**

29.     Midtown selected Fidelity to serve as the Escrow Agent, and Sauer, Midtown, and Fidelity entered into the Escrow Agreement on January 31, 2019.

30.     Pursuant to the Escrow Agreement, an Escrow Investment Account (the "Escrow Account") at Bank of America ("BOA") was opened, and Midtown deposited the $1,385,421.44 Retainage, defined in the Escrow Agreement as the "Deposit," into the Escrow Account.

31.     The Escrow Agreement provides that the Deposit was to be held by Fidelity to pay: (1) Retainage to Subcontractors; (2) Retainage to Sauer; and (3) any sums due to Sauer pursuant to the Escrow Agreement.

32.     The Escrow Agreement states:

> **Whereas**, in connection with the construction of the Project, Owner and Contractor have requested Escrow Agent to hold monies (the "**Deposit**"), which includes unpaid retainage to date, to pay the subcontractors performing work on the Property (the "**Subcontractors**") and retainage sums that are paid to Contractor and any sums that may be due to Contractor in accordance with the provisions of this Escrow Agreement.

(emphasis in original).

33.     Fidelity was required by the Escrow Agreement to open the Escrow Account in Fidelity's name, as Escrow Agent.

34.     According to the Escrow Agreement, interest accruing on the Escrow Deposit should be disbursed to Midtown in accordance with subparagraph 7.c. of the Escrow Agreement, but the Escrow Agreement does not contain a subparagraph 7.c.

6

35.     The parties to the Escrow Agreement intended that the Escrow Agreement include an Exhibit B referenced as a "Deposit Breakdown."

36.     The Deposit Breakdown was intended by the Parties to be a "list of the Subcontractors to be paid pursuant to [the Escrow Agreement] and the amount to be paid to each of such Subcontractors as well as any amount owed  to the Contractor, in form and substance acceptable to Owner, Contractor and Escrow Agent[.]" Escrow Agreement at ¶ 7, **Ex. 1**.

37.     In conjunction with finalizing the Escrow Agreement, Sauer provided its deposit breakdown schedule to Midtown and Sauer and Midtown agreed in principal on much of what was included within the breakdown.  However, Midtown was still working on a few remaining pieces of the breakdown, and the schedule was not attached to the Escrow Agreement.

### Sauer's Performance Pursuant to the Escrow Agreement

38.     As set forth above, Sauer provided Midtown with a Deposit Breakdown based on amounts withheld as Retainage from Payment Applications 1 through 17.

39.     Midtown initially refused to approve Payment Application 17 until the Deposit Breakdown was finalized. However, even after Payment Application 17 was approved by Midtown and paid, Midtown continued to withhold approval of a Deposit Breakdown containing the amounts reflected in approved Payment Application 17.

40.     Sauer provided Midtown with lien waivers that waived lien rights through the refinancing date of January 31, 2019, on behalf of subcontractors and suppliers who provided Notices to Owner regarding labor, materials, and services.

41.     Maria Lopez ("Ms. Lopez"), an employee of Roger Development Group, Inc., an agent of Midtown related to the management of the Project, represented to Sauer that she would provide the lien waivers to Fidelity after review of same.

42.     At no time after Ms. Lopez's representation referenced in Paragraph 41 did Midtown or its agent, Roger Development Group, Inc., inform Sauer that there were concerns about the lien waivers.

43.     At no time after Ms. Lopez's representation referenced in Paragraph 41 did Midtown or its agent, Roger Development Group, Inc., inform Sauer that it did not provide the lien waivers to Fidelity.

44.     Sauer did not learn until August 19, 2020, by email from a Fidelity representative to counsel for Sauer and copy to Midtown's counsel, that Midtown never provided the lien waivers to Fidelity.

45.     In addition to lien waivers, although not required by the Escrow Agreement, Sauer also provided check copies to Midtown reflecting payments made by Sauer to its downstream suppliers and subcontractors with the understanding that Midtown would agree to a disbursement schedule upon receipt thereof.

46.     Sauer sought disbursements from the Escrow Account pursuant to the terms of the Escrow Agreement.

47.     To date, Midtown has not approved disbursements from the Escrow Account.

48.     Sauer provided the document attached as **Exhibit 2** to Midtown, which provides:

    a.  The amount withheld from Midtown's payments to Sauer in Payment Applications 1 through 17 for specific subcontractors and suppliers by scope;

    b.  To whom the disbursement should be made based on whether the subcontractor or vendor was already compensated in full by Sauer; and

c. Whether funds should be held until a still-performing entity completes performance or other issues related to entitlement are resolved.

49. Midtown indicated it was willing to work with Sauer to disburse the funds from the Escrow Account, but when Sauer repeatedly requested Midtown's cooperation, Midtown proved to be unwilling to take the necessary steps to effectuate disbursement. Instead, Midtown frustrated Sauer's attempts by repeatedly demanding information not required by the Escrow Agreement.

50. Although its objections remain unclear, Midtown refused to cooperate to effectuate disbursements from the Escrow Account in accordance with **Exhibit 2** up to the filing of its chapter 11 Petition on May 8, 2020, at which time Sauer had to cease its efforts to disburse the long overdue funds.

## The Deposit Breakdown

51. The $1,385,421.44 amount placed into the Escrow Account was intended by the Parties to represent the value of Retainage withheld from payments to Sauer on Payment Applications 1 through 17.

52. Payment Applications 1 through 17 reflect the value of work performed and supplies provided by Sauer, its subcontractors, and its suppliers between August 1, 2017 and January 25, 2019.

53. Because Midtown needed to know the Deposit amount before Sauer and its subcontractors had all information necessary to prepare Payment Application 17, Midtown and Sauer agreed the retainage values for Payment Application 17 would be estimated by replicating the amounts in Payment Application 16 (*i.e.*, the December 2018 Payment Application).

54.     Each Payment Application contains a "Schedule of Values" which shows the value of services, labor, or materials provided within the application period for each line item on the schedule.

55.     The Schedule of Values also shows aggregate Retainage amounts withheld under the contract for a particular line item.

56.     Pursuant to the Completion Contract, no retainage was withheld from payments to Sauer for Sauer's services.

57.     Payment Application 17 ("PA 17") was negotiated between Sauer and Midtown, and its final agreed form was executed on or about March 14, 2019. A true and correct redacted copy of PA 17 is attached hereto as **Exhibit 3**.

58.     PA 17 reflects $1,372,200.84 of Retainage was withheld from Payment Applications 1 through 17.

59.     The $1,372,200.84 sum was the amount agreed by Midtown to have been withheld from payments to Sauer for Retainage on Payment Applications 1through 17. For this reason, Sauer initially based its Deposit Breakdown on the withholding amounts agreed to in PA 17.

60.     Based on project records including invoices, cancelled checks, lien waivers, and other supporting documentation, the actual amounts that Midtown owes in Retainage from the Escrow Account related to a given entity's services, labor, and/or materials provided from August 1, 2017 to January 25, 2019, are outlined in **Exhibit 4**, attached hereto.

61.     Upon information and belief, Capital Bank paid some subcontractors the Retainage related to Payment Application 1 directly, but Sauer does not have confirmation of which entities listed on **Exhibit 4**, if any, were compensated directly by Capital Bank for Payment Application 1 Retainage.  To the extent Capital Bank paid Payment Application 1 Retainage shown in **Exhibit**

**4** to some or all entities identified, and evidence of such payment(s) is provided, the requested disbursal amount will be reduced accordingly.

62.    **Exhibit 4** lists the amount that was withheld from payment for a particular entity's work or materials by the entity's name, which is referenced on **Exhibit 4** as the "Retainage Entity."

63.    **Exhibit 4** identifies to whom the Retainage funds in the Escrow Account are now due for each Retainage Entity in a column titled "Disbursal Entity."

64.    The total amount of Retainage due to Sauer's subcontractors, suppliers, and/or Sauer from the Escrow Account is $1,364,818.27 (the "Total Disbursement Amount").

65.    Because PA 17's retainage values were estimated for purposes of calculating the Escrow Deposit, there is a $13,220.60 difference between Deposit and the amount of Retainage reflected on PA 17, and there is a $2,572.44 reduction from the stated Retainage amount in PA 17 based on the project documentation.

66.    The Total Disbursement Amount is the true amount of Project payments withheld by Midtown from Sauer's subcontractors and suppliers between August 1, 2017 and January 25, 2019 as Retainage, which is now due.

67.    The Total Disbursement Amount of $1,364,818.27 that was withheld from payments to Sauer is due to Sauer and parties with whom Sauer has contracts pursuant to the Completion Contract.

68.    The Total Disbursement Amount should be disbursed as broken down in **Exhibit 4**.

69.    The individual disbursements of the Total Disbursement Amount sum each fall into one of five categories: (1) disbursements for amounts owed to subcontractors for Payment Applications 1 through 17 ("Category 1"); (2) disbursements to Sauer where Sauer paid supplier

purchase orders in full, despite not receiving full payment from Midtown due to retainage ("Category 2"); (3) disbursements amounts for which entitlement is not resolved because the entity is either still performing or because there is a pending claim or dispute related to that entity's work ("Category 3"); (4) payments made to Midtown in full for self-performed work or materials for which Midtown withheld retainage upon payment to Sauer ("Category 5"); and (5) payments to Sauer for amounts paid directly to sub-subcontractors and suppliers of former subcontractor Pedreiras, Inc. ("Category 5").

70.     For each subcontractor listed on **Exhibit 4** in Category 1, 10% of the value of services, labor and/or materials provided by that subcontractor was retained by Midtown for Payment Applications 1 through 17.

71.     Each entity in Category 1 is owed the amount reflected on **Exhibit 4** for value provided to the Project between August 1, 2017 and January 25, 2019, which amounts were placed by Midtown into the Escrow Account to ensure payment of same.

72.     For each payment to be disbursed to Sauer under Category 2 on **Exhibit 4**, the subcontractor or supplier listed was paid in full by Sauer, despite Midtown withholding 10% for that work from its payments to Sauer.

73.     The Retainage related to the Category 2 entities is due to Sauer because Sauer already reimbursed the Category 2 Retainage Entities in full.

74.     For each subcontractor or supplier listed in the Category 3 on **Exhibit 4**, the entitlement to the funds is unresolved between Sauer and the respective entities due to pending issues related to claims or continued performance at the Project.

75.     Regarding the Category 4, Midtown elected to self-perform work or provide materials during the applicable periods from Payment Application 11 to Payment Application 17 (the "Self-Performed Work"), and it sought to have those amounts billed against the contract value.

76.     Midtown submitted invoices to Sauer for its Self-Performed Work, and Sauer paid each of those invoices in full.

77.     Nevertheless, ten percent (10%) Retainage was withheld from the payments to Sauer based on the Completion Contract for the Self-Performed Work, which resulted in Sauer paying Midtown more than Midtown was paying Sauer for the Self-Performed Work.

78.     Accordingly, the Retainage amounts listed in Category 4 of **Exhibit 4** are due to Sauer for amounts already paid to Midtown.

### The Pedreiras Retainage

79.     The disbursements in Category 5 on **Exhibit 4** relate to Sauer's right to offset against retainage for losses incurred due to default and non-performance of former subcontractor Pedreiras, Inc. ("Pedreiras")

80.     At the insistence of Midtown, Sauer hired Pedreiras as a subcontractor for the electrical, drywall, plumbing, and concrete scopes in 2017.

81.     Because Pedreiras did not meet Sauer's bonding requirements, Midtown agreed to act as surety in the event of a default by Pedreiras and termination of its subcontract with Sauer.

82.     In the Amendment, Midtown agreed to indemnify and hold Sauer harmless for losses incurred related to the default and termination of Pedreiras. (Main Case D.E. 60-1).

83.     Pedreiras defaulted on its subcontract with Sauer and was terminated by Sauer.

84.     Sauer made over $800,000 in direct payments to Pedreiras' suppliers because Pedreiras was not paying its suppliers and sub-subcontractors.

13

85.    Nevertheless, Pedreiras filed a lawsuit in the Circuit Court of the Eleventh Judicial Circuit in Miami-Dade County, Florida, Case No. 2019-021551-CA-01 (the "Pedreiras Lawsuit"), against the surety that issued the Payment Bond for the project, Federal Insurance Company, alleging Pedreiras was not fully compensated pursuant to its subcontract with Sauer. A true and correct copy of the Amended Complaint in the Pedreiras Lawsuit is attached hereto as **Exhibit 5**.

86.    Sauer disputes the allegations in the Pedreiras Lawsuit and denies that Pedreiras is entitled to the relief sought in the Pedreiras Amended Complaint.

87.    Although the allegations and relief requested in the Pedreiras Amended Complaint are not clear, Pedreiras erroneously alleges that Sauer withheld ten percent "of approved payments," and this is likely a reference to the Retainage withheld by Midtown from its payments to Sauer. **Ex. 5** at 3, ¶ 12.

88.    The total amount of Retainage in the Escrow Account related to Pedreiras is $351,007.26.

89.    Sauer incurred costs related to the default of Pedreiras well in excess in of the amounts which would be due to Pedreiras from the Retainage in the Escrow Account.

90.    The Retainage in the Escrow Account that was withheld from payments to Sauer by Midtown related to Pedreiras' scope of work is due to Sauer because of the costs Sauer incurred as a direct result of Pedreiras failing to perform its obligations pursuant to its subcontract with Sauer.

## The Present Status of the Escrow Account

91.    On May 15, 2020, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Certain Existing Bank Accounts and*

*Cash Management Accounts and Cash Management System (II) Waiving Certain U.S. Trustee Requirements in Connection Therewith (III) Extending Time to Comply with 11 U.S.C. §345 Investment Guidelines and (IV) Granting Related Relief* (the "Bank Account Motion")(Main Case D.E. 19).

92.     On August 21, 2020, the Court entered its *Final Order (I) Authorizing Maintenance of Certain Existing Bank Accounts and Cash Management Accounts and Cash Management System (II) Waiving Certain U.S. Trustee Requirements in Connection Therewith (III) Extension of Time to Comply with the Investment Guidelines of §345(B) and (IV) Granting Related Relief [ECF No. 19]*(the "Bank Account Order")(Main Case D.E. 182). In the Bank Account Order, the Court Ordered, *inter alia*, that pending further Order of the Court, the Escrow Account shall remain where it is currently located at BOA. *Id*. at ¶5. In addition, no funds from the Escrow Account will be disbursed from the Escrow Account other than pursuant to further Order of the Court, after notice of any such request and hearing thereon being provided to both Sauer and Fidelity. *Id*.

93.     In the Bank Account Motion, the Debtor stated that as of the Petition Date, the Escrow Account value is $1,392,770.13. (Main Case D.E. 19 at ¶ 14).

94.     In its Amended Summary of Assets and Liabilities (Main Case D.E. 71), the Debtor stated the Escrow Account's value was $1,385,421.44, as of the Petition Date.

95.     While Sauer does not know the reason for the $7,348.69 difference between the Debtor's statement of the Escrow Account's value on the Petition Date, the amount stated on the Amended Summary of Assets and Liabilities is equal to the initial Deposit amount as provided in the Escrow Agreement.

96.     After the filing of the Bank Account Motion, and the entry of interim orders thereon, Counsel for the Debtor and Sauer had discussions about the funds in the Escrow Account

to determine whether they could reach an agreement on the respective rights and interests of the parties in the funds thereto.  However, to date, they have not been able to do so.

97.     At the present time, the funds in the Escrow Deposit remain in the Escrow Account and no further Order of the Court has been entered authorizing their disbursement.

98.     There is presently a dispute between Sauer and the Debtor as to the respective rights and interests in and to the funds in the Escrow Account.

### COUNT I: DECLARATORY RELIEF THAT $1,364,818.27 OF THE ESCROW DEPOSIT IS NOT PART OF THE BANKRUPTCY ESTATE

99.     Sauer re-alleges and incorporates herein by reference each of the allegations in paragraphs 1 through 97 above as if fully set forth herein.

100.     There exists an actual controversy between the Parties and a need for a determination as to that portion of the funds in the Escrow Account that are assets of the Debtor (thus constituting property of the Estate), if any, and the extent of the funds therein that are property of Sauer and its subcontractors and suppliers.

101.     Fidelity does not have any interest in any of the funds in the Escrow Account, and is named herein solely because it is the Escrow Agent for whom notice is to be provided pursuant to the Bank Account Order and because it is a party to the Escrow Agreement.

102.     Until amounts owed to subcontractors, vendors, and Sauer have been appropriately disbursed pursuant to the terms of the Escrow Agreement, none of the funds in the account are property of the Estate.

103.     Midtown erroneously listed $1,385,421.44 of the funds in the Escrow Account as a cash equivalent asset of the Estate in its Amended Summary of Assets and Liabilities (Main Case D.E. 71).

104.    As it relates to Payment Applications 1 through 17, $1,364,818.27 of value for services, labor and materials was added to the Project between August 1, 2017 and January 25, 2019, by Sauer's subcontractors and suppliers, which remains outstanding.

105.    $1,364,818.27 of the funds in the Escrow Account was withheld from payments to Sauer pursuant to the Completion Contract, and the $1,364,818.27 sum is part of the agreed contract price payable to Sauer by Midtown in the Completion Contract.

106.    All of the funds in the Escrow Account were placed into the Escrow Account for the express benefit of Sauer, its subcontractors, and its suppliers.

107.    Pursuant to the terms of the Escrow Agreement, sums are to be distributed to Sauer and its subcontractors and suppliers first, with Midtown only entitled to receive funds that may thereafter remain, if any (the "Remaining Funds").

108.    Collectively, Sauer and its subcontractors and suppliers are owed $1,364,818.27 from the Escrow Account, and such disbursements are required to be made pursuant to the Escrow Agreement before any disbursement of Remaining Funds to Midtown.

109.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Bankruptcy Rules 7001(2) and (9), Sauer requests that the Court declare that:

   a. Debtor has no legal interest in $1,364,818.27 of the amounts in the Escrow Account, and therefore, such funds are not property of the Estate; and

   b. The $1,364,818.27 sum is an amount intended for the benefit of Sauer and its subcontractors and suppliers, which shall be disbursed to Sauer and its subcontractors and suppliers before any Remaining Funds can be disbursed to Midtown; and

   c. Any such further relief as the Court deems just and proper.

**COUNT II: DECLARATORY RELIEF THAT FIDELITY IS AUTHORIZED TO
DISBURSE CERTAIN FUNDS TO SAUER AND ITS SUBCONTRACTORS**

110.    Sauer re-alleges and incorporates herein by reference each of the allegations in paragraphs 1 through 108 above as if fully set forth herein.

111.    There exists an actual controversy between the Parties and a need for a determination as to whether certain sums within the Escrow Account can be disbursed and to whom.

112.    Fidelity does not have any interest in any of the funds in the Escrow Account, but it is currently in control of the funds pursuant to the terms of the Escrow Agreement.

113.    There is a Payment Bond for the Project issued by Federal Insurance Company, which protects the subcontractors from nonpayment.

114.    Pursuant to its downstream subcontracts and purchase orders with its subcontractors and suppliers who provided value to the Project between August 1, 2017 and January 25, 2019, Sauer has payment rights and obligations regarding the use, offset, and disbursement of the $1,364,818.27 Total Disbursement Amount  held as Retainage in the Escrow Account.

115.    Midtown has no interest in the Total Disbursement Amount in the Escrow Account.

116.    **Exhibit 4** outlines to whom disbursements from the Total Disbursement Amount should be made based on the Retainage Entity, the original entity from whom the Retainage was withheld, and whether that entity has been compensated in full by Sauer or whether Sauer is exercising its right to offset based on default or nonperformance.

117.    Pursuant to the Uniform Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202, and Bankruptcy Rules 7001(2) and (9), Sauer requests that the Court declare that:

a.  Fidelity is authorized to distribute the sum of $1,364,818.27 either to Sauer in its entirety to distribute in accordance with its downstream obligations as illustrated in **Exhibit 4**, or to distribute the amounts directly to the parties identified on **Exhibit 4** to receive the disbursements; and

b.  Any such further relief as the Court deems just and proper.

**WHEREFORE**, for the reasons set forth herein, Sauer Incorporated requests that the Court enter a Declaratory Judgment holding: (1) $1,364,818.27 of the funds in the Escrow Account are not part of the Bankruptcy Estate; (2) that the same $1,364,818.27 sum within the Escrow Account is a sum to be distributed to Sauer and its subcontractors and suppliers before any disbursements from the Escrow Account are made to Debtor; (3) Fidelity is authorized (a) to distribute the sum of $1,364,818.27 either to Sauer in its entirety to distribute in accordance with its downstream obligations as illustrated in **Exhibit 4**, or to distribute the amounts directly to the parties identified on **Exhibit 4** to receive the disbursements, and (b) only after such amounts are distributed, to then return any Remaining Amount to the Debtor; and (4) any such other relief as the Court deems necessary and appropriate.

Dated:  November 20, 2020

Respectfully submitted,

**SHAWDE & EATON, P.L.**
1792 Bell Tower Lane
Weston, Florida 33326
Telephone:  (954) 376-3176

By:___*/s/ John D. Eaton*_____
        John D. Eaton
        Florida Bar No. 861367
        jeaton@shawde-eaton.com

        **and**

Callie E. Waers
(pro hac vice admission)
**MARTIN | HILD P.A.**
555 Winderley Place, Suite 415
Maitland, FL 32751
Telephone: (407) 660-4488
Email: cew@martinhild.com

*Attorneys for Sauer Incorporated*