**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

                                    **Chapter 11**

**MIDTOWN CAMPUS PROPERTIES, LLC,**     **Case No. 20-15173-RAM**

          **Debtor.**

_____/

**SECOND AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED**
**CHAPTER 11 PLAN OF REORGANIZATION**
**PROPOSED BY MIDTOWN CAMPUS PROPERTIES, LLC**

**GENOVESE JOBLOVE & BATTISTA, P.A**.
Paul J. Battista, Esq.
Florida Bar No. 884162
Mariaelena Gayo-Guitian, Esq.
Florida Bar No. 0813818
John K. Olson, Esq.
Florida Bar No. 201634
Heather L. Harmon. Esq.
Florida Bar No. 013192
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

*Counsel for the Debtor-in-Possession*

Dated:  November 7, 2021

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE *SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY MIDTOWN CAMPUS PROPERTIES, LLC* DATED NOVEMBER 7, 2021 (AS DEFINED HEREIN, THE "PLAN"),[1] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN ***IN ITS ENTIRETY*** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VII OF THIS DISCLOSURE STATEMENT ("RISK FACTORS IN CONNECTION WITH THE PLAN") BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENTS.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE CONTENT OF THE PLAN.  IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.  ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to such terms in the Plan.

DEBTOR AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

AS TO ANY CONTESTED MATTERS OR OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR AND DEBTOR-IN-POSSESSION IN THE CHAPTER 11 CASE.

NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY OR ANY PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND (I) THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND (II) THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN. NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THE DISCLOSURE STATEMENT. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.

ALTHOUGH THE ATTORNEYS AND FINANCIAL ADVISORS EMPLOYED BY THE DEBTOR HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY

THEREOF. THE ATTORNEYS AND FINANCIAL ADVISORS EMPLOYED BY THE DEBTOR SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THIS DISCLOSURE STATEMENT.

THE DEBTOR RESERVES THE RIGHT TO OBJECT TO ANY CLAIM PRIOR TO THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT. ON AND AFTER THE EFFECTIVE DATE OF THE PLAN, THE REORGANIZED DEBTOR WILL BE VESTED WITH FULL AUTHORITY TO UNDERTAKE THE CLAIMS OBJECTION PROCESS WITH RESPECT TO ALL CLAIMS THAT HAVE NOT BEEN PREVIOUSLY RESOLVED BY COURT ORDER OR OTHERWISE (INCLUDING, BUT NOT LIMITED TO, GENERAL UNSECURED CLAIMS). THE ACTUAL AMOUNTS OF THE DISTRIBUTIONS UNDER THE PLAN TO THE HOLDERS OF ALLOWED CLAIMS WILL BE DETERMINED AFTER COMPLETION OF THE CLAIMS OBJECTION PROCESS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR AND ITS PROFESSIONALS CANNOT AND DO NOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS. THE DEBTOR ALSO BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO ACCOMPLISH THE OBJECTIVES OF REORGANIZATION UNDER CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS CREDITORS AND HOLDERS OF EQUITY INTERESTS. THUS, IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS AND HOLDERS OF EQUITY INTEREST UNDER THE PLAN CONTEMPLATE A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED THROUGH LIQUIDATION OF THE DEBTOR IN A CASE UNDER CHAPTER 7 OR UPON DISMISSAL OF THIS CHAPTER 11 CASE.**

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR STRONGLY URGES CREDITORS TO VOTE TO <u>ACCEPT</u> THE PLAN.**

**<u>IRS CIRCULAR 230 NOTICE</u>:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY

INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT ANY PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.

## **TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 1 |
| | A. | Overview of Chapter 11 and the Plan Confirmation Process. | 2 |
| | B. | Plan Overview and Recommendation of the Debtor. | 2 |
| | C. | Summary of Voting Requirements for Plan Confirmation. | 4 |
| | | 1. In General. | 4 |
| | | 2. Unimpaired and Impaired Classes Under the Plan. | 4 |
| | | 3. Acceptances by Class of Claims and Equity Interests | 4 |
| | | 4. Nonconsensual Confirmation | 5 |
| | | 5. Voting Deadline. | 5 |
| | | 6. Voting Instructions | 5 |
| | | 7. Additional Information | 5 |
| II. | | BACKGROUND INFORMATION | 6 |
| | A. | Overview of the Debtor's Business. | 6 |
| | B. | Construction of the Project | 6 |
| | C. | Management of the Project- Asset Campus USA, LLC | 9 |
| | D. | The Debtor's Corporate Structure | 9 |
| | E. | Prepetition Capital Structure | 9 |
| | F. | Pending Litigation | 10 |
| | G. | Assets and Claims | 10 |
| | H. | Leasing of the Project | 11 |
| III. | | EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE | 11 |
| IV. | | EVENTS OCCURRING DURING DEBTOR' CHAPTER 11 CASE | 12 |
| | A. | Bankruptcy Filings and First Day Orders and Other Matters. | 12 |
| | | i. Retention and Employment of Professionals. | 12 |
| | | ii. Schedules and Statement of Financial Affairs. | 13 |
| | | iii. Debtor-In-Possession Monthly Reports. | 13 |
| | | iv. Cash Management Motion. | 13 |
| | | v. Relief From the Automatic Stay Motions. | 14 |
| | | vi. Critical Vendor Motion | 15 |
| | | vii. Assumption of Certain Executory Contracts and Leases. | 16 |
| | | a. Southern Furniture Leasing, Inc. | 16 |
| | | b. Ground Lease with St. Augustine Parish Land, LLC.. | 17 |

c. PGAL, Inc., f/k/a Pierce Goodwin, Alexander & Linville.................. 17

viii.    Extensions of Section 362(d)(3) deadline................................................. 18

ix.    Extensions of Exclusivity and Solicitation Deadlines and Filing of Plan and Disclosure Statement.................................................. 20

x.    Debtor-in-Possession Financing. .................................................. 22

a. Initial DIP Financing – Junior DIP Loan $5,200,000 . ......................... 22

b. Additional Post-Petition Financing – Priming DIP Loan $7,400,000...23

xi.    Interim Fee Awards.................................................. 24

xii.    Cash Collateral.................................................. 25

B.    Challenges to the Claim asserted by U.S. Bank, National Association, in its capacity as Indenture Trustee.................................................. 27

C.    The Claim Asserted by U.S. Bank. .................................................. 30

D.    Sauer Incorporated's Claims and Pending Litigation. ......................... 30

i.    Objection to Sauer Claim.................................................. 30

ii.    Sauer Adversary Proceeding – Adv. Case No. 20-01401-RAM. ........... 31

iii.    State Court Case filed by Sauer in Alachua County, Florida. ................ 32

iv.    Mediation with Sauer.................................................. 33

v.    Motion to Abate and Injunctive Relief. .................................................. 33

E.    The Stalking Horse Buyer, the Purchase Agreement and the Sale Motion ........ 33

V.    THE CHAPTER 11 PLAN .................................................. 33

A.    Treatment of Claims and Equity Interests Under the Plan. ............................... 33

i.    Administrative Claims, Professional Clams, Priority Tax Claims and United States Trustee Fees.................................................. 34

a. Administrative Claims.. .................................................. 34

b. Professional Claims .................................................. 34

c. Priority Tax Claims.................................................. 34

d. Statutory Fees.................................................. 35

e. The DIP Loans. .................................................. 35

ii.    Classification of Claims and Equity Interests.................................................. 36

B.    Special Provision Governing Unimpaired Claims.................................................. 40

C.    Means for Implementation of the Plan.................................................. 40

i.    Source of Funding for Plan Distributions- Sale of Project  ................ 40

ii.    Section 1146 Exemption .................................................... 41

iii.    Corporate Action .............................................................. 41

iv.    Vesting of Property of the Estate in the Reorganized Debtor ................. 42

v.    Distributions .................................................................. 42

vi.    Surrender and Cancellation of Notes, Instruments, Certificates and Other Documents Evidencing Claims ...................................... 42

vii.    Continued Corporate Existance of the Reorganized Debtor ................... 42

viii.    Post Confirmation Accounts ............................................... 42

ix.    Management of the Reorganized Debtor ................................ 43

x.    Section 1145 Determination ............................................ 43

xi.    Preservation of Causes of Action ........................................ 43

xii.    Prosecution and Settlement of Causes of Action and Objections to Claims ....................................................................... 44

xiii.    Automatic Stay ................................................................ 45

xiv.    Closing of Chapter 11 Case ............................................. 45

D.    Provisions Governing Distributions .............................................. 45

i.    Manner of Cash Payments Under the Plan ............................ 45

ii.    Entity Making Distributions ............................................. 45

iii.    Distribution Dates ......................................................... 45

iv.    Record Date for Distribution ............................................ 46

v.    Delivery of Distributions .................................................. 46

vi.    Undeliverable and Unclaimed Distributions ........................... 46

vii.    Compliance with Tax Requirements .................................... 46

viii.    No Payments of Fractional Dollars ..................................... 47

ix.    Interest on Claims .......................................................... 47

x.    No Distribution in Excess of Allowed Amount of Claim ............ 48

xi.    Setoff and Recoupment ................................................... 48

xii.    De Minimis Distributions ................................................ 48

xii.    Distributions in Satisfaction; Allocation ............................... 48

xiv.    No Distributions on Late-Filed Claims ................................ 48

E.    Disputed Claims ...................................................................... 49

i.    Resolution of Disputed Claims ......................................... 49

ii.    Objection Deadline ........................................................ 49

|      | iii. | Estimation of Claims..................................................................... | 49 |
|      | iv.  | No Distributions Pending Allowance; Disputed Claims Reserve............. | 49 |
| F.   |      | Treatment of Executory Contracts and Unexpired Leases ................................ | 50 |
|      | i.   | General Treatment: Rejected if not Previously Assumed....................... | 50 |
|      | ii.  | Bar to Claims Arising from Rejection, Termination or Expiration ......... | 50 |
| G.   |      | Conditions Precedent to the Effective Date ..................................... | 50 |
|      | i.   | Conditions Precedent ..................................................................... | 50 |
|      | ii.  | Waiver ......................................................................................... | 51 |
| H.   |      | Effect of Confirmation, Indemnity, Discharge, Exculpation and Injunction....... | 50 |
|      | i.   | Compromise and Settlement ........................................................... | 51 |
|      | ii.  | Vesting of Assets .......................................................................... | 51 |
|      | iii. | Title to Assets; Discharge of Liability ............................................ | 52 |
|      | iv.  | Binding Effect............................................................................... | 52 |
|      | v.   | Discharge of Claims....................................................................... | 52 |
|      | vi.  | Discharge of the Debtor ................................................................. | 52 |
|      | vii. | Exculpation by the Debtor and the Estate ........................................ | 53 |
|      | viii.| Limitations on Exculpation............................................................ | 53 |
|      | ix.  | Injunction..................................................................................... | 53 |
|      | x.   | Releases of Liens .......................................................................... | 54 |
| I.   |      | Retention of Jurisdiction ................................................................ | 55 |
| J.   |      | Miscellaneous Provisions................................................................ | 56 |
|      | i.   | Modification of Plan. ..................................................................... | 56 |
|      | ii.  | Revocation of Plan. ....................................................................... | 56 |
|      | iii. | Binding Effect............................................................................... | 56 |
|      | iv.  | Successors and Assigns................................................................... | 56 |
|      | v.   | Governing Law. ............................................................................. | 57 |
|      | vi.  | Reservation of Rights..................................................................... | 57 |
|      | vii. | Section 1125(e) Good Faith Compliance........................................... | 57 |
|      | viii.| Further Assurances........................................................................ | 57 |
|      | ix.  | Service of Documents. ................................................................... | 57 |
|      | x.   | Filing of Additional Documents. ..................................................... | 58 |
|      | xi.  | No Stay of Confirmation Order. ...................................................... | 58 |
|      | xii. | Bankruptcy Rule 9019 Request; Impact. ........................................... | 58 |

VI.     RISK FACTORS IN CONNECTION WITH THE PLAN ............................................. 58

    A.     Business Risk ....................................................................................................... 58

    B.     Bankruptcy Considerations. .................................................................................. 59

    C.     No Duty to Update Disclosures. ........................................................................... 59

    D.     Representations Outside this Disclosure Statement. .............................................. 59

    E.     No Admission. ...................................................................................................... 59

    F.     Tax and Other Related Considerations. ................................................................ 60

VII.    PLAN CONFIRMATION AND CONSUMMATION .................................................. 60

    A.     The Confirmation Hearing. ................................................................................... 60

    B.     Plan Confirmation Requirements Under the Bankruptcy Code. ........................... 60

        i.     Best Interests of Creditors. ........................................................................ 61

        ii.    Feasibility of the Plan. .............................................................................. 61

        iii.   Acceptance by Impaired Classes. .............................................................. 62

VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................................... 62

    A.     Chapter 7 Liquidation. ......................................................................................... 62

    B.     Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ...................... 62

    C.     Dismissal of the Debtor' Chapter 11 Case. .......................................................... 63

IX.     CERTAIN FEDERAL TAX CONSEQUENCES ....................................................... 63

    A.     General. ................................................................................................................ 63

X.      RECOMMENDATION AND CONCLUSION ............................................................ 64

## **EXHIBITS**

**Exhibit 1**     Second Amended Plan of Reorganization Proposed by Midtown Campus
Properties, LLC, dated November 7, 2021

**Exhibit 2**     Claims Register

**Exhibit 3**     Liquidation Analysis

## I.    <u>INTRODUCTION</u>

On May 8, 2020 (the "<u>Petition Date</u>"), Midtown Campus Properties, LLC (the "<u>Debtor</u>" or "<u>Midtown</u>"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as now in effect or as hereafter amended, the "<u>Bankruptcy Code</u>").

The Debtor submits this second amended disclosure statement (the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code and rule 3017 of the Federal Rules of Bankruptcy Procedure (as now in effect or as hereafter amended, the "Bankruptcy Rules"), in connection with the solicitation of votes on its *Second Amended Chapter 11 Plan of Reorganization Proposed by Midtown Campus Properties, LLC*, dated as of November 7, 2021 (the "<u>Plan</u>") and attached hereto as **Exhibit "A"** and incorporated herein by reference[2]. The Debtor believes that confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties.

This Disclosure Statement and the other documents described herein are being furnished by the Debtor to Creditors in the Debtor's Chapter 11 Case pending before the United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>"). This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtor's Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding: (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Debtor's Chapter 11 Case; (iv) the terms of the Plan; (v) the manner in which Distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN**.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements)

---

[2] Capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.

will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

A.    **Overview of Chapter 11 and the Plan Confirmation Process**.

Chapter 11 of the Bankruptcy Code allows the debtor to reorganize or to liquidate and wind up their affairs for the benefit of the debtor and its creditors.  Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, and the current owner(s) and management typically remain in control of the debtor as a debtor-in-possession.  The Debtor remains in possession of its property without the oversight of a trustee.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 case to negotiate the terms of a chapter 11 plan so that it may be confirmed.  A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

After a chapter 11 plan has been filed, the holders of impaired claims against the debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan.  This Disclosure Statement is presented to holders of Claims against the Debtor entitled to vote under section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

B.    **Plan Overview and Recommendation of the Debtor**.

The Debtor asserts that under the current circumstances of this Chapter 11 Case, including the Claim asserted by the Indenture Trustee through the Section 506(a) Pleadings, the Debtor has been compelled to proceed with a sale of the Project to maximize recoveries to the holders of Allowed Claims and Allowed Equity Interests.  As a result, as discussed in more detail below, the Plan contemplates the sale of the Project as the means for implementation of the Plan.

To that end, the Debtor engaged B. Riley as its real estate advisor, which engagement was approved by the Bankruptcy Court.  In connection therewith, B. Riley conducted (and continues to conduct) a marketing process for the sale of the Debtor's Project.  On or shortly after B. Riley established September 8, 2021 as a date for a "call for offers," the Debtor received at least four (4) offers for the purchase of the Project in excess of $100 million each.  After evaluating such offers

and negotiating with certain of the proposed purchasers, the Debtor ultimately selected the Stalking Horse Buyer as the "stalking horse" purchaser.  On November 4, 2021, the Debtor entered into the Purchase Agreement with the Stalking Horse Buyer for the sale of the Project at a purchase price equal to $104,100,000.  The due diligence period under the Purchase Agreement has expired and the Stalking Horse Buyer has made its good faith deposit thereunder.  In connection therewith, on November 5, 2021, the Debtor filed the Sale Motion seeking the expedited entry of the Bidding Procedures Order approving, among other things, (i) certain bidding procedures for the solicitation of higher and/or better offers for the sale of the Project, including setting an auction, if applicable, and a hearing on the approval of the sale thereof, (ii) the Purchase Agreement, (iii) certain bid protections to the Stalking Horse Buyer, and (iv) the sale of the Project free and clear of all liens, claims, encumbrances and interests under sections 363 and 365 of the Bankruptcy Code to the highest and/or best bidder therefor.  As set forth in the Plan, the Debtor intends to seek approval of the sale of the Project under and through the Plan and the Sale Motion.  Notwithstanding, the Debtor, through B. Riley, is also continuing to market the Project to other interested buyers and is continuing to provide due diligence in connection therewith and as provided in the Bidding Procedures Order.

**Notwithstanding anything herein to the contrary, the proposed sale of the Project as set forth in the Sale Motion and herein shall be done in connection with and as part of the implementation of the Plan for all purposes, including specifically Section 1146(a) of the Bankruptcy Code.  In fact, the Effective Date of the Plan is conditioned on the sale of the Project and occurs simultaneously with the Sale Closing Date.**

In the event the Bankruptcy Court approves the sale of the Project pursuant to the Sale Motion, then Distributions to the holders of Allowed Claims and Equity Interests shall be made from Available Cash, including specifically the Net Sales Proceeds from the sale of the Project.  However, as outlined in the Liquidation Analysis attached hereto as Exhibit 3, the ultimate amount of Distributions to holders of Allowed Claims and Allowed Equity Interests will be principally dependent on the outcome of the Claims objection process currently before the Bankruptcy Court.  Among other things, the outcome of the Debtor's objection to the Claim of the Indenture Trustee in connection with the Adversary and the Section 506(b) Pleadings will determine whether or not all Creditors with Allowed Claims will be paid in full, together with a Distribution to the holders of Equity Interests.

Specifically, if the Bankruptcy Court sustains the Debtor's objections to the Indenture Trustee's Claim, then as set forth in the Liquidation Analysis, if the sale of the Project is approved by the Bankruptcy Court and thereafter consummated, such sale will generate Net Sales Proceeds sufficient to pay in full the expected amount of all Allowed Administrative Claims, Professional Claims, Allowed Priority Tax Claims, the DIP Loans and all Allowed Claims in Classes 1, 2, 3 and 4 under the Plan, and return monies to the holders of the Equity Interests.  If the Bankruptcy Court overrules the Debtor's objections to the Indenture Trustee's Claim, then as set forth in the Liquidation Analysis, Distributions to Creditors with Allowed Claims (and holders of Administrative Claims) other than the Priming DIP Lender and the Indenture Trustee will be substantially and adversely impacted, and in many cases eliminated.  Moreover, there will be no Distribution to the holders of Equity Interests under that scenario.

The following is a brief overview of the Plan and is qualified by reference to the Plan itself.

**C.    Summary of Voting Requirements for Plan Confirmation**.

**1.    In General.**

Creditors should refer only to this Disclosure Statement and the Plan and any Court approved solicitations to determine whether to vote to accept or reject the Plan.  Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof, or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.**

Pursuant to the Bankruptcy Code, only creditors who actually vote on each Plan will be counted for purposes of determining whether the required number of acceptances have been obtained for each such Plan.  Failure to deliver a properly completed ballot by the Voting Deadline (as defined herein) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

**2.    Unimpaired and Impaired Classes Under the Plan.**

The Claims in each of Class 1 (Other Priority Claims), Class 2 (Secured Claim), Class 3 (Other Secured Claims), and Class 5 (Equity Interests) are Unimpaired and therefore the holders of Claims in those Classes are not entitled to vote to accept or reject the Plan, but rather are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.  The Claims in Class 4 (General Unsecured Claims) are Impaired under the Plan and therefore the holders of such Claims shall have the right to vote on the Plan.

**3.    Acceptance by Class of Claims and Equity Interests.**

Under the Bankruptcy Code, an Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class.  For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of such claim

shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

A class of equity interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of equity interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Pursuant to Section 1126(f) of the Bankruptcy Code, holders of Allowed Claims and Equity Interests who are Unimpaired under the Plan are deemed to have accepted the Plan.  As a result, the Debtor is not required to solicit any votes on the Plan.

**4.      Nonconsensual Confirmation.**

In the event that any Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan. The Debtor shall exercise the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

**5.      Voting Deadline.**

If a Creditor holds a Claim classified in a voting Class of Claims under a Plan, the Creditor's acceptance or rejection of such Plan is important and must be in writing and submitted on time.  The voting deadline is _____2021 at 5:00 pm (Eastern Time)(the "**Voting Deadline**").

**6.      Voting Instructions**.

**IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED TO THE CLERK OF THE COURT OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION) BY THE VOTING DEADLINE AT THE ADDRESS PRINTED ON THE BALLOT.**

**7.      Additional Information.**

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, (iii) the amount of your Claim, (iv) obtaining or replacing a Ballot, or (v) obtaining an additional copy of any Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Debtor's counsel, Genovese Joblove & Battista, P.A., 100 S.E. Second Street, 44th Floor, Miami, FL 33131, Attn: Paul J. Battista, Esq., email: pbnattista@gjb-law.com and Mariaelena Gayo-Guitian Esq. mguitian@gjb-law.com.

## II.    BACKGROUND INFORMATION

### A.    Overview of the Debtor's Business.

Pursuant to the terms of a 99-year ground lease, the Debtor owns a certain 500,000 square foot mixed-use student housing project known as One College Park ("Project") and located on a 2.0-acre site at 104 Northwest 17th Street, Gainesville, FL 32603 close to the University of Florida campus and Ben Hill Griffin Stadium.  The Project (i) consists of a 6-story, multi-use building with a rectangular shape that wraps around a 7.5-level parking garage, and (ii) when complete will have 310 apartment units (589-beds consisting of studios, and each of one, two, three, and four bedrooms), 289 parking spaces for monthly rental for tenants and an additional 250 spaces used for public parking, 14 scooter spaces, 260 bicycle spaces, and 15,000 square feet of commercial retail space and related facilities on its bottom floor. The Project is being marketed as mid-priced luxury apartments primarily for college students.



### B.    Construction of the Project

In 2016, Midtown began the development and construction of the Project. The Debtor initially engaged Bradenton Cove Construction, LLC ("BCC") as the general contractor for the Project.  BCC was later replaced by Sauer Incorporated ("Sauer") as completion contractor in August 2017.   In connection therewith, Sauer posted a $31 million dollar payment and performance bond (the "Sauer Bond") as the completion contractor.   Originally, Phase 1 of the Project was to be completed by January 1, 2019 and Phase 2 in August of 2020.  Unfortunately, the Project suffered from certain delays, including due to extreme weather conditions, such as Hurricane Irma and labor shortages associated therewith, as well as disputes with Sauer related to various unauthorized change orders, cost overruns, depletion of construction funds and construction delays, all of which is the subject matter of pending litigation between the Debtor and Sauer described in more detail below.

In January 2019, in order to pay the extra costs for delays, contractor change orders, cost overruns, and other miscellaneous items associated the Project, the Debtor financed (and partly refinanced) construction with proceeds from the issuance of $77,820,000 in Bonds (described in more detail below).  A short year later, in March of 2020, the worldwide pandemic resulting from

the spread of the Coronavirus (COVID-19) further delayed construction and completion of the Project and adversely affected the potential for leasing the Project during the Fall of 2020 due to the uncertainty surrounding the re-opening of the University of Florida.  In order to deal with the foregoing delays and costs overruns, the Debtor filed this Chapter 11 Case and immediately began working to obtain the required funds to complete construction of Project and thereby preserve its assets for the benefit of all stakeholders, including the secured and unsecured creditors and equity holders.

By the filing the Chapter 11 Case, the Debtor was able to obtain the funding it needed under that certain debtor-in-possession loan from BMI Financial Group, Inc. (the "Junior DIP Lender") in the amount of $5,200,000 pursuant to the terms of the Junior DIP Loan Order (defined below) to continue construction of the Project.

On June 26, 2020, the Debtor's architect, PGAL (Pierce Goodwin Alexander & Linville), Inc., issued  a letter certifying that sufficient cause existed for the Debtor to terminate Sauer pursuant to AIA A201 Section 14.2 of Sauer's Contract.  As a result,  on June 27, 2020, the Debtor served on Sauer a formal Notice of Intent to Terminate Sauer's Contract for Cause pursuant to AIA A201 §14.2.2 (the "Notice to Terminate").  Sauer disputes the Debtor's contention that cause existed for the Debtor to terminate Sauer, and Sauer contends that the Debtor wrongfully terminated Sauer and Sauer's contract with the Debtor.  Pursuant to the Notice to Terminate, upon the expiration of seven (7) days after the date thereof, the Debtor was able to proceed with a termination of the Sauer Contract.  On June 20, 2020, the Debtor entered into a Construction Management Agreement with Globe Construction Services Company ("Globe") to complete construction of the Project

After Sauer's termination, the Debtor successfully obtained a temporary certificate of occupancy ("TCO") for Phase 1A of the Project on July 31, 2020, which enabled the Debtor to open 170 beds for lease. As of the commencement of the Fall 2020 semester, the Debtor had rented approximately 75 beds to students at the University of Florida.  Thereafter, the Debtor completed construction of Phase 2A of the Project and successfully obtained the TCO for Phase 2A on October 2, 2020, which added another 129 beds (plus two study halls) for lease in addition to the 170 beds available in Phase 1A.

Notwithstanding the progress made by the Debtor during the early part of 2020, the delays caused by the termination of Sauer, the issues with the Project that were unknown to the Debtor prior to the termination of Sauer and the lingering effects of the pandemic continued to plague the Project.  For these reasons and others, the Junior DIP Loan was not sufficient to complete construction of the Property.  As result, on November 4, 2020, the Debtor sought approval from the Bankruptcy Court to borrow an additional $7,400,000 in debtor-in-possession financing from the Priming DIP Lender (defined below) to fund hard and softs costs to complete the Project as contemplated by the Estimated Revised Cost to Complete dated December 10, 2020 (as defined below) which financing was conditioned on a first priority priming lien being granted to the Priming DIP Lender.

In connection with the foregoing, the Bankruptcy Court held an evidentiary hearing on the Priming DIP Loan on December 11, 2020, at which the Debtor presented expert appraisal evidence that the Project had (i) a Market Value As-Is on November 20, 2020 equal to $74,900,000, (ii) a

Prospective Value Upon Completion as of April 1, 2021 equal to $99,400,000, and (iii) a Prospective Value Upon Stabilization equal to $108,200,000.

Pre-petition, the construction of the parking garage was completed, a TCO was obtained for the garage on May 24, 2019 and the garage is fully operational. As set forth above, despite severe labor and material shortages and related cost increases impacting the entire construction industry due to the COVID pandemic, the Debtor continued construction at the Project and received TCOs for Phases 1A and 2A of the Project on July 31, 2020 and October 2, 2020, respectively, for a total of 299 beds (plus two study halls). Thereafter, on July 31, 2021, the Debtor completed construction of another 150 beds and obtained yet another TCO, bringing the total to 449 beds available to be leased for the Fall 2021 term to start on August 15, 2021. On September 24, 2021, the Debtor obtained yet another TCO for an additional 33 beds at the Project, bringing the total available beds to 482. On October 14, 2021, the Debtor obtained yet another TCO for an additional 12 beds at the Project, bringing the total available beds to 494. The Debtor anticipates obtaining a final certificate of occupancy for the Project, including the remaining 95 beds in November 2021.

Notwithstanding the successes achieved by the Debtor under very difficult circumstances, on April 8, 2021, U.S. Bank filed a *Motion to Set Status Conference* ("Status Motion") [ECF No. 362] and without seeking any relief raised a number of issues and criticisms concerning the Debtor's progress with construction of the Project. On April 27, 2021 the Debtor filed *Debtor's Response to Motion of U.S. Bank, As Indenture Trustee, to Set Status Conference* [ECF No. 374] and provided a detail response to each of the allegations raised by U.S. Bank in its Status Motion. On May 3, 2021, the Bankruptcy Court entered an *Order Setting Further Status Conference and Filing Deadline* [ECF No. 381] scheduling a further Status Conference on May 27, 2021. On May 24, 2021, U.S. Bank filed the *Statement of U.S. Bank, As Indenture Trustee, In Connection with Its Motion for a Status Conference* ("U.S. Bank's Statement")[ECF No. 387]. On May 26, 2021, the Debtor filed a *Response to U.S. Bank's Statement* [ECF No. 389] and once again addressed and responded in detail to the issues raised in U.S. Bank's Statement in connection with the Debtor's progress of construction at the Project. No relief nor action was requested U.S. Bank at either Status Conference or ordered by the Bankruptcy Court.

### C.    Management of the Project – Asset Campus USA, LLC

On January 18, 2019, the Debtor and Asset Campus USA, LLC ("Asset" or "Management Company") entered into a Management Agreement ("Management Agreement") whereby Asset provides certain services, including, among others, on-site personnel, leasing, maintenance and capital improvements in accordance with an operating budget, preparation of monthly operating budgets, and advertising (collectively, the "Services"). The Debtor pays a flat monthly management fee of $8,500, plus other reimbursable expenses to the Management Company. The Management Agreement is for a term of 3 years and is subject to assumption or rejection by the Debtor.

### D.    The Debtor's Corporate Structure.

Mr. Oscar Roger, Sr. is the Manager of the Debtor, having served in such capacity since 2015. Mr. Roger is also the President and CEO of Roger Development Group, Inc. ("Roger

Development"), a 2nd generation, family owned business that has been in real estate development since 1955, serving Coral Gables, Miami, South Beach, Gainesville, Orlando and other parts of Florida. Roger Development is a multifaceted real estate firm specializing in housing and development. Roger Development has developed, approximately 10 million square feet of residential/mixed use space, including creating and assembling value added zoning of over 1,500 units in Miami-Dade County. Roger Development manages the business affairs of Midtown and the development of the Project under Mr. Roger's direction through a team of approximately seven (7) full-time employees. As of the Petition Date, Midtown did not have any independent employees and instead relied on the management team at Roger Development. Post-petition, Roger Development has continued to perform these tasks.

### E. Prepetition Capital Structure.

(i)      99- year Ground Lease with St. Augustine Parish Land, LLC

The land underlying the Project is subject to a certain 99-year Ground Lease, dated as of April 11, 2008,[3] by and between College Park Group, LLC and St. Augustine Parish Land, LLC. ("SAPL" or "Ground Lessor"), which Ground Lease was amended by that certain Amendment to Ground Lease dated July 28, 2010; by that certain Second Amendment to Ground Lease dated January 15, 2013; by that certain Third Amendment to Ground Lease dated May 10, 2013; by that certain Fourth Amendment to Ground Lease dated October 23, 2014; by that certain Fifth Amendment to Ground Lease dated April 17, 2015; by that certain Sixth Amendment to Ground Lease dated October 5, 2016; by that certain Seventh Amendment dated October 2, 2017;  by that certain Eighth Amendment dated July 10, 2018; and by that certain Ninth Amendment dated January 29, 2019 (collectively "Ground Lease").  The Ground Lease was assigned to the Debtor pursuant to that certain Assignment and Assumption of Ground Lease by and between College Park Group, LLC and Midtown Campus Properties, LLC, which assignment was recorded on September 18, 2015, in Official Records for Alachua County, Florida, Book 4379/Page 1943.  The Ground Lease provides for a term of 99 years commencing on April 11, 2008.

As described in more detail below, on August 31, 2020, the Debtor filed the *Lease Assumption Motion* to assume the Ground Lease with SAPL [ECF No. 181] which was approved by Order of the Bankruptcy Court dated September 17, 2020 [ECF No. 200].

(ii)      Prepetition Bond Debt

The Project was financed (and partly refinanced) in January 2019 from the proceeds of the issuance of $77,820,000 in Florida Development Finance Corporation Student Housing Revenue Bonds (Midtown Campus Properties, LLC Student Housing Project) Series 2019 (Taxable) (the "Bonds") pursuant to the terms of a certain Trust Indenture between the Florida Development Finance Corporation ("FDFC" or "Issuer") and U.S. Bank National Association, as indenture trustee (the "Indenture Trustee"), dated as of January 31, 2019 (the "Indenture").   In connection

---

[3] A Memorandum of 99 Year Ground Lease dated April 11, 2008, by and between College Park Group, LLC and St. Augustine Parish Land, LLC, was recorded in Official Records for Alachua County, Florida, Book 3803/Page 1039 to provide notice of the existence of the Ground Lease.

therewith, FDFC loaned the proceeds of the Bonds to Midtown pursuant to the terms of that certain Loan Agreement ("Loan Agreement"), dated as of January 1, 2019.

In connection with the financing of the Project, the Debtor also executed a Promissory Note in the original principal amount of $77,820,000, dated January 31, 2019 (the "Note"), payable to the order of FDFC in order to evidence its obligations to repay the loan evidenced by the Note (the "Loan"). The Bonds are secured by that certain Leasehold Mortgage, Assignment of Leases, Security Agreement and Fixture Filing, dated as of January 1, 2019, from the Debtor, as mortgagor, to U.S. Bank, as mortgagee (the "Leasehold Mortgage"). The Bonds, the Loan Agreement, the Indenture, the Leasehold Mortgage and all documents executed in connection therewith are referred to herein as the "Indenture Documents." As described in more detail in Section IV(B) below, the Debtor has objected to the Claim of the Indenture Trustee, including pursuant to the Adversary and the Section 506(b) Pleadings. As discussed above, the outcome of the Debtor's objection to the Indenture Trustee's Claim will dictate whether and to what extent Distributions will be made to the holders of Allowed Claims and Allowed Equity Interests.

F.      **Pending Litigation**

As of the Petition Date, the Debtor was involved in the following pre-petition litigation:

(i) *Midtown Campus Properties, LLC v. Roger Benedeti, Pedreiras, Inc. and Federal Insurance Company* (Case No. 50-2019-CA-000768) filed in the Circuit Court, Palm Beach County, Florida on January 18, 2019. On August 14, 2020, the Circuit Court entered an *Agreed Order* Substituting Party Plaintiff Action Labor of Florida, LLC for Midtown Campus Properties as Plaintiff in the case.

(ii)      *Pedreiras, Inc. v. Midtown Campus Properties, LLC, Oscar Roger and Federal Insurance Company,* Case No: 2019-021551-CA-01 filed on July 22, 2019, in the Circuit Court of the Eleventh Judicial Circuit In Miami-Dade County, Florida. On October 1, 2019, Pedreiras filed an *Amended Complaint* seeking relief only against Defendant, Federal Insurance Company ("FIC"). On October 11, 2019, FIC moved to dismiss the Amended Complaint on the grounds that venue was not proper in Miami-Dade County. On November 8, 2020, the Court entered an Order Granting Motion to Transfer Venue and transferred the case to the Circuit Court of the Fourth Judicial Circuit In and For Duval County, Florida ("Venue Order"). On December 7, 2020 Pedreiras filed a *Notice of Appeal* of the Venue Order for *Pedreiras, Inc. v. Federal Insurance Company, et al;* Florida Third District Court of Appeals, Case No. 3D20-1825.

(iii)      *Johns Creek Remodeling LLC v. Midtown Campus Properties, LLC*, Case No. 01-2020-CA-002097 filed on August 6, 2020, pending in the Circuit Court of the Eighth Judicial Circuit In and For Alachua County, Florida. The Debtor filed a Suggestion of Bankruptcy on January 8, 2021 and on January 19, 2021, the Circuit Court entered a *Report and Recommendation of General Magistrate Order Inactivating Case.*

G.      **Assets and Claims.**

On the Petition Date, the Debtor reported in its *Summary of Assets and Liabilities for Non-Individuals* [ECF No. 5] assets totaling approximately $143,074,164.28, and liabilities totaling approximately $78,640,983.37.

Pursuant to the Bar Date Order, a number of parties filed Proofs of Claim, which are set forth in more detail in Exhibit "2" attached hereto. A total of six (6) secured claims were filed totaling in excess of $83,894,503. As of the date hereof, the Debtor has filed Objections to the Secured Claims asserted by (i) Sauer (POC #7), and (ii) U.S. Bank, as Indenture (POC #3) as described in more detail below. Additionally, a total of seven (7) unsecured proof of claims were filed totaling in excess of $65,188,930. However, included in that amount is a claim asserted by Federal Insurance Company ("FIC")(POC #6) in the amount of $60,948,703.57, which Claim is disputed, and is the subject matter of the pending Sauer Litigation before the Bankruptcy Court. The Debtor asserts that there is no legal or factual basis for the Claim asserted by FIC and intends to file an Objection in connection therewith. Further, the Debtor is in the process of reviewing the balance of the Proofs of Claim filed and expects to file additional objections as noted in Exhibit "2."

On October 21, 2020, Creditor, American Structural Concrete LLC f/k/a Southern Pan Structures, LLC ("ASC") filed *a Motion for Leave to File a Late Proof of Claim and To Deem Proof of Claim Timely Filed* [ECF 233]. On November 6, 2020, the Bankruptcy Court entered an *Agreed Order* deeming Claim No. 9 as timely filed in the amount of $255,517.47 [ECF No. 250].

On November 12, 2020, Sims Crane and Equipment Co.'s filed a *Motion to Enlarge Time to File Proof of Claim and to Deem Proof of Claim Timely Filed* [ECF No. 259]. On December 21, 2020, the Bankruptcy Court entered an *Order Granting Sims Crane and Equipment Co.'s Motion* and deemed its Proof of Claim 11-1, which was filed on November 11, 2020, as timely [ECF No. 298].

### H.    Leasing of the Project.

As set forth above, as of the start of the Fall 2020 semester, the Debtor had leased approximately 75 beds to students at the University of Florida. However, leading up to the beginning of the Fall 2021 semester at the University of Florida, the Debtor, working closing with its management company, Asset Campus, was aggressively leasing the Project, ultimately entering into 432 leases with students for the Fall/Spring 2021 school term. From and after August 2021, the Project generates monthly gross revenue of approximately $475,000 and monthly net rental income of approximately $320,000.

### III.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE

As disclosed in the Chapter 11 Case Management Summary filed by the Debtor on May 13, 2020 [ECF No. 11], the Debtor's chapter 11 bankruptcy filing was precipitated by a combination of factors, including, among others, (i) delays due to Hurricane Irma and labor shortages associated therewith, (ii) disputes with its general contractor, Sauer, related to various unauthorized change orders, cost overruns, depletion of construction funds and construction delays, and (iii) most recently, the worldwide pandemic resulting from the spread of the Coronavirus (COVID-19), which has caused construction delays, shortage of labor and materials

and uncertainty as to the prospect of leasing the Project to students based on whether the University of Florida would reopen in the Fall of 2020. In fact, because of COVID-19, the Project had to be closed down for a period of 2 ½ weeks in early 2020 in order to follow prescribed guidelines.

Based on the above unprecedented circumstances and the disputes with Sauer, the Debtor determined that the filing of a Chapter 11 bankruptcy was in the best interests of the Project and all of its stakeholders. The Debtor sought bankruptcy relief and the Chapter 11 process (i) to provide the necessary breathing room that it needed to weather the economic storm caused by the Coronavirus pandemic, (ii) to complete construction of the Project using the proceeds from the Junior DIP Loan and Secured Priming DIP Loan, (iii) to stabilize the Project based on the expectation that students will return to the University of Florida in the Fall of 2020-2021, (iv) to address its disputes with Sauer and Bondholders, and (v) to emerge from Chapter 11.

## IV.    EVENTS OCCURRING DURING DEBTOR' S CHAPTER 11 CASE

### A.    Bankruptcy Filings and First Day Orders and Other Matters.

On the Petition Date, the Debtor filed a Voluntary Petition for relief under chapter 11 of the United States Bankruptcy Code [ECF No. 1]. The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### (i)    Retention and Employment of Professionals

On the Petition Date, the Debtor filed *Debtor's Expedited Application for Authority to Employ and Retain, on an Interim and Final Basis, Paul J. Battista and The Law Firm of Genovese Joblove & Battista, P.A. As General Bankruptcy Counsel for Debtor-in-Possession Effective as of May 8, 2020* [ECF No. 16], which was approved on an interim basis on May 26, 2020 [ECF No. 43], and on an final basis on June 17, 2020 [ECF No. 85]. The Debtor retained Paul J. Battista and the law firm of Genovese, Joblove & Battista, P.A. to act as its general bankruptcy counsel in this Chapter 11 Case.

On the Petition Date, the Debtor filed *Debtor's Expedited Application for Authority to Employ and Retain, on an Interim and Final Basis, Soneet R. Kapila and The Accounting Firm of KapilaMukamal, LLC As Financial Advisors To The Debtor-in-Possession Effective as of May 8, 2020* [ECF No. 17], which was approved on an interim basis on May 26, 2020 [ECF No. 44], and on a final basis on June 17, 2020 [ECF No. 84]. The Debtor retained Soneet R. Kapila and the accounting firm of KapilaMukamal, LLP as financial advisors to the Debtor.

On the Petition Date, the Debtor filed *Debtor's Expedited Application for Authority to Employ and Retain, on an Interim and Final Basis, William H. Strop and The Law Firm of Becker & Poliakoff As Special Construction Counsel Pursuant to Sections 327(E ), and 328 (A) of the Bankruptcy Code Effective as of May 8, 2020* [ECF No. 18], which was approved on an interim basis on May 26, 2020 [ECF No. 45], and on a final basis on  June 17, 2020 [ECF No. 83]. The Debtor retained William H. Strop and the law firm of Becker & Poliakoff as its special construction litigation counsel to continue representing the Debtor with respect to certain pending state court litigation and various contract negotiations and disputes among the Debtor and Sauer,

subcontractors, suppliers, design professionals, insurance companies, and other entities related to the construction of the Project.

On June 23, 2020, the Debtor filed *Debtor's Expedited Motion Seeking to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of Business Effective as of May 8, 2020* ("OCP Motion") [ ECF No. 93] seeking to employ certain professionals to perform a variety of non-bankruptcy services during this Chapter 11 Case, including related to (i) general non-bankruptcy corporate and real estate matters, (ii) land use, planned development plan approval, permitting and project coordination with the City of Gainesville, (ii) project based bookkeeping, invoicing, accounting and tax services, (iii) construction management and consulting, and (iv) engineering services. The OCP Motion was granted on July 20, 2020 [ECF No. 128].   In connection with the foregoing, the Debtor retained the services of C. David Coffey and Richard A. Slider, Slider Engineering Group, Inc., as ordinary course professionals.

On July 22, 2020, the Debtor filed *Debtor's Expedited Application for Authority to Retain Maria B. Bosch, CFCC, CCP, PSP And The Bosch Group, Inc., As Construction Consultants To The Debtor-In-Possession Effective As Of May 8, 2020* [ECF No. 131] seeking the employment and retention of Maria B. Bosch, CFCC, CCP, PSP ("Bosch") and The Bosch Group, Inc. ("TBG") to serve as construction consultants to the Debtor.  The Bosch application was approved by the Bankruptcy Court on July 28, 2020 [ECF No. 151].  For unforeseen, personal health reasons, Maria B. Bosch and The Bosch Group resigned from employment as construction consultant to the Debtor in January 2021.  The Debtor will be seeking to retain Darlene Roman-Rossy, MSCM ("DRR") to serve as construction consultant to the Debtor during the remainder of the case to assist with pending litigation against Sauer and other construction related issues.

On September 14, 2020, the Debtor filed *Debtor's Application For Authority To Retain, Rafael A. Espinosa And The Accounting Firm Of Garcia, Espinosa, Miyares, Rodriguez, Trueba & Company, LLP, As Financial Accountants To The Debtor-In-Possession Effective As Of May 8, 2020* [ECF No. 205] seeking the employment of GEMRTC as financial accountants to the Debtor which Application was approved by the Bankruptcy Court on October 2, 2020 [ECF No. 222].

**(ii)    Schedules and Statement of Financial Affairs**

On June 8, 2020, the Debtor filed its Initial Schedules and Statement of Financial Affairs [ECF No. 70] as Amended (Attachments Only) [ECF No. 71].  On October 6, 2020, the Debtor filed Amended Schedules and Statement of Financial Affairs [ECF No. 228].

**(iii)    Debtor-In-Possession Monthly Reports**

The Debtor has filed all of its monthly operating reports and is current in connection therewith as of the filing of this Disclosure Statement.

**(iv)    Cash Management Motion**

On May 15, 2020, as part of its First Day Motions, the Debtor filed *Debtor's Emergency Motion For Entry of Interim and Final Orders (I) Authorizing Maintenance of Certain Existing*

*Bank Accounts and Cash Management System (II) Waiving Certain U.S. Trustee Requirements In Connection Therewith (III) Extension Of Time To Comply With The Investment Guidelines Of Section 345(B) And (Iv) Granting Related Relief* [ECF No. 19]("Cash Management Motion").

In connection with the foregoing, on May 19, 2020, Sauer Incorporated filed a *Limited Objection to the Cash Management Motion* [ECF No. 35] and *U.S. Bank National Association, as Trustee under Trust Indenture dated January 1, 2019, Florida Development Finance Corporation filed an Objection to the Cash Management Motion* [ECF No. 36] and *Memorandum of Law* [ECF No. 79]. The Bankruptcy Court held an initial hearing on the Cash Management Motion on May 20, 2020 and thereafter entered its *Interim Order (I) Authorizing Maintenance of Certain Existing Bank Accounts And Cash Management System (II) Waiving Certain U.S. Trustee Requirements In Connection Therewith (III)Extension of Time To Comply With the Investment Guidelines of Section 345(b) (IV) Granting Related Relief And (V) Setting Final Hearing* (the "First Interim Order") [ECF No. 52]; a *Second Interim Order* on June 18, 2020 [ECF No. 87] and *Third Interim Order* on July 10, 2020 [ECF No. 110]. On August 20, 2020, a *Final Order (I) Authorizing Maintenance of Certain Existing Bank Accounts and Cash Management System (II) Waiving Certain U.S. Trustee Requirements In Connection Therewith (III) Extending Time To Comply With 11 U.S.C. §345 Investment Guidelines And (IV) Granting Related Relief* [ECF No. 182] ("Final Order") was entered. Pursuant to the Final Order, the Debtor was allowed to maintain sixteen (16) restricted reserve accounts at U.S. Bank (the "("Indenture Trustee Accounts") in accordance with the terms of the Indenture (as defined herein).

In addition to the Indenture Trustee Accounts, the Debtor also maintains an operating account at U.S. Bank titled: *Midtown Apartments UF – Account ending 8053* ("UF Operating Account") which was set up to receive the rental income from its student tenants. Roughly 70-80% of the tenants pay their rent through auto-draft, which is currently set up to be deposited into the UF Operating Account. For those tenants who do not use auto-draft, they have the ability to pay their rent via check or via credit card (if paid via credit card these funds also go directly into the UF Operating Account).

On September 30, 2020, the Debtor filed *Debtor's Motion for Entry of Order (I) Authorizing Maintenance of Existing Bank Account at U.S. Bank National Association for Collection of Rents (II) Waiving Certain U.S. Trustee Requirements In Connection Therewith and (III) Granting Related Relief* [ECF No. 212]. On October 2, 2020, the Bankruptcy Court entered an Order [ECF No.223] authorizing the Debtor to continue to use, with the same account number, the UF Operating Account at U.S. Bank for the sole purpose of receiving the rents and thereafter sweeping such rents into the newly opened DIP Account at Valley National Bank (an Authorized Depository), Account ending in 0946, in order to fund the monthly operating expenses associated with the operation of the Project.

**(v)    Relief From the Automatic Stay Motions**

On June 4, 2020, Sauer Incorporated filed its *Emergency Motion to Set Expedited Deadline for Debtor to Assume or Reject its Executory Contract, or in the alternative Motion for Relief from Stay to Exercise its Contractual Rights* [ECF No. 60] (the "Sauer Stay Relief Motion"). On June 11, 2020, the Debtor filed *Debtor's Response and Objection to the Sauer Motion* [ECF NO. 76].

On June 15, 2020, the Bankruptcy Court entered its *Order Granting In Part Sauer's Motion to Set Deadline or Alternatively, To Grant Stay Relief* ("Stay Relief Order") [ECF No. 81], pursuant to which, among other things, the Bankruptcy Court set a deadline of June 29, 2020 for the Debtor to assert and/or exercise any and all of its rights and remedies against Sauer, including under the Sauer Contract and Sauer's Bond. The Stay Relief Order also directed Sauer to cooperate in the transition of the Project by providing, among other things, copies of subcontracts, keys, permits, and other information reasonably requested by the Debtor.

On July 10, 2020, Asset Campus USA, LLC filed an *Emergency Motion to set Deadline For Debtor to Assume or Reject its Executory Contract or, in the Alternative for Relief* [ECF No. 108], which Motion was continued by agreement of the parties several times and ultimately the Bankruptcy Court entered an Order reserving ruling on the Motion until further notice [ECF No. 221].

On July 14, 2020, *Johns Creek Remodeling, LLC filed a Motion for Relief from Stay* [ECF No. 118]. On July 23, 2020, the Debtor filed its *Opposition Response to the Johns Creek Stay Relief Motion* [ECF No. 138]. On July 28, 2020, the Bankruptcy Court entered an *Order Granting Limited Stay Relief to Johns Creek Remodeling, LLC* [ECF No. 149] and granted limited relief from stay to John Creek to file and serve a state court complaint against the Debtor to enforce the lien it filed against the Debtor and thereafter the state court case will be stayed.

On February 10, 2021, Sauer filed a *Motion for Clarification As to the Applicability of Automatic Stay to State Court Action Against Non-Debtor Third Parties, Or In the Alternative, If the Automatic Stay Applies, For Relief From the Automatic Stay* [ECF No. 322] which is described in more detail below.

On March 24, 2021, Creditor FCCI Insurance Company filed a *Motion for Relief from Stay* [ECF No. 354] in this case pursuant to 11 U.S.C. §362(d)(1) for the limited purpose of allowing FCCI and/or LP Construction, Inc. ("LP") to file suit in Florida state court to foreclose on a properly recorded lien on property held by the Debtor, Midtown Campus Properties, LLC, and to thereafter file a notice of *lis pendens*. On April 13, 2021, the Debtor filed its *Objection to the Stay Relief Motion* [ECF No. 368]. On April 15, 2021, the Bankruptcy Court entered the *Agreed Order Denying Motion For Relief From Stay by Creditor FCCI Insurance Company* [ECF No. 371] on the basis that pursuant to and in accordance with Section 108(c) of the Bankruptcy Code, any rights that FCCI has to commence a foreclosure action under Section 713.22 Florida Statutes based on a claim of lien against the Debtor's property are preserved and extended until 30 days after termination of the automatic stay pursuant to Section 362(c)(2).

On September 2, 2021, 305 Power Corp. filed a *Motion for Relief from the Automatic Stay* [ECF No. 479] seeking relief from stay to pursue a lawsuit in state court to collect on amounts allegedly owed to 305 Power Corp. On October 13, 2021, the Debtor filed its *Response and Objection to the Motion for Stay Relief* [ECF No. 493]. On November 3, 2021, the Bankruptcy Court entered an Order denying such motion [ECF No. 507].

**(vi)     Critical Vendor Motion**

On July 1, 2020, the Debtor filed *Debtor's Expedited Motion for Entry of An Order Authorizing the Debtor to Pay Certain Prepetition Obligations To Certain Subcontractors and Lessors As Critical Vendor Claims* [ECF No. 96] ("Critical Vendor Motion") as Supplemented on July 8, 2020 [ECF No. 100]. On July 7, 2020, Sauer filed a Limited Response [ECF No. 99].

As a part of the transition after the termination of Sauer as the general contractor, the Debtor contacted a few subcontractors that the Debtor urgently needed to continue on the Project to try to negotiate new arrangements with such subcontractors to continue and complete work at the Project. At the same time, the Debtor was discussing with Sauer the issues surrounding the assignment of various subcontracts by Sauer to the Debtor, which assignment is provided for under the Sauer Contract. As a result, the Debtor negotiated arrangements with several of the subcontractors to continue on the Project, including the payment of certain prepetition obligations and negotiated an assignment of the retainage monies held with the Escrow Agent at Bank of America pursuant to that Escrow Agreement dated January 31, 2019 executed by the Debtor, Sauer and Fidelity Title Insurance Company as Escrow Agent. Additionally, the Debtor sought authority to pay Southern Furniture the sum of $28,768.88 for certain prepetition damage claims asserted by Southern to the leased furniture.

On July 13, 2020, the Bankruptcy Court enter an *Order Granting the Critical Vendor Motion and Supplement* [ECF No. 111] and authorized, but did not direct, the Debtor to pay the pre-petition obligations to each of Hicks Asphalt Paving & Concrete, One Stop Painting and Flooring, Inc., Door One USA, Brooks Building Solutions, Ultra Low Temp, Inc., Wayne Automatic Fire Sprinklers, Inc., and JSC Systems and Southern Furniture Leasing, Inc. (collectively, the "Critical Vendors"). Ultimately, the Debtor reached agreements with Hicks, Wayne, JSC, and One Stop and paid at total of $344,591.63 ("Critical Vendor Payments")[4] to the Critical Vendors to complete the scope of work under each of the Subcontracts. In connection with the foregoing agreements, the Debtor obtained an assignment of the retainage amounts held with the Escrow Agent pursuant to the Escrow Agreement in the amount of $124,002.03 ("Retainage")(as described in more detail below).

On May 20, 2021, the Debtor filed an *Ex-Parte Motion for Payment of Prepetition Obligations to Traffic2Revenue, Inc.* as a critical vendor [ECF No. 384] seeking authority to pay Traffic2Revenue in connection with the Debtor's listing of the Project on SwampRentals.com. On May 21, 2021, the Bankruptcy Court entered the *Agreed Ex-Parte Order Granting Motion for Payment of Prepetition Obligations to (I) Traffic2Revenue, Inc. as Critical Vendor, (II) Continue Satisfying Postpetition Obligations in the Ordinary Course of Business and (III) Granting Related Relief* [ECF No. 385].

    **(vii)**    **Assumption of Certain Executory Contracts and Leases**

---

[4] In addition to the Critical Vendor Payments referenced herein, the Debtor recently negotiated an agreement with CRQ Florida Inc., d/b/a Blue Furniture ("CRQ") which is subject to Court approval to furnish labor and materials to complete the installation of cabinets and countertops at 147 units at the Project consistent with the CRQ Subcontract in exchange for a total and final payment of $217,102.11 which amount includes a retainage of $39,201.16 for work completed and not paid for pre-petition. However, CRQ defaulted in its obligation to complete such installation and the Debtor was forced to locate such services elsewhere, and is reserving all of its rights against CRQ.

### a.    Southern Furniture Leasing, Inc.

Prior to the Petition Date, the Debtor entered into certain furniture leases with Southern Furniture Leasing, Inc. ("SFL") dated September 24, 2019 ("Phase I Lease") and March 26, 2020 ("Phase II Lease")(collectively, the "Furniture Leases') with respect to sofas, tables, chairs, bed frames, mattresses and other miscellaneous furniture needed to furnish the common areas and bedroom units for Phases I and II of the Project.  The Furniture Leases are for a term of 5 years and 7 months at a monthly rental rate of $5,000, including delivery, installation and pickup fees. In connection with the foregoing, on August 3, 2021, the Debtor filed *Debtor's Motion For Entry Of An Order (I) Authorizing The Debtor to Assume Certain Furniture Leases With Southern Furniture Leasing, Inc., Pursuant To Section 365 Of The Bankruptcy Code And (II) Fixing Cure Amounts With Respect Thereto* [ECF No. 161].  On October 2, 2020, the Bankruptcy Court entered an Order approving the assumption of the Furniture Leases [ECF No. 186].  In connection with the assumption of the Furniture Leases, the Debtor paid SFL the sum of $28,768.88 for certain furniture that was vandalized and damaged in Phase 1A of the Project in exchange for the replacement and installation of 100 new mattresses and other miscellaneous furniture on or prior to August 8, 2020.

### b.    Ground Lease with St. Augustine Parish Land, LLC

As described in more detail above, the land underlying the Project is subject to a 99-year Ground Lease with SAPL.  On August 31, 2020, the Debtor filed the *Debtor's Expedited Motion for Entry of An Order (I) Authorizing the Debtor to Assume Ground Lease with St. Augustine Parish Land, LLC, Pursuant to Section 365 of the Bankruptcy Code and (II) Fixing Cure Amounts With Respect Thereto* (the "Lease Assumption Motion")[ECF No. 181].  On September 17, 2020 the Bankruptcy Court entered an Order granting the Lease Assumption Motion (the "Ground Lease Order") [ECF No. 200]. Pursuant to the Ground Lease Order, the Debtor (as Tenant) assumed the Ground Lease. The Ground Lease Order further provides, in relevant part, that as of the date of the Order, the Debtor was current with its monthly Lease payments and there were no defaults under the Ground Lease requiring further compliance with section 365(b)(1) of the Bankruptcy Code, provided however that the assumption of the Ground Lease was without prejudice to SAPL's or Debtor's rights in connection with certain open punch list items relating to the Project that the parties are working consensually to resolve.

### c.    PGAL, Inc., f/k/a Pierce Goodwin, Alexander & Linville

In connection with the construction of the Project, the Debtor is a party to AIA Document B109™–2010 standard form agreement with PGAL dated May 6, 2015, as amended, in June, 2018, for the design, construction and administration of the Project. In connection with the foregoing, PGAL was providing services to the Debtor with the various phases of the Project including but not limited to: (i) Schematic Design, (ii) Design Development, (iii) Construction Contracts, (iv) Permitting, (v) Bidding or Negotiation, (vi) Cost Estimation of Construction, (vii) evaluation of work, and (viii) other miscellaneous additional services described in more detail in Article 5 of the Contract.

In addition to the foregoing, PGAL was responsible for reviewing the pay applications submitted by Sauer to determine, in general, if the work observed is being performed in a manner

that when fully completed will be in accordance with the Contract Documents.[5] In connection with the foregoing, PGAL reviewed the monthly Pay Applications submitted by Sauer in order to certify payments of amounts requested. PGAL's certification (or rejection) constitutes a representation to the Debtor, based on the Architect's evaluation of the work and on the data comprising the Contractor's Application for Payment, that to the best of the Architect's knowledge, information and belief, the work has progressed to the point indicated and that the quality of the work is in accordance with the Contract Documents (collectively, the "Services").

On September 14, 202, the Debtor filed *Debtor's Motion For Entry Of An Order (I) Authorizing The Debtor To Assume Executory Contract With PGAL, Inc., F/K/A Pierce Goodwin, Alexander & Linville Pursuant To Section 365 Of The Bankruptcy Code And (Ii) Fixing Cure Amounts With Respect Thereto* (the "PGAL Assumption Motion") [ECF No. 204]. On October 2, 2020, the PGAL Assumption Motion was granted [ECF No. 224] and the Debtor was authorized to assume the AIA Document B109™–2010 standard form agreement with PGAL dated May 6, 2015, as amended, in June, 2018, for the design, construction and administration of the Midtown Project. In connection with the assumption of the Contract, the Debtor paid PGAL the sum of $19,738.66 for monthly services and reimbursable expenses due and owing through July 2020.

**(viii)    Extensions of section 362(d)(3) deadline**

On May 27, 2020, the Debtor and U.S. Bank filed the *Joint Expedited Ex Parte Motion for Entry of Agreed Order Approving Stipulation* [ECF No. 48] (the "Interest Payment Stipulation"), which was approved by the Bankruptcy Court by Order dated May 27, 2020 [ECF No. 49] (the "Interest Payment Order"). Pursuant to the Interest Payment Stipulation, the Debtor and U.S. Bank agreed that the interest payment due on the Bonds on June 1, 2020 would be paid. The interest payment due on June 1, 2020 was paid in the amount of $2,705,381.25, with an amount equal to $2,414,417.61 being paid from the CI Fund and the balance of $290,963.64 being paid from the DSR Fund, in each case as required by the terms of the Indenture.

On July 27, 2020, the Debtor filed the *Debtor's Expedited Motion For Entry Of Order (I) Approving And/Or Confirming Extension Of Deadline Under 11 U.S.C. §362(d)(3) With U.S. Bank National Association, And (II) Extending Deadline To File A Plan Under 11 U.S.C. §362(D)(3) For Cause To The Extent Applicable To Any Other Party-In-Interest* ("First Extension Motion") [ECF No. 144]. On August 5, 2020, the Bankruptcy Court entered a second order extending the time under section 362(d) of the Bankruptcy Code for the Debtor to file a plan [ECF No. 164](the "First 362(d) Order"). The First 362(d) Order extended the deadline in section 362(d)(3) for cause through and including November 4, 2021. Further, as set forth in the First 362(d) Order, the Debtor and U.S. Bank agreed that the interest payment due on the Bonds on December 1, 2020 would be paid as required by the terms of the Indenture. The interest payment due on December 1, 2020 was paid in the amount of $2,705,381.25, which funds came from the DSR Fund.

On October 29, 2020, the Debtor filed the *Debtor's Expedited Motion for Entry of Second*

---

[5] Contract Documents refers collectively to that certain revised A1A A102-2007 and A201 and Addendum to Completion Contract for One College Park" (the "Addendum") dated August 1, 2017 by and between Sauer and Midtown Campus, which was subsequently amended with the Amendment to the Addendum (the "Amendment") on November 9, 2017.

*Order (I) Extending Deadline Under 11 U.S.C. 362(d)(3) with U. S. Bank National Association, and (II) Extending Deadline to File A Plan Under 11 U.S.C. 362(d)(3) for Cause to the Extent Applicable to Any Other Party-In-Interest* (the "Second Extension Motion") [ECF No. 241].  On November 6, 2020, the Bankruptcy Court entered the *Agreed Order Granting Debtor's Expedited Motion For Entry Of Second Order (I) Extending Deadline Under 11 U.S.C. 362(d)(3) with U.S. Bank National Association, and (II) Extending Deadline to File a Plan Under 11 U.S.C. 362(d)(3) for Cause to the Extent Applicable to Any Other Party-Interest* (the "Second  362(d) Order") [ECF No. 254]. The Second 362(d) Order extended the deadline in section 362(d)(3) for cause through and including February 2, 2021.  Further, as set forth in the Second 362(d) Order, U.S. Bank was authorized to pay the interest payment due on the Bonds in June 2021 from funds on deposit in the DSR Fund.

On January 20, 2021, the Debtor filed the *Debtor's Expedited Motion for Entry of Third Order (I) Extending Deadline Under 11 U.S.C. 362(d)(3) with U. S. Bank National Association, and (II) Extending Deadline to File A Plan Under 11 U.S.C. 362(d)(3) for Cause to the Extent Applicable to Any Other Party-In-Interest* (the "Third Extension Motion") [ECF No. 313].  On February 12, 2021, the Bankruptcy Court entered the *Order Granting Debtor's Expedited Motion For Entry Of Third Order (I) Extending Deadline Under 11 U.S.C. 362(d)(3) with U.S. Bank National Association, and (II) Extending Deadline to File a Plan Under 11 U.S.C. 362(d)(3) for Cause to the Extent Applicable to Any Other Party-Interest* (the "Third 362(d) Order") [ECF No. 329].  The Third 362(d) Order extended the deadline in section 362(d)(3) for cause through and including May 3, 2021.  Further, as set forth in the Third 362(d) Order, U.S. Bank was once again authorized to pay the interest payment due on the Bonds in June 2021 from funds on deposit in the DSR Fund.

On April 30, 2021, the Debtor filed *Debtor's Ex-Parte Agreed Motion For Entry of Fourth Order (I) Extending Deadline Under 11 U.S.C. 362(d)(3) with U.S. Bank National Association, and (II) Extending Deadline to File a Plan Under 11 U.S.C. 362(d)(3) for Cause to the Extent Applicable to Any Other Party-Interest* (the "Fourth Extension Motion")[ECF No. 376]. On May 2, 2021, the Bankruptcy Court entered the *Agreed Order Granting Debtor's Ex-Parte  Motion Fourth Motion for Entry of Fourth Order (I) Extending Deadline Under 11 U.S.C. 362(d)(3) with U.S. Bank National Association, and (II) Extending Deadline to File a Plan Under 11 U.S.C. 362(d)(3) for Cause to the Extent Applicable to Any Other Party-Interest* (the "Fourth 362(d) Order") [ECF No. 379] and further extended the deadline in section 362(d)(3) for cause for a period of thirty (30) days, through and including June 2, 2021.

On June 2, 2021, the Debtor filed *Debtor's Ex-Parte Agreed Motion For Entry of Fifth Order For Relief Related to and Extending Deadline For Non-Consensual Lienors Under 11 U.S.C. 362(d)(3)* (the "Fifth Extension Motion")[ECF No. 395]. The Debtor seeks a further extension of the Fourth Deadline and entry of an order approving and confirming an extension "for cause" of the deadline contained in 11 U.S.C. §362(d)(3) for the Debtor to file a plan or commence making payments for a period of twenty-seven (27) days up to and including June 29, 2021, if and to the extent such deadline is applicable to any Non-Consensual Lienors who assert a claim secured by an interest in the Project.  On June 4, 2021, the Bankruptcy Court entered an Order Granting the Fifth Extension Motion and extending the section 362(d)(3) deadline to June 29, 2021 (the "Fifth 362(d) Order") [ECF No. 398].

Contemporaneously with the filing of the Fifth Extension Motion, the Debtor filed the *Joint Ex-Parte Stipulation for Entry of An Order Regarding Relief Under 11 U.S.C. §362(d)(3) with U.S. Bank National Association* ("362(d) Stipulation") [ECF No. 394] wherein the parties agreed that U.S. Bank would forbear from seeking or pursuing, any relief under or related to 11 U.S.C. §362(d)(3) through and including June 29, 2021. On June 4, 2021, the Bankruptcy Court entered an Order approving the 362(d) Stipulation with U.S. Bank (the "U.S. Bank 362(d) Order")[ECF No. 397].

On June 29, 2021, the Debtor filed a *Motion to Compel Payment of Interest From DSR Fund, and (II) For Order Determining Compliance with 11 U.S.C. §362(d)(3)* [ECF No. 405] (the "DSRF Motion") requesting the entry of order (i) compelling U.S. Bank to make the June 2021 interest payment due on the Bonds from the DSR Fund as expressly contemplated in the Third 362(d) Order, which 362(d) Order was agreed to by U.S. Bank, and (ii) determining that the Debtor has complied with the provisions of Section 362(d)(3) of the Bankruptcy Code through January 2022. On July 22, 2021, U.S. Bank filed its *Objection of U.S. Bank to Debtor's Motion to Compel Payment of Interest From DSR Fund, and (II) For Order Determining Compliance with 11 U.S.C. §362(d)(3)* [ECF No. 420]. On August 5, 2021, the Debtor filed its *Reply* to the U.S. Bank Objection [ECF No. 438]. On August 30, 2021, U.S. Bank filed its *Sur-Reply* [ECF No. 471]. The hearing on the DSRF Motion has been adjourned pending further order of the Bankruptcy Court [ECF No. 469].

**(ix)    Extensions of Exclusivity and Solicitation Deadlines and Filing of Plan and Disclosure Statement**

On August 20, 2020, the Debtor filed *Debtor's Expedited Motion Pursuant to Section 1121(d) of the Bankruptcy Code For An Extension of the Exclusivity Period To File A Plan of Reorganization and To Solicit Acceptances* (the "First Motion for Extension") [ECF No. 180]. On September 1, 2020, the Bankruptcy Court entered its *Order Granting Debtor's Expedited Motion Pursuant To Section 1121(D) Of The Bankruptcy Code For An Extension Of The Exclusivity Period To File A Plan Of Reorganization And To Solicit Acceptances* ("First Extension Order") [ECF No. 199].

On November 24, 2020, the Debtor filed *Debtor's Second Motion Pursuant to Section 1121(d) of the Bankruptcy Code for an Extension of the Exclusivity Period to File a Plan of Reorganization and to Solicit Acceptance* (the "Second Motion for Extension") [ECF No. 267]. On December 16, 2020, the Bankruptcy Court entered its *Order Granting Debtor's Second Motion Pursuant to Section 1121(d) of the Bankruptcy Code for an Extension of The Exclusivity Period to File a Plan of Reorganization and to Solicit Acceptances* (the "Second Extension Order") [ECF No. 296].

On January 20, 2021, the Debtor filed the *Debtor's Expedited Third Motion for Entry of Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusivity Period to File a Plan of Reorganization and to Solicit Acceptance* (the "Third Extension Motion"). [ECF No. 315]. On February 11, 2021, the Bankruptcy Court entered its *Order Granting Debtor's Expedited Third Motion For Entry Of Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusivity Period To File a Plan Of Reorganization and To Solicit Acceptances* (the "Third Extension Order") [ECF No. 330].

On April 30, 2021, the Debtor filed *Debtor's Agreed Ex-Parte Fourth Motion For Entry Of Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusivity Period To File A Plan Of Reorganization and To Solicit Acceptance* (the "Fourth Extension Motion") [ECF No. 375]. On May 2, 2021, the Bankruptcy Court entered its *Agreed Debtor's Agreed Ex-Parte Fourth Motion For Entry Of Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusivity Period To File A Plan Of Reorganization and To Solicit Acceptance* (the "Fourth Extension Order") [ECF No. 378].

On June 2, 2021, Debtor filed *Debtor's Ex-Parte Agreed Fifth Motion For Entry Of Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusivity Periods To File A Plan Of Reorganization and To Solicit Acceptances* (the "Fifth Extension Motion") [ECF No. 393]. On June 3, 2021, the Bankruptcy Court entered its *Agreed Order Granting Debtor's Ex-Parte Fifth Motion Pursuant to Section 1121(d) of the Bankruptcy Code For An Extension of the Exclusivity Periods To File A Plan Of Reorganization and To Solicit Acceptances* (the "Fifth Extension Order") [ECF No. 396] extending the deadline for the Debtor to file a plan through and including June 29, 2021 and to solicit acceptances thereof through and including August 29, 2021.

On June 29, 2021, the Debtor timely filed its *Chapter 11 Plan of Reorganization* [ECF No. 403] (the "Plan") and its accompanying *Disclosure Statement for Chapter 11 Plan of Reorganization* [ECF No. 404] (the "Disclosure Statement"). The Bankruptcy Court set a hearing on the Disclosure Statement for August 16, 2021. In connection therewith, on August 9, 2021, U.S. Bank filed its *Objection* to the Disclosure Statement [ECF No. 443] and Sauer filed its *Objection* to the Disclosure Statement [ECF No. 441]. On August 12, 2021, the Debtor filed the *Debtor's (I) Omnibus Response to Objections to Disclosure Statement, and (II) Request to Amend Disclosure Statement and Continue Hearing* [ECF No. 451]. The Court granted the Debtor's request to amend the Disclosure Statement, and ordered that the Disclosure Statement e amended by October 14, 2021, and reset the hearing on any amended Disclosure Statement for October 27, 2021 [ECF No. 462].

On October 14, 2021, the Debtor filed its *First Amended Plan of Reorganization* [ECF No. 497] and this *First Amended Disclosure Statement* [ECF No. 498]. By order of the Court, dated October 18, 2021 [ECF No. 503], the hearing on the approval of the Disclosure Statement was continued to November 8, 2021.

On November 1, 2021, U.S. Bank filed its Supplemental Preliminary Objection of U.S. Bank, as Indenture Trustee, to Amended Disclosure Statement [ECF No. 506] (the "Supplemental Objection"). On November 5, 2021, the Debtor filed its Response to the Supplemental Objection [ECF No. 514].

On November 7, 2021, the Debtor filed its *Second Amended Plan of Reorganization* [ECF No. ___] and this *Second Amended Disclosure Statement* [ECF No. ___], including to address and resolve certain objections raised in the Supplemental Objection, to address certain informal comments received from Sauer and to incorporate the information related to the Stalking Horse Buyer and the Purchase Agreement.

(x)    **Debtor-in-Possession Financing**

(a)    **Initial DIP Financing – Junior DIP Loan $5,200,000.**

On May 15, 2020, the Debtor filed *Debtor's Emergency Motion (I) For Authorization To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) To Grant Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507, And (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001* ("DIP Financing Motion")[ECF No. 26] seeking Bankruptcy Court authority for the Debtor, as borrower, to obtain post-petition financing from Junior DIP Lender[6] in an amount not to exceed $5,200,000 (the "Junior DIP Loan").  On May 19, 2020, Sauer, Inc., filed an Objection to the DIP Financing Motion [ECF No. 34].

In connection with the Junior DIP Loan, the Bankruptcy Court entered several orders granting the Junior DIP Loan on an interim basis as follows: (i) on May 26, 2020, the Bankruptcy Court entered its *Interim Order Granting Debtor's Emergency Motion (I) For Authorization To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) To Grant Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507, And (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001* [ECF No. 47] (the "First Interim Order"); (ii) on June 18, 2020, a *Second Interim Order Granting Debtor's Emergency Motion (I) for Authorization to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. Sections 105, 361, 362 and 364, (II) to Grant Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. Sections 361 and 507; and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001* [ECF No. 88] ("Second Interim Order");  (iii) on July 15, 2020, a *Third Interim Order Granting Debtor's Emergency Motion (I) for Authorization to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. Sections 105, 361, 362 and 364, (II) to Grant Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. Sections 361 and 507; and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001* [ECF No. 120] ("Third Interim Order"); and (iv) on August 7, 2020, the Bankruptcy Court entered the *Fourth Interim Order Granting Debtor's Emergency Motion (I) For Authorization To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) To Grant Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507, And (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001* [D.E. 166] as amended on August 11, 2020 [ECF No. 171] ("Fourth Interim Order") (collectively, the "DIP Loan Interim Orders").

On October 8, 2020, the Bankruptcy Court entered the *Final Order (I) Authorizing The Debtor To Obtain Postpetition Secured Financing From BMI Financial Group, Inc., Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) Granting Liens And Super-Priority Administrative Expense Claims; (Iii) Granting Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507 And (Iv) Related Relief* ("Junior DIP Loan Final Order") [ECF No. 230] in respect of the Junior DIP Loan.

At the time the Junior DIP Loan Final Order was entered, the Debtor had borrowed substantially all, but not all, of the amounts authorized thereunder.  On October 22, 2020, the

---

[6] The Junior DIP Lender is affiliated with one of the Debtor's equity members, Antonio M. Sierra.

Debtor filed the *Debtor's Emergency Motion To Amend Final Order (I) Authorizing The Debtor To Obtain Postpetition Secured Financing From BMI Financial Group, Inc., Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) Granting Liens And Super-Priority Administrative Expense Claims; (III) Granting Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507 And (IV) Related Relief* [ECF No. 236] (the "Motion to Amend") seeking to amend the Junior DIP Loan Final Order to immediately borrow an amount equal to $200,000 of the remaining balance available under the Junior DIP Loan for payment of hard and soft costs proposed in the Interim Budget attached thereto.   In connection with the foregoing, Sauer filed a Limited Response [ECF No. 240].

On November 3, 2020, the Bankruptcy Court entered the *Amend Final Order (I) Authorizing The Debtor To Obtain Postpetition Secured Financing From BMI Financial Group, Inc., Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) Granting Liens And Super-Priority Administrative Expense Claims; (III) Granting Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507 And (IV) Related Relief* [ECF No. 247].  On November 20, 2020, the Bankruptcy Court entered the *Corrected Amended Final Order (I) Authorizing The Debtor To Obtain Postpetition Secured Financing From BMI Financial Group, Inc., Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (II) Granting Liens And Super-Priority Administrative Expense Claims; (III) Granting Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507 And (IV) Related Relief* [ECF No. 264].

### (b)    Additional Post-Petition Financing - Priming DIP Loan $7,400,000

On November 4, 2020, the Debtor filed *Debtor's Emergency Motion (I) Authorizing Debtor To Obtain Priming, Senior Secured Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(C) And 364(D) Of The Bankruptcy Code And The Federal Rules Of Bankruptcy Procedure, (II) Granting Priming Liens And Superpriority Administrative Claim Status, (III) Determining Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §361, And (IV) Granting Related Relief* ("Priming DIP Motion") [ECF No.249] requesting authority to enter into a new term loan with Best Meridian International Insurance Company SPC, a Cayman Islands company and/or Best Meridian Insurance Company, a Florida corporation (collectively the "Priming DIP Lender")[7] for priming, senior secured debtor-in-possession financing in an aggregate amount of up to $7,400,000 ("Priming DIP Loan"), which Priming DIP Loan included (i) an amount up to $6,270,000 to fund hard and softs costs to complete the Project as contemplated by the Estimated Revised Cost to Complete dated December 10, 2020 attached thereto (the "Revised Cost to Complete")[ECF No. 288]; and (ii) an interest reserve through December 31, 2021 ("Maturity Date") of an amount equal to approximately $1,130,000  ("Interest Reserve") pursuant to the terms and conditions of the Priming DIP Motion and the Amended and Restated Term Sheet, dated December 10, 2020 [ECF No. 288-1], any promissory note and loan and security documents to be executed by the Debtor in connection with and consistent with the terms and conditions of such financing (collectively, the "Senior DIP Loan Documents").  In addition to the amounts to be funded under the Priming DIP Loan to complete construction, the Junior DIP Lender agreed to extend the maturity date for the Junior DIP Loan of December 31, 2021.  In connection

---

[7] The Priming DIP Lender is also affiliated with the Junior DIP Lender and with one of the Debtor's equity members, Antonio M. Sierra.

with the foregoing, Objections were filed to the Priming DIP Motion by Sauer [ECF No. 257 & 276] and U.S. Bank [ECF No. 282].    BMI filed a *Limited Response to Sauer's Objection* [ECF No. 277].

On November 13, 2020, the Bankruptcy Court held a preliminary hearing on the Debtor's request for approval of the Priming DIP Motion and entered an Interim Order [ECF No. 270] authorizing the Debtor to borrow an interim basis an initial advance of $600,000.  The Bankruptcy Court scheduled a final hearing for December 11, 2020 ("Final Hearing").  In connection with the Final Hearing, the Debtor and U.S. Bank filed a *Joint Stipulation of Undisputed Facts* [ECF No. 289].

After conducting a lengthy evidentiary hearing, the Bankruptcy Court approved the Priming DIP Loan and, on December 16, 2020, entered a *Final Order Granting Debtor's Emergency Motion (I) Authorizing Debtor To Obtain Priming, Senior Secured Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(C) And 364(D) Of The Bankruptcy Code And The Federal Rules Of Bankruptcy Procedure, (II) Granting Priming Liens And Superpriority Administrative Claim Status, (III) Determining Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §361, And (IV) Granting Related Relief* [ECF No. 295].

**(xi)    Interim Fee Awards**

On January 14, 2021, Paul J. Battista and Genovese, Joblove and Battista, P.A. as counsel for the Debtor filed their *First Application for Interim Compensation as counsel for the Chapter 11 Debtor* [ECF No. 301] for the period of 5/8/2020 to 12/31/2020, seeking fees of $816,676.00 and expenses of $5,709.39. On February 12, 2021, the Bankruptcy Court entered an *Order Granting First Interim Application For Compensation of Debtor's Counsel* and awarded fees of $653,340.80 and expenses of $5,709.39 [ECF No. 325].

On January 14, 2021, Soneet R Kapila, and KapilaMukamal as Financial Advisors to the Debtor-in Possession filed their *First Application for Interim Compensation for Financial Advisors* [ECF No. 302] for the period of 5/8/2020 to 12/31/2020, seeking fees of $234,854.00 and expenses of $1,419.23. On February 12, 2021, the Bankruptcy Court entered an *Order Granting First Interim Application For Compensation of Financial Advisors* and awarded fees of $187,883.20 and expenses of $1,419.23 [ECF No. 326].

On January 14, 2021, William H. Strop and Becker & Poliakoff as special counsel to the Debtor filed their *First Application for Interim Compensation as Special Counsel* [ECF No. 303] for the period of 5/8/20 to 12/31/2020, seeking fees of $149,552.50 and expenses of $11,746.30. On February 12, 2021, the Bankruptcy Court entered an Order Granting First Interim Application For Compensation Special Counsel and awarded fees of $119,642.00 and expenses of $11,746.30 [ECF No. 327].

On January 14, 2021, Ralph A Espinosa as accountant to the Debtor filed the *First Application for Interim Compensation for Accountants* [ECF No. 304] for the period: 5/8/2020 to 12/31/2020, seeking fees of $24,989.25 and expenses of $0. On February 12, 2021, the Bankruptcy

Court entered an *Order Granting First Interim Application For Compensation to Accountant* and awarded fees of $19,991.40 [ECF No. 328].

      **(xii)**   **Cash Collateral**

      On September 30, 2020, the Debtor filed a *Joint Expedited Ex Parte Motion For Entry Of Agreed Order Approving Stipulation And Agreement Pursuant To 11 U.S.C. §§105, 361, 362 And 363 And Fed. R. Bankr. P. 2002, 4001(B) and 9014; (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing For Adequate Protection* [D.E. 213].  On October 5, 2020, the Bankruptcy Court Entered the *Order Granting Joint Expedited Ex Parte Motion For Entry Of Agreed Order Approving Stipulation And Agreement Pursuant To 11 U.S.C. §§105, 361, 362 And 363 And Fed. R. Bankr. P. 2002, 4001(B) and 9014; (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing For Adequate Protection* [D.E. 226].

      On October 29, 2020, the Debtor filed its *Debtor's Expedited Motion for Entry of Order Pursuant To 11 U.S.C. §§105, 361, 362 And 363 And Fed. R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing For Adequate Protection* [D.E. 242].  On November 10, 2020, the Bankruptcy Court entered the *Order Granting Debtor's Expedited Motion for Entry of Order Pursuant to 11 U.S.C. §§105, 361, 362 and 363 and Fed. R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing for Adequate Protection* [D.E. 255].

      On January 20, 2021, the Debtor filed its *Debtor's Expedited Third Motion for Entry of Order Pursuant To 11 U.S.C. §§105, 361, 362 And 363 And Fed. R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing For Adequate Protection* [D.E. 316].  In connection with the foregoing, Best Meridian filed a Limited Response [ECF No. 321].  On February 12, 2021, the Bankruptcy Court entered the *Order Granting Debtor's Expedited Third Motion For Entry Of Order Pursuant To 11 U.S.C. §§105, 361, 362 And 363 And Fed. R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing For Adequate Protection* [D.E. 331].

      On May 28, 2021, the Debtor filed *Debtor's Ex-Parte Agreed Motion for Entry of Order Pursuant to 11 U.S.C. 105, 361, 362 and 363 and Fed R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing for Adequate Protection* ("Fourth Cash Collateral Motion")[ECF No. 390]. On June 1, 2021, the Bankruptcy Court entered the *Agreed Order Granting Motion for Entry of Order Pursuant to 11 U.S.C. §§105, 361, 362 and 363 and FED. R.BANKR. P. 2002, 4001(B) and 9014 (I) To Use Cash Collateral and Granting Motion For Adequate Protection* [ECF No. 391], authorizing the Debtor to use cash collateral through July 31, 2021.

      On July 30, 2021, the Debtor filed *Debtor's Ex-Parte Agreed Motion for Entry of Order Pursuant to 11 U.S.C. 105, 361, 362 and 363 and Fed R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing for Adequate Protection* ("Fifth Cash Collateral Motion")[ECF No. 432]. On August 2, 2021, the Bankruptcy Court entered the *Agreed Order Granting Motion for Entry of Order Pursuant to 11 U.S.C. §§105, 361, 362 and 363 and FED. R.BANKR. P. 2002, 4001(B) and 9014 (I) To Use Cash Collateral and Granting Motion*

*For Adequate Protection* [ECF No. 434] authorizing the Debtor to use cash collateral through September 15, 2021.

On August 15, 2021, the Debtor filed *Debtor's Ex-Parte Agreed Motion for Entry of Order Pursuant to 11 U.S.C. 105, 361, 362 and 363 and Fed R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing for Adequate Protection* ("Sixth Cash Collateral Motion")[ECF No.  457]. On August 24, 2021, the Bankruptcy Court entered the *Agreed Order Granting Motion for Entry of Order Pursuant to 11 U.S.C. §§105, 361, 362 and 363 and FED. R.BANKR. P. 2002, 4001(B) and 9014 (I) To Use Cash Collateral and Granting Motion For Adequate Protection* [ECF No. 461] authorizing the Debtor to use cash collateral through September 30, 2021 (the "Sixth Cash Collateral Order").

Thereafter, the Debtor obtained the consent of U.S. Bank and the Priming DIP Lender to continue the use of cash collateral through October 15, 2021 under the same terms and conditions as the Sixth Cash Collateral Order.

On October 14, 2021, the Debtor filed *Debtor's Ex-Parte Agreed Motion for Entry of Order Pursuant to 11 U.S.C. 105, 361, 362 and 363 and Fed R. Bankr. P. 2002, 4001(B) and 9014 (I) Authorizing the Debtor to Use Cash Collateral; and (II) Providing for Adequate Protection* ("Seventh Cash Collateral Motion")[ECF No. 495].  On October 14, 2021, the Bankruptcy Court entered the *Agreed Order Granting Motion for Entry of Order Pursuant to 11 U.S.C. §§105, 361, 362 and 363 and FED. R.BANKR. P. 2002, 4001(B) and 9014 (I) To Use Cash Collateral and Granting Motion For Adequate Protection* [ECF No. 500] authorizing the Debtor to use cash collateral through December 31, 2021 (the "Seventh Cash Collateral Order").

Pursuant to the terms of the various Cash Collateral Stipulations and Orders, the Debtor has been authorized to use the cash collateral of the Priming DIP Lender, the Junior DIP Lender and U.S. Bank, as indenture trustee "Prepetition Lender") through December 31, 2021 to pay: (i) operating expenses associated with the operation, maintenance and repair of the Project including, without limitation, for such items as marketing, cable, television, utilities, repairs and maintenance, parking decals, contract services (including, but not limited to, cleaning, security, pest control, and trash removal), elevator permitting, and other general administrative expenses, including the payment of rent under the ground lease, furniture lease, the management fee, and payroll expense due to Asset Campus, LLC, subject to and in accordance with the various Budgets attached to the Motions.  In connection with the foregoing, the Debtor agreed to provide adequate protection in the form of (i) perfected replacement liens upon and security interests, (ii) certain allowed superpriority administrative expense claims in the Bankruptcy Case, and (iii) and certain reporting requirements and information rights, in each case subject to the Carve-Out, the Fee Reserve for Professional Expenses and the Professional Escrow as defined in the Cash Collateral Stipulation.

Pursuant to the Sixth Cash Collateral Order, the Debtor was authorized to use an amount equal to $225,000 of monies allocated to pay professional fees to Genovese Joblove & Battista, P.A. and KapilaMukamal to pay for hard and soft costs of construction at the Project in order to facilitate the completion of the Project.

Pursuant to the Seventh Cash Collateral Order and in addition to the use of cash collateral to pay the operating expenses of the Project, the Debtor was also authorized to use cash collateral to continue with and complete the construction of the Project pursuant to the terms and conditions therein.

Based on the proposed use of cash collateral to complete the Project as set forth in the Seventh Cash Collateral Order, the Debtor anticipates that it will have obtained (i) a TCO for all non-retail portions of the Project, inclusive of amenities, or, in the alternative, (ii) shall have completed all work on the Project that would be necessary for the obtaining of a TCO for all non-retail portions of the Project, inclusive of amenities, such that there are no further construction costs or construction activity associated with the Project and all costs incurred thereafter will be administrative expenses necessary solely for securing a Certificate of Occupancy.

On August 31, 2021, U.S. Bank filed its *Motion for Additional Adequate Protection under §§ 361 and 363(e) pf the Bankruptcy Code* [ECF No. 473] (the "AP Motion"), pursuant to which U.S. Bank seeks and asserts that it is entitled to additional adequate protection in connection with the Debtor's proposed use of cash collateral. On October 13, 2021, the Debtor filed its *Response to Motion for Additional Adequate Protection under §§ 361 and 363(e) pf the Bankruptcy Code* [ECF No. 494] opposing the additional adequate protection relief sought by U.S. Bank. As part of the Seventh Cash Collateral Order, U.S. Bank has agreed to hold the AP Motion in abeyance.

### B.    Challenges to the Claim asserted by U.S. Bank, National Association, in its capacity as Indenture Trustee

As part of the Fourth Cash Collateral Order, the Debtor had a deadline of June 30, 2021 to (i) challenge the amount, validity, perfection, enforceability, priority, extent or attachment solely of the Prepetition Liens and/or claims of the Prepetition Lender and the Prepetition Lender's Adequate Protection Liens, or (b) otherwise assert or prosecute any action for preference, fraudulent transfers or conveyance, or other avoidance power claims solely related to the granting of the Prepetition Liens of the Prepetition Lender (any such proceeding, a "Challenge Proceeding").

On June 29, 2020, U.S. Bank filed Proof of Claim #3 (the "Claim") asserting a secured claim in the aggregate amount of $80,179,693.65, broken down as follows:

| Principal | Interest | Total |
|---|---|---|
| $ 29,310,000.00 | $ 878,791.15 | $ 30,188,791.15 |
| $ 48,510,000.00 | $1,480,902.50 | $ 49,990,902.50 |
| **Total Indebtedness** | | **$ 80,179,693.65** |

Specifically, U.S. Bank asserted that the Claim is comprised of the following amounts as of the Petition Date: (i) $77,820,000.00 of outstanding principal amount of the Bonds; (ii) $2,359,693.65 of accrued and unpaid interest due on the Bonds to the Petition Date; (iii) plus any other interest accrued; (iv) plus premium, if any; plus all other fees, charges and expenses of the Indenture Trustee,

including without limitation the attorneys' fees and expenses of counsel and all fees, expenses, costs, payments, and amounts incurred and to be incurred by the Indenture Trustee in the course of this case and these proceedings, all of which continue to accrue and are payable; plus all other amounts owed by the Debtor pursuant to the Bonds and the Bond Documents. Although not detailed or segregated in the Claim, the principal amount of the Bonds asserted in the Claim includes the following amounts: (i) an Original Issue Discount in the amount of $1,556,400.00, and (ii) an Underwriter's Discount[8] in the amount of $1,586,188.08 (collectively, the "Original Issue Discounts").

Because U.S. Bank had not amended its Claim (as defined below) after 14 months in this Chapter 11 Case and had not sought any entitlement to post-petition interest or reasonable fees/costs/charges under section 506(b) of the Bankruptcy Code, the Debtor was forced to seek relief through an Adversary and the Section 506(b) Pleadings as described in more detail below. In connection therewith, the Debtor filed the following pleadings in respect of its objections to the Claim of U.S. Bank:

(i)    On June 29, 2021, the Debtor filed a *Complaint (i) to Determine the Extent, Validity and/or Priority of Lien, (ii) for Declaratory Relief, and (iii) for Objection to Claim against U.S. Bank, National Association, in its capacity as Indenture Trustee* Adv. Case No. 21-01220-BKC-RAM (the "Adversary"). The Adversary seeks to determine the extent of U.S. Bank's lien on the Project and for declaratory relief in connection therewith, including an objection to Proof of Claim #3 filed by U.S. Bank, as Indenture Trustee (the "Claim Objection"). In the Adversary, the Debtor seeks, among other things, a determination that (i) under Section 506(b) of the Bankruptcy Code or otherwise U.S. Bank is only entitled to accrue and be paid post-petition interest on its allowed Claim calculated at the non-default contract rate under the Bonds and Indenture Documents, namely 6.75% and 7.0% per annum respectively, as opposed to the default rate of interest therein; (ii) the attempted acceleration by U.S. Bank of the Bonds pursuant to the Default Notice is unenforceable as an *ipso facto* clause or otherwise under the Bankruptcy Code; and (iii) that no defaults existed or occurred under the Indenture Documents prior to or after the Petition Date.

In the event the Bankruptcy Court determines that a default occurred or existed under the Indenture Documents entitling U.S. Bank to charge interest at the contractual default rate, then the Debtor requests in the Adversary that the Bankruptcy Court (i) find and determine that equitable considerations (including judicial estoppel) under the facts of the present case justify the elimination of such contractual default interest rate and its reduction to the non-default contract rate; (ii) find and determine that under section 506(b) of the Bankruptcy Code or otherwise that U.S. Bank (x) is not entitled to the allowance of any post-petition fees, costs and charges under the Indenture Documents in respect of its Claim and this Chapter 11 Case, and (y) in the event that the Bankruptcy Court determines that the Indenture Documents provide for post-petition fees, costs and charges in this Chapter 11 Case, then determining that any such fees, costs and other charges asserted by U.S. Bank are unreasonable and should be disallowed; and (iii) find and determine that any proposed prepayment/redemption of the Bonds does not require the payment of any premium in connection therewith, including because such prepayment/redemption does not constitute an "Optional Redemption" under the Indenture Documents. Pursuant to the Claim Objection, the

---

[8] The Debtor is presently investigating whether this amount represents pre-paid interest similar to the Original Issue Discount.

Debtor seeks (i) to disallow the Original Issue Discounts included in U.S. Bank's Claim as unmatured interest under Section 502(b)(2) of the Bankruptcy Code; and (ii) to disallow the Prepayment Interest as unmatured interest under Section 502(b)(2) of the Bankruptcy Code. In addition, the Debtor seeks a reduction in U.S. Bank's Claim based on (x) interest payments made to U.S. Bank during the pendency of this Chapter 11 Case, and (y) the amounts remaining in the Indenture Trustee Accounts, including specifically the DSR Fund.

On July 30, 2021, U.S. Bank filed its Answer and Affirmative Defenses in the Adversary denying the relief sought by the Debtor and asserting a number of affirmative defenses thereto.

On September 29, 2021, the Bankruptcy Court entered its Second Amended Order Setting Filing and Disclosure Requirements for Pretrial and Trial [Adv. Proc. ECF No. 22], pursuant to which the Bankruptcy Court set a pre-trial hearing on December 15, 2021 (the "Second Pre-Trial Order").

The Debtor and U.S. Bank have issued discovery to each other in the Adversary.

(ii)    On June 29, 2021, the Debtor filed its *Motion to Limit Entitlement of U.S. Bank, as Indenture Trustee, regarding Post-Petition Interest, Fees, Costs and Other Charges under 11 U.S.C. §506(b) and Seeking Related Relief* (the "506(b) Motion") [ECF No. 406].

In addition to the relief sought in the U.S. Bank Adversary, the Debtor filed the 506(b) Motion seeking, among other things, pursuant to section 506(b) of the Bankruptcy Code, (i) to limit the rights of U.S. Bank to accrue and be paid post-petition interest on its allowed Claim calculated solely at the non-default contract rate under the Bonds (6.75%/7.0% per annum) as opposed to the default rate of interest therein, which default rate adds an additional 10% per annum to the applicable contract rate, and (ii) to limit the post-petition fees, costs and charges allowable to U.S. Bank in respect of its Claim and this Chapter 11 Case only to those that are provided for under the Indenture Documents and only to the extent determined by the Bankruptcy Court to be reasonable.

On July 22, 2021, U.S. Bank filed its Objection to the 506(b) Motion [ECF No. 419]. On August 5, 2021, the Debtor filed its Reply to the Objection of U.S. Bank to the 506(b) Motion [ECF No. 437]. On August 30, 2021, U.S. Bank filed its Sur-Reply to the Debtor's Reply [ECF No, 470].

Pursuant to the Second Pre-Trial Order, the issues in the 506(b) Motion will be addressed by the Bankruptcy Count in connection with the Adversary. The Debtor and U.S. Bank have also agreed to defer the issues related to U.S. Bank's fees and expenses until a later date or as otherwise ordered by the Bankruptcy Court.

The Debtor and U.S. Bank have agreed to proceed with a mediation of all disputes between them, including in the Adversary and the 506(b) Pleadings. In connection therewith, the Debtor and U.S. Bank have selected retired Bankruptcy Judge Robert Gerber to act as their mediator. As of the date hereof, the Debtor and U.S. Bank are discussing the scope, timing and other matters related to the proposed mediation.

C.    **The Claim Asserted by U.S. Bank.**

On August 9, 2021, U.S. Bank filed its Objection to the Disclosure Statement filed by the Debtor on June 29, 2021 [ECF No. 443] (the "U.S. Bank Objection"). In the U.S. Bank Objection, U.S. Bank asserted that it was owed as of August 1, 2021 an amount no less than $95,465,695.57 plus fees, costs, charges, expenses and indemnities comprised of (i) $77,820,000 of principal, (ii) $13,754,695.57 in accrued and unpaid interest at the default rate,(iii) $3,891,000 for the redemption premium, and (iv) U.S. Bank's fees, costs, expenses, charges and indemnities. As set forth above, the Debtor has challenged several aspects of U.S. Bank's Claim, including, without limitation, the request for default interest, the redemption premium, the Original Issue Discounts and the fees and costs incurred by U.S. Bank. As a result, the Liquidation Analysis attached hereto as Exhibit 3 sets forth the amounts that the Debtor asserts would be due U.S. Bank in the event that its Claim is Allowed as asserted by U.S. Bank or its Claim is Allowed based on the Debtor's objections thereto.

In addition, U.S. Bank asserts that it has a right to make a credit bid on any sale of the Project under section 363(k) of the Bankruptcy Code. The Debtor has reserved its rights to oppose any such credit bid if and when relevant. Moreover, the Debtor anticipates that any sale of the Project will be for an amount that would exceed any allowable credit bid of U.S. Bank.

D.    **Sauer Incorporated's Claims and Pending Litigation**

(i)    **Objection to Sauer Claim:**

In connection with construction of the Project, the Debtor and Sauer are parties to that certain AIA Document A102-2007 Standard Form of Agreement Between Owner and Contractor dated August 1, 2017 and AIA Document A201-2007 General Conditions of the Contract for Construction between Midtown and PGAL as amended by that certain Addendum to Completion Contract and Amendment to the Addendum dated November 9, 2017 (collectively, the "Sauer Contract"). In connection with the Sauer Contract, Federal Insurance Company, as surety, issued a payment and performance bond dated August 1, 2017 in the amount of $31,961,810 (the "Bond").

 In connection with the foregoing, the Debtor, Sauer and Fidelity Title Insurance Company ("Escrow Agent") are parties to a certain Retainage and Lien Waiver Escrow Agreement effective as of January 31, 2019 ("Escrow Agreement"). Pursuant to the Escrow Agreement, the Debtor and Sauer requested that the Escrow Agent hold certain monies in escrow for unpaid retainages due to certain subcontractors performing work on the Project (the "Subcontractors") in accordance with the provisions of the Escrow Agreement. Currently, an amount equal to $1,385,421.44 is being held in escrow (the "Escrow Funds") by the Escrow Agent in an interest bearing account at Bank of America (the "Escrow Account").

On November 12, 2020, the Debtor filed its *Objection to Claim Proof of Claim #7 filed by Sauer* [ECF No. 260] and objected to the entire amounts asserted in the Claim filed by Sauer Incorporated ("Sauer" or "Claimant"), in an alleged secured amount of $2,974,916.43 (the "Alleged Secured Claim") and an alleged unsecured amount of $3,633,794.78 (the "Alleged Unsecured Claims") (collectively referred to herein as the "Sauer Claim"). Moreover, as discussed

more fully below, the Debtor believes that it has substantial claims against Sauer and under Sauer's payment and performance bond related to Sauer's actions and omissions prior to the Petition Date in respect of construction of the Project.

On January 15, 2021, Sauer filed its *Response to Objection to Claim* [ECF No. 310].

### (ii)    Sauer Adversary Proceeding- Adv. Case No. 20-01401-RAM:

On November 20, 2020, Sauer filed its *Complaint for Declaratory Judgment to Determine Interests in Escrow Accoun*t (the "Sauer Adversary Complaint") [Adv. ECF No.  1] asserting a Count for declaratory relief that $1,364,818.27 of the Escrow Deposit is not part of the bankruptcy case (Count I) and seeking declaratory relief that Fidelity is authorized to disburse certain funds to Sauer and its subcontractors (Count II).

On January 25, 2021, the Debtor filed *Midtown Campus Properties, LLC's Motion to (I) Dismiss Sauer Incorporated's Complaint, or (II) In the Alternative to Consolidate with Pending Objection to Claim* (the "Motion to Dismiss")[Adv. ECF No. 20]. On February 8, 2021, Sauer filed  *Plaintiff's Response to Defendant Midtown Campus Properties, LLC's Motion to (I) Dismiss Complaint, or (II) in the alternative to Consolidate with Pending Objection to Claim* ("Sauer's Response")[Adv. ECF No. 25].  On February 12, 2021, the Bankruptcy Court entered the *Order (1) Denying Motion to Dismiss; (2) Granting, In Part, Motion to Consolidate; and (3) Setting Deadlines* ("Order Denying Motion to Dismiss") [Adv. ECF No. 26 and ECF No. 334].

On March 12, 2021, the Bankruptcy Court entered the *Order of Referral to Mediation* (the "Mediation Order")[Adv. ECF No. 30] setting a mediation deadline no later than April 30, 2021.

On March 29, 2021, the Debtor filed *Midtown Campus Properties, LLC's Answer and Affirmative Defenses to the Complaint of Sauer Incorporated and Counterclaim for Affirmative Relief and Restating its Objection to the Claim of Sauer Incorporated* (the "Counterclaim")[Adv. ECF No. 37] consisting of the following claims: Count I – Breach of Contract; Count II – Declaratory Relief; Count III – Objection to the Alleged Secured Claim of Sauer; and Count IV – Objection to the Entire Claim of Sauer.

On April 6, 2021, the Debtor filed *Debtor/Adversary Defendant's, Midtown Campus Properties, LLC, Motion to Compel Better Interrogatory Responses from Adversary Plaintiff, Sauer Incorporated* [Adv. ECF No. 38].  On April 16, 2021, Sauer filed *Sauer Incorporated's Response in Opposition to Debtor/Adversary Defendant's, Midtown Campus Properties, LLC, Motion to Compel Better Interrogatory Responses* [Adv. ECF No. 43].

On April 13, 2021, the Debtor filed *Debtor/Adversary Defendant's, Midtown Campus Properties, LLC Agreed Motion to Extend the Deadline to Conduct Mediation by One Week* ("Motion for Extension")[Adv. D.E. 41] and on April 14, 2021, the Bankruptcy Court entered the *Agreed Order Extending Deadline to Conduct Mediation* ("Agreed Order")[Adv. ECF No. 42] extending the mediation deadline to May 6, 2021.

On April 19, 2021, Sauer filed *Sauer Incorporated's Partial Answer to Counts I, II and IV of Counterclaim for Affirmative Relief and Partial Affirmative Defenses [Adv. D.E. 44] and its Sauer Incorporated's Motion to Dismiss Count II of the Counterclaim for Affirmative Relief* [Adv. ECF No. 45].

On April 19, 2021, Sauer filed *Sauer Incorporated's Motion to Strike Certain Answers and Affirmative Defenses Included in Midtown Campus Properties, LLC's Answer and Affirmative Defenses in Response to Sauer Incorporated's Complaint for Affirmative Relief* [Adv. ECF No. 46]. On April 20, 2021, the Bankruptcy Court entered the O*rder Granting Interim Relief on Motion to Compel* [Adv. D.E. 47].

### (iii)    State Court Case Filed by Sauer in Alachua County, Florida

On January 18, 2021, Sauer filed a Complaint in the Circuit Court of the Eighth Judicial Circuit In and For Alachua County, Florida, Case No. 2021 CA 000076 against Roger Development Group, Inc., ("Roger Development"), and RDG Midtown, LLC ("RDG") ("Alachua Case").   In connection with the foregoing, on February 20, 2021, Sauer filed a *Motion for Clarification As To The Applicability of Automatic Stay To State Court Action Against Non-Debtor Third Parties, Or In The Alternative, If The Automatic Stay Applies, For Relief From The Automatic Stay* ("Clarification Motion") [ECF No 322] seeking entry of an Order clarifying that the automatic stay does not apply to the Alachua Case, or in the alternative for relief from the automatic stay.

Pursuant to the Bankruptcy Court's *Order Setting Hearing and Briefing Schedule on Motion for Clarification* [ECF No. 333] entered on February 21, 2021 ("Briefing Order"), the Debtor filed *Debtor's Motion for Extension of the Automatic Stay of In the Alternative for Injunctive Relief* ("Injunctive Relief Motion") [ECF No.338] and separately filed *Debtor's Response and Memorandum of Law In Opposition to Motion for Clarification As To The Applicability of Automatic Stay To State Court Action Against Non-Debtor Third Parties, Or In The Alternative, If The Automatic Stay Applies, For Relief From The Automatic Stay* ("Response") [ECF No 337].   The Briefing Order further authorized the Debtor to seek alternative relief to enjoin Sauer from proceeding with the Alachua Case by filing the Injunctive Relief Motion with Sauer's consent. The parties conferred and Sauer agreed to waive the requirements of an adversary proceeding provided that the adversary rules in the context of contested matters to the Injunctive Relief Motion.

On March 12, 2021, the Bankruptcy Court entered an *Order on Motion for Injunctive Relief and Order Granting Motion for Clarification* [ECF No. 350] and found that Sauer did not violate the automatic stay by filing the Alachua Case and reserved ruling on the Debtor's request for an injunction under section 105 pending the parties' agreement to proceed with Mediation.

### (iv)    Mediation with Sauer

On March 31, 2021, the Bankruptcy Court entered an Order [ECF No. 349] referring the Sauer Adversary, Objection to Claim and the claims in the related Alachua Case asserted against

Roger Development and RDG to mediation.  The parties selected Bruce Alexander as Mediator and held an all-day mediation session on May 6, 2021. Since that date, the parties have continued settlement discussions with the assistance of the Mediator to try and resolve the claims asserted and reach a global settlement.

Ultimately, the Debtor and Sauer were not able to reach agreement at the Mediation and as a result, the mediator issued an impasse [Sauer Adv. Proc. No. 48].

### (v)    Motion to Abate and Injunctive Relief.

As a result of an impasse at the Mediation, the Bankruptcy Court set an evidentiary hearing on the Debtor's *Injunctive Relief Motion* in respect of the Alachua Case for August 16, 2021 [ECF Nos. 422, 424, 426].  On July 28, 2021, the Debtor filed its *Motion to Abate Adversary Proceeding and Related Matters* [Sauer Adv. Proc. No. 49] (the "Motion to Abate").  The Bankruptcy Court set a hearing on the Motion to Abate for August 16, 2021.

After a lengthy evidentiary hearing on August 16, 2021, the Bankruptcy Court granted the Debtor's request for temporary injunctive relief as to the Alachua Case [ECF No. 460] and granted the Motion to Abate [Sauer Adv. Proc. No. 61] on a temporary basis as well. The temporary injunction as to the Alachua case and the abatement in the Sauer Adversary ran through October 31, 2021, which date was thereafter extended by agreed Orders through November 11, 2021 [ECF No. 502] and [Sauer Adv. Proc. No. 66].  On November 5, 2021, the Court entered an Ex-Parte Agreed Orders further extending the temporary injunction through December 31, 2021 [ECF No. 511] and [Sauer Adv. Proc. No. 69].

### E.    The Stalking Horse Buyer, the Purchase Agreement and the Sale Motion.

On November 5, 2021, the Debtor filed the Sale Motion [ECF No. 510] seeking the entry of the Bidding Procedures Order on an emergency basis.  The Sale Motion also seeks the approval of the Purchase Agreement with the Stalking Horse Buyer, pursuant to which the Debtor proposes to sell the Project to the Stalking Horse Buyer, subject to higher and/or better offers, for a purchase price equal to $104,100,000.  The Purchaser is CASL Holdings, LLC, which is affiliated with CA Ventures, a global real estate investment management company with $13 billion in assets, including student housing projects.  The Court set an emergency hearing on the Sale Motion for November 8, 2021.

## V.    THE CHAPTER 11 PLAN

### A.    Treatment of Claims and Equity Interests under the Plan.

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

Under the Plan, the Claims against the Debtor are divided into Classes according to their priority and other criteria.  The Classes of Claims against and Equity Interests in the Debtor, as well as the implementation of the Plan and the Distributions to be made under the Plan are

described more fully below.

   (i)   **Administrative Claims, Professional Claims, Priority Tax Claims and United States Trustee Fees.**

       **a.   Administrative Expense Claims.**

The Debtor shall pay each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Debtor; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that any Claim seeking administrative expense status included as a part of a Proof of Claim filed in this Chapter 11 Case shall not qualify as an Administrative Claim. The Debtor does not yet know the amount of Administrative Claims that may be asserted against the Estate, but believes that they will not be material since the Debtor has been paying its post-petition obligations.

Unless otherwise ordered by the Bankruptcy Court, any holder of an Administrative Claim (including a holder of a Claim for postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Claim against the Debtor, the Estate, the Reorganized Debtor, or their respective assets, and such holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Claim.

       **b.   Professional Claims.**

On or prior to the deadline set by the Bankruptcy Court for Professionals to file final fee applications, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Confirmation Hearing. The Debtor shall pay the Allowed Claims of each Professional from Cash on hand in accordance with the Orders of the Bankruptcy Court. From and after the Confirmation Date until the Effective Date, the Debtor, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period. The expected amount of Professional Claims is set forth in the Liquidation Analysis attached hereto as Exhibit 3.

       **c.   Priority Tax Claims.**

The Debtor shall pay each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; provided, however, that the Debtor shall not pay

any premium, interest or penalty in connection with such Allowed Priority Tax Claim. Other than real estate taxes on the Project (which are set forth in the Liquidation Analysis), the Debtor does not anticipate any Priority Tax Claims against the Estate. As set forth in the Plan, the sale of the Project is being done under, in connection with and as part of the implementation of this Plan for all purposes, including specifically section 1146(a) of the Bankruptcy Code. Therefore, the Debtor asserts that it is entitled to an exemption for documentary or transfer taxes or stamps on the sale of the Project.

        **d.**      **Statutory Fees.**

Notwithstanding any other provisions of the Plan to the contrary, the Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the entry of the order confirming the Plan, for pre-confirmation periods and simultaneously file all the monthly operating reports for the relevant periods, indicating the cash disbursements for the relevant period. The Reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Reorganized Debtor, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the Bankruptcy Code, and the Reorganized Debtor shall provide to the United States Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, post-confirmation quarterly operating reports indicating all the cash disbursements for the relevant period.

        **e.**      **The DIP Loans**

        (i)    <u>Priming DIP Loan</u>. Pursuant to the Priming DIP Loan Documents, the Bankruptcy Court has approved the Priming DIP Loan by the Priming DIP Lender to the Debtor in an amount up to $7,400,000, which Priming DIP Loan is secured by a first priority priming Lien in favor of the Priming DIP Lender on substantially all assets of the Debtor, including specifically the Project. Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the Priming DIP Lender shall receive Cash on the Sale Closing Date from a combination of the Cash Collateral and the Net Sales Proceeds, in each case which secure the Lien of the Priming DIP Loan, in full and final satisfaction, settlement, release, extinguishment, and discharge of the Priming DIP Loan, in an amount equal to the then outstanding balance of the Priming DIP Loan in accordance with the terms thereof. To the extent that any Liens to secure the Priming DIP Loan have been filed or recorded publicly, if requested by Reorganized Debtor, the Priming DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

        (ii)   <u>Junior DIP Loan</u>. Pursuant to the Junior DIP Loan Documents, the Bankruptcy Court has approved the Junior DIP Loan by the Junior DIP Lender to the Debtor in an amount up to $5,200,000, which Junior DIP Loan is secured by a junior priority Lien in favor of the Junior DIP Lender on substantially all assets of the Debtor, including specifically the Project. Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the Junior DIP Lender shall receive Cash on the Sale Closing Date from a combination of the Cash Collateral and the Net Sales Proceeds, in

each case which secure the Lien of the Junior DIP Loan, in full and final satisfaction, settlement, release, extinguishment, and discharge of the Junior DIP Loan, in an amount equal to the then outstanding balance of the Junior DIP Loan in accordance with the terms thereof, provided however, that no such payment shall be made to the Junior DIP Lender unless and until the Priming DIP Loan, the Allowed Secured Claim in Class 2 (or if not then Allowed, the asserted Class 2 Secured Claim) and the Allowed Other Secured Claims in Class 3 (or if not then Allowed, the asserted Class 3 Other Secured Claims) that have priority over the Junior DIP Loan have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in connection therewith. To the extent that any Liens to secure the Junior DIP Loan have been filed or recorded publicly, if requested by Reorganized Debtor, the Junior DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

**(ii)    Classification of Claims and Equity Interests.**

Except as set forth in the Plan, all Claims against and Equity Interests of the Debtor are placed in a particular Class. The Debtor has not classified Administrative Claims, Professional Claims, Priority Tax Claims, the Statutory Fees and the DIP Loans. The following table classifies Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in Article III of the Plan. The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties. The following Classes and proposed treatment to creditors with Allowed Claims are contained in the Plan:

| Class | Type of Claim or Equity Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approx. Percentage Recovery |
|-------|----------------------------------|--------|-----------|------------------|------------------------------------------------------------------|
| 1 | Other Priority Claims | Unimpaired | Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtor prior to the Effective Date or agrees to a different classification and treatment, each holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the | No, deemed to have accepted the Plan | Expected <u>Amount</u>:<br><br>Zero |

| Class | Type of Claim or Equity Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | | Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law; provided, however, that the Debtor shall not pay any premium, interest or penalty in connection with such Allowed Other Priority Claim. Such treatment shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Other Priority Claim. | | |
| 2 | Secured Claim of Indenture Trustee | Unimpaired | The Allowed Secured of the Indenture Trustee within this Class 2 shall be satisfied and paid in full from a combination of Cash Collateral, the Reserve Funds and the Net Sales Proceeds generated from the sale of the Project, in each case which secures the Lien of such Allowed Secured Claim, at the later of (i) the Sale Closing Date, or (ii) the date such Class 2 Secured Claim becomes an Allowed Secured Claim, provided however, that for avoidance of doubt, that portion of the Class 2 Secured Claim that is not Disputed shall be paid from the Net Sale Proceeds on the Sale Closing Date, and provided further, that no Distribution shall be made to the holder of the Allowed Secured Claim in this Class 2 unless and until the Priming DIP Loan has been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue. Notwithstanding anything herein to the contrary, at such time as the Class 2 Secured Claim becomes an Allowed Claim by the Bankruptcy Court, then such Allowed Class 2 Secured Claim shall first be reduced by the Reserve Funds to the extent remaining at such time, which remaining amount shall be based on agreement between the Indenture Trustee and the Debtor or order of the Bankruptcy Court. In the event that the Project is sold prior to the Class 2 Secured Claim being Allowed, then the Class 2 Secured Claim and any Lien related thereto shall transfer and attach to the Net Sales Proceeds pursuant to and in accordance with the Sale | No, deemed to have accepted the Plan | Amount: <br><br> See Different Scenarios in the Liquidation Analysis <br><br> Percentage Recovery: <br><br> 100% |

| Class | Type of Claim or Equity Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | | Order and section 363(f) of the Bankruptcy Code, which shall then be used to pay the Allowed Class 2 Secured Claim in accordance herewith. The treatment of the Allowed Class 2 Secured Claim under the Plan shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Class 2 Secured Claim. | | |
| 3 | Other Secured Claims | Unimpaired | Each Allowed Class 3 Other Secured Claim against the Estate (for avoidance of doubt which shall include post-petition interest, if applicable under section 506(b) of the Bankruptcy Code or otherwise, including as set forth in the documents establishing such Allowed Class 3 Other Secured Claim) shall be classified in a separate sub-class within this Class 3 and shall be satisfied and paid in full from the Net Sales Proceeds generated from the sale of the Project which secures the Lien of such Allowed Class 3 Other Secured Claim at the later of (i) the Sale Closing Date, or (ii) the date such Class 3 Other Secured Claim becomes an Allowed Secured Claim, provided however, that for avoidance of doubt, that portion of any Class 3 Other Secured Claim that is not Disputed shall be paid from the Net Sale Proceeds on the Sale Closing Date subject to the terms of the Plan, and provided further, that no Distribution shall be made to the holder of any Allowed Other Secured Claim in this Class 3 unless and until the Priming DIP Loan, the Allowed Secured Claim in Class 2 (or if not then Allowed, the asserted Class 2 Secured Claim) and all Allowed Other Secured Claims in this Class 3 (or if not then Allowed, the respective asserted Class 3 Other Secured Claims) with lien priority over the applicable Allowed Other Secured Claim in this Class 3 have been, as applicable, paid in full, reserved in the Disputed Claims Reserve) or otherwise resolved, and/or included in or accounted for in the Distribution at issue. In the event that the Project is sold prior to the allowance of any Class 3 Other Secured Claim, then each such Class 3 Other Secured Claim and any Lien related thereto | No, deemed to have accepted the Plan | Amount and percentage recovery: See Liquidation Analysis |

| Class | Type of Claim or Equity Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | | shall transfer and attach to the Net Sales Proceeds pursuant to and in accordance with the Sale Order and section 363(f) of the Bankruptcy Code, which shall then be used to pay each such Allowed Class 3 Other Secured Claim in accordance herewith. The treatment of each Allowed Class 3 Secured Claim under the Plan shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Class 3 Other Secured Claim. Any portion of an Allowed Class 3 Other Secured Claim that is not satisfied as part of its Allowed Class 3 Other Secured Claim shall be treated as an Allowed Class 4 General Unsecured Claim pursuant to the terms of this Plan. | | |
| 4 | Allowed General Unsecured Claims | Impaired | Each Allowed General Unsecured Claim in this Class 4 shall be satisfied and paid in full, without interest from and after the Petition Date, from the Available Cash, including the Net Sales Proceeds generated from the sale of the Project on the later of (i) the Effective Date, or (ii) the date such Class 4 General Unsecured Claim becomes an Allowed General Unsecured Claim, provided however, that no Distribution shall be made to holders of Allowed General Unsecured Claims in this Class 4 unless and until all Allowed Administrative Claims, all Professional Claims, all Allowed Priority Tax Claims, the DIP Loans and all Allowed Claims in Classes 1, 2 and 3 (or if such Claims are not then Allowed, the respective asserted Claims) have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in the Distribution at issue. Notwithstanding anything in the Plan to the contrary, if and to the extent the Available Cash is not sufficient to pay all of the Allowed Class 4 General Unsecured Claims in full, then the Distribution to the holders of the Allowed Class 4 General Unsecured Claims shall be made on a Pro-Rata basis. The treatment of each Allowed Class 4 General Unsecured Claim hereunder shall be in full and final satisfaction, settlement, | Yes | Amount and percentage recovery: See Liquidation Analysis |

| Class | Type of Claim or Equity Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approx. Percentage Recovery |
|-------|----------------------------------|--------|-----------|------------------|------------------------------------------------------------------|
| | | | release, extinguishment, and discharge of such Allowed Class 4 General Unsecured Claim. | | |
| 5 | Equity Interests | Unimpaired | Each holder of an Equity Interest in the Debtor as of the Petition Date shall retain its respective Equity Interest in the Reorganized Debtor from and after the Effective Date, provided however, that no Distribution shall be made to holders of the Equity Interests in this Class 5 unless and until all Allowed Administrative Claims, all Professional Claims, all Allowed Priority Tax Claims, the DIP Loans and all Allowed Claims in Classes 1, 2, 3 and 4 (or if such Claims are not then Allowed, the respective asserted Claims) have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in the Distribution at issue. | No, deemed to have accepted the Plan | Amount: See Liquidation Analysis |

**B.    Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, or as agreed to between a Debtor and any Holder of any Unimpaired Claim, nothing under the Plan shall affect any Debtor's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**C.    Means for Implementation of the Plan.**

**(i)    Source of Funding for Plan Distributions- Sale of Project**

The Debtor asserts that based on positions taken by the Indenture Trustee during the Chapter 11 Case, including the Indenture Trustee's demand for post-petition default rate interest which is the subject of the Section 506(b) Pleadings and the Adversary, the Debtor has been compelled to proceed with a sale of the Project as the means for implementation of the Plan in order to maximize the recovery to all stakeholders in this Chapter 11 Case. As a result, Distributions to the holders of Allowed Claims and Equity Interests under the Plan shall be made from Available Cash, including specifically the Net Sales Proceeds.

As a result of the above, the Debtor engaged, and the Bankruptcy Court approved, B. Riley to conduct a marketing and sale process for the Project. On or about July 22, 2021, B. Riley commenced and is continuing a marketing process for the sale of the Project. On or shortly after

B. Riley established September 8, 2021 as a date for a "call for offers," the Debtor received at least four (4) offers for the purchase of the Project in excess of $100 million each.  After evaluating such offers and negotiating with certain of the proposed purchasers, the Debtor ultimately selected the Stalking Horse Buyer as the "stalking horse" purchaser.  On November 4, 2021, the Debtor entered into the Purchase Agreement with the Stalking Horse Buyer for the sale of the Project at a purchase price equal to $104,100,000.  The due diligence period under the Purchase Agreement has expired and the Stalking Horse Buyer has made its good faith deposit thereunder.  In connection therewith, on November 5, 2021, the Debtor filed the Sale Motion.   In the event the Debtor receives any Qualified Bids by the Bid Deadline (each as defined in the Bidding Procedures Order), then the Debtor will conduct an auction for the Project.  In the event the Debtor does not receive any Qualified Bids under the Bidding Procedures Order, then the Debtor will seek approval from the Bankruptcy Court for the sale of the Project to the Stalking Horse Buyer at the Sale Hearing (as defined in the Bidding Procedures Order) pursuant to the Purchase Agreement.  In the event the Bankruptcy Court approves the sale of the Project to the Successful Bidder (as defined in the Bidding Procedures Order), then the Debtor will proceed to consummate the sale of the Project.

Notwithstanding anything herein to the contrary, the sale of the Project as set forth above shall be done in connection with and as part of the implementation of this Plan for all purposes, including specifically Section 1146(a) of the Bankruptcy Code.

(ii)     **Section 1146 Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the making, delivery, or recording of an instrument of transfer in connection with the sale by the Debtor or Reorganized Debtor of the Project pursuant to any Sale Motion and Sale Order (whether by auction or otherwise) shall not be taxed under any law imposing a stamp or similar tax, including but not limited to any recording fee, intangible taxes or documentary stamp taxes, whether on any deed, leasehold, assignment, promissory note, security agreement or mortgage.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  **For avoidance of doubt, the sale of the Project as contemplated under the Plan and the Sale Order shall have the full benefit of Section 1146(a) of the Bankruptcy Code**.

(iii)     **Corporate Action**

All actions contemplated to be performed by any Debtor or Reorganized Debtor pursuant to any Plan, or any corporate action to be taken by or required of any Debtor or Reorganized Debtor, shall, as of the Effective Date of the Plan, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, partners, members or managers of such Debtor or Reorganized Debtor.  All Persons, the Reorganized Debtor, Governmental Units, title agencies, licensing agencies and offices of recordation may rely upon the authority vested in the Debtor's officers, or

managers to act on such Debtor's behalf in order to effectuate the Plan and the transactions contemplated therein.

(iv)    **Vesting of Property of the Estate in the Reorganized Debtor.**

Except as provided for herein or in the Sale Order, pursuant to Sections 1123(a)(5), 1123(b)(3) and 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all property of the Estate not otherwise subject of Distributions under the Plan or required to be deposited into the Disputed Claims Reserve shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances.  As of the Effective Date, the Reorganized Debtor may operate its business, if any, and use, acquire, and dispose of its property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Sale Order, the Plan and the Confirmation Order.  All privileges with respect to the property of the Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may only be asserted by and/or waived on behalf of, the Reorganized Debtor.

(v)    **Distributions**

The Distributions will be made in accordance with the Plan by the Debtor and Reorganized Debtor, as applicable and as set forth herein.

(vi)    **Surrender and Cancellation of Notes, Instruments, Certificates and Other Documents Evidencing Claims**

On the Effective Date of the Plan, except to the extent otherwise provided in such Plan, all notes, instruments, certificates, and other documents evidencing Claims will be cancelled and the obligations of the respective Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy Code.

(vii)    **Continued Corporate Existence of the Reorganized Debtor**

The Reorganized Debtor will exist after the Effective Date with all of the powers of a limited liability company under applicable law in the state of Florida pursuant to its existing operating agreement or other organizational documents in effect before the Effective Date, except to the extent such operating agreement or other organizational documents are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.  Notwithstanding the above, the Debtor or the Reorganized Debtor may change its status of incorporation or alter its corporate structure or business form (either through a merger, consolidation, restructuring, conversion, disposition, liquidation, dissolution, or otherwise) on or after the Effective Date as may be determined by the Debtor or the Reorganized Debtor to be appropriate.

(viii)    **Post-Confirmation Accounts**

From and after the Effective Date, the Reorganized Debtor will establish the Disputed Claims Reserve and may establish one or more other bank accounts as it determines may be necessary or appropriate to effectuate the provisions of the Plan.

(ix)     **Management of the Reorganized Debtor**

Existing management of the Debtor shall continue to serve in their respective capacities through the Effective Date and shall serve in the same capacity for the Reorganized Debtor, as set forth in the applicable existing organizational or operational documents of the Debtor.   The management team shall be compensated in the same manner that it historically has been compensated.   On or before the Effective Date, and without the need for any further order or authority, the Debtor may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Debtor as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor, the Reorganized Debtor, and any other necessary party, as applicable, shall perform all actions reasonably contemplated regarding the implementation of the Plan.

Oscar Roger, Sr., as the manager of the Debtor and the Reorganized Debtor is authorized, without the need for any further order or authority, (i) to execute, deliver, file, or record such deeds, contracts, instruments, and other agreements or documents and take such actions as may be necessary or appropriate to implement or consummate the Plan, or to convey the Project pursuant to the Plan and the Sale Order, and to consummate the terms of the Purchase Agreement, and (ii) to undertake any other action on behalf of the Debtor to implement or consummate the Plan, the Sale Order and the transactions contemplated under the Purchase Agreement.  Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of any Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and (to the extent taken before the Effective Date) ratified in all respects without any requirement of further action by any officer, director or manager of the Debtor.

(x)     **Section 1145 Determination**

The offer, purchase, sale, exchange and issuance of securities under the Plan, or in connection with the Plan, is exempt from the registration requirements under state and federal securities laws.

(xi)     **Preservation of Causes of Action**

The Debtor (prior to the Effective Date) and Reorganized Debtor (on and after the Effective Date) shall retain and be authorized to prosecute all Causes of Action, except for those which are expressly released, settled or compromised prior to the Confirmation Date by separate Order of the Bankruptcy Court.

On the Effective Date, the Causes of Action, including specifically as set forth in the Section 506(b) Pleadings, the Adversary and the Sauer Litigation,[9] shall be preserved and vested in the Reorganized Debtor for the benefit of the Reorganized Debtor and the holders of Allowed Claims and Allowed Equity Interests hereunder.  After the Effective Date, the Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, enforce, file, settle,

---

[9] U.S. Bank asserts in the Supplemental Objection that certain claims and causes of action exist against certain insiders of the Debtor.  The Debtor strongly disagrees with U.S. Bank and asserts that no such claims or causes of action exist.

compromise, release, withdraw, arbitrate or litigate any Cause of Action that vests in the Reorganized Debtor on the Effective Date.

**UNLESS SPECIFICALLY PROVIDED FOR HEREIN, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSE OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE DEBTOR AND THE REORGANIZED DEBTOR**.  Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtor to release such claims.  As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or Reorganized Debtor do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan.  It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of Reorganized Debtor.  A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing any such Cause of Action.  Nothing in the Plan operates as a release of any Cause of Action.

Other than in the Section 506(b) Pleadings, the Adversary and the Sauer Litigation, the Debtor does not presently know the full extent of the Causes of Action and, for purposes of the Plan, all Creditors are advised that the Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action.  Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Confirmation Order or in any other Final Order of the Bankruptcy Court.  Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Cause of Action following Confirmation of the Plan.

The Estate shall remain open, even if the Chapter 11 Case shall has been closed, as to any and all objections to Claims and Causes of Action until such time as all objections to Claims and the Causes of Action have been fully administered and the recoveries therefrom have been received.

(xii)    **Prosecution and Settlement of Causes of Action and Objections to Claims**

The Debtor or Reorganized Debtor, as applicable, (a) may commence or continue in any appropriate court, tribunal or any other appropriate setting (e.g., American Arbitration Association or other arbitration association) any suit or other proceeding for the filing, prosecution and/or enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, including any objections to Claims and and/or Causes of Action

pending as of the Effective Date, and (b) may settle or adjust any Cause of Action or objection to Claim; provided, however, that from and after the Effective Date, the Reorganized Debtor shall be authorized to compromise and settle any Cause of Action or objection to a Claim upon approval by the Bankruptcy Court after notice and a hearing.

(xiii)    **Automatic Stay**

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Case until the Effective Date of the Plan.

(xiv)    **Closing of the Chapter 11 Case**

Notwithstanding anything to the contrary in the Bankruptcy Rules or Local Rules of the Bankruptcy Court providing for earlier closure of the Chapter 11 Case, when all Claims against the Debtor have become Allowed Claims or Disallowed Claims, and the Debtor's Available Cash has been distributed in accordance with the Plan, or at such earlier time as the Reorganized Debtor deems appropriate, such Reorganized Debtor shall seek authority from the Bankruptcy Court to close such Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**D.    Provisions Governing Distributions**

(i)    **Manner of Cash Payments Under the Plan**

Any Distribution pursuant to the Plan, to the extent posted in the United States mail, shall be deemed made when deposited by the Debtor or the Reorganized Debtor (or its respective agent(s)), as applicable, into the United States mail, or paid by wire transfer.  At the option of the Debtor or the Reorganized Debtor, as applicable, any Cash payment to be made pursuant to the Plan shall be made, at the election of the Debtor or the Reorganized Debtor, as applicable, by check drawn on a domestic bank, by wire transfer, or by ACH, from a domestic bank, or other method mutually agreed upon by the holder of the Allowed Claim or Allowed Equity Interest and the Debtor or the Reorganized Debtor.  Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on that due date.

(ii)    **Entity Making Distributions**

Except as otherwise provided in the Plan, Distributions to holders of Allowed Claims and/or Allowed Equity Interests shall be made by the Debtor, if before the Effective Date, or the Reorganized Debtor if on or after the Effective Date.  The Debtor and the Reorganized Debtor shall not be required to give any bond or surety or other security for the performance of its duties, unless otherwise ordered by the Bankruptcy Court.

(iii)    **Distribution Dates**

Distributions to holders of Claims shall be made as provided in each Plan.  In the event that any payment or act under a Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the

next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### (iv)    Record Date for Distribution

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Debtor or Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Debtor or Reorganized Debtor, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the Proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date.

### (v)    Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Debtor or Reorganized Debtor, as applicable, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no Proof of Claim is filed or if the Debtor or Reorganized Debtor, as applicable, have not been notified in writing of a change of address.

### (vi)    Undeliverable and Unclaimed Distributions

In the event that any Distribution to any holder of an Allowed Claim made by the Debtor or Reorganized Debtor, as applicable, is returned as undeliverable, the Debtor or Reorganized Debtor, as applicable, shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until respective Debtor or Reorganized Debtor, as applicable, has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by a Debtor or Reorganized Debtor, as applicable, that are unclaimed for a period of one hundred-twenty (120) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtor or Reorganized Debtor, as applicable, or its property. Any Distributions which are undeliverable or have not been negotiated within the time period set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtor or Reorganized Debtor, as applicable. The Debtor or Reorganized Debtor, as applicable, shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred.

### (vii)    Compliance with Tax Requirements

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan. The Debtor or

Reorganized Debtor, as applicable, may withhold from any Distributions under and pursuant to the Plan to any Person or Entity any and all amounts, determined in the reasonable discretion of the Debtor or Reorganized Debtor, as applicable, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement; *provided*, *however*, that the Debtor or Reorganized Debtor, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Claims or Equity Interest without first filing a notice with the Court (and serving such notice on the holder of the Claim or Equity Interest) describing the nature and amount of the proposed withholding and providing such holder an opportunity to object.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims and/or Equity Interests.  The Debtor or Reorganized Debtor, as applicable, shall be authorized to collect such tax information from the holders of Claims and/or Equity Interests (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan.  In order to receive Distributions under the Plan, all holders of Claims and Equity Interests will need to identify themselves to the Debtor or Reorganized Debtor, as applicable, and provide all tax information such Debtor or Reorganized Debtor, as applicable, deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder).  The Debtor or Reorganized Debtor, as applicable, may refuse to make a Distribution to any holder of a Claim or Equity Interest that fails to furnish such information within the time period specified by such Debtor or Reorganized Debtor, as applicable, and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if such Debtor or Reorganized Debtor, as applicable, fails to withhold in respect of amounts received or distributable with respect to any such holder and the Debtor or the Reorganized Debtor is later held liable for the amount of such withholding, such holder shall reimburse the Debtor or Reorganized Debtor, as applicable, for such liability.  Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Allowed Equity Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit.

(viii)    **No Payments of Fractional Dollars**

Notwithstanding any other provision of any Plan to the contrary, no payment of fractional dollars shall be made pursuant to any such Plan.  Whenever any payment of a fraction of a dollar under a Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

(ix)    **Interest on Claims**

Except as specifically provided for in this Plan or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date.  Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided in any Plan or in an order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or similar charges.

(x)    **No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary contained in any Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

(xi)    **Setoff and Recoupment**

The Debtor or Reorganized Debtor, as applicable, may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that such Debtor or Reorganized Debtor, as applicable, or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under such Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor, as applicable, or such Estate of any right of setoff or recoupment that any of them may have against the holder of any Claim.  Any such setoffs or recoupments may be challenged in Bankruptcy Court.  Notwithstanding any provision in any Plan to the contrary, nothing herein or in a Plan shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; provided, however, that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtor or Reorganized Debtor, as applicable, and the Estates with respect thereto are reserved.

(xii)    **De Minimis Distributions**

Notwithstanding anything to the contrary in any Plan, the Debtor or Reorganized Debtor, as applicable, shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $10 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.

(xiii)    **Distributions in Satisfaction; Allocation**

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities on, Liens on, obligations of and Equity Interests in the Debtor and its Estate, whether known or unknown, that arose or existed prior to the Effective Date.  Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest (if any).

(xiv)    **No Distributions on Late-Filed Claims**

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a Proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Case, including, without limitation, the General Bar Date and any bar date established in any Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Case, without the need for (a) any further action by the respective Debtor or Reorganized Debtor, as applicable, or (b) an order of the Bankruptcy Court. Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

E.    **Disputed Claims**

(i)    **Resolution of Disputed Claims**

The Debtor or Reorganized Debtor, as applicable, shall have the right to make and file objections to Claims in the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

(ii)    **Objection Deadline**

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the applicable Chapter 11 Case pursuant to Bankruptcy Rule 2002.

(iii)    **Estimation of Claims**

At any time, each Debtor or Reorganized Debtor, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether such Debtor or Reorganized Debtor, as applicable, has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the respective Debtor or Reorganized Debtor, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(iv)    **No Distributions Pending Allowance; Disputed Claims Reserve**

Notwithstanding any other provision in the Plan, no Distributions shall be made under the Plan on account of any Disputed Claim until it becomes an Allowed Claim. To protect the interests of holders of Disputed Claims, the Reorganized Debtor shall establish the Disputed Claims Reserve. The Reorganized Debtor shall fund the Disputed Claims Reserve with Cash in an amount that represents the Disputed Claim (or portion thereof) that would otherwise be distributed to the holder of each Disputed Claim (or portion thereof) if such Disputed Claim was Allowed in the amount set forth on the holder's Proof of Claim or as estimated by the Bankruptcy Court. As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive from the Disputed Claims Reserve a distribution in an amount equal to the Distribution that such Holder would have received had such Disputed Claim been an Allowed Claim on the Effective Date. If and when a Disputed Claim or any portion thereof becomes a Disallowed Claim, the Distributions that would otherwise be made thereon shall be available for

Distribution to holders of Allowed Claims or Equity Interests pursuant to the Plan.

**F.    Treatment of Executory Contracts and Unexpired Leases**

**(i)    General Treatment: Rejected if not Previously Assumed.**

**If applicable, within fourteen (14) days prior to the Confirmation hearing, the Debtor shall file and serve a Notice of all contracts that it intends to assume (the "Assumption Schedule") that have not been previously assumed pursuant to separate Order of the Bankruptcy Court.  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed rejected, unless included on the Assumption Schedule or previously assumed by separate order of the Bankruptcy Court. If applicable, within 14 days prior to the Confirmation Hearing, the Debtor shall file a proposed Schedule of Cure Amounts for any leases or contracts that will be assumed under the Plan  (the "Cure Schedule").  Any party objecting the proposed cure amount as set forth in the Cure Schedule shall file an objection within three (3) days prior to the Confirmation hearing.  If no objection is filed, then the proposed cure amount will be deemed approved. The Debtor shall have forty-five (45) days from the Effective Date to supplement the Assumption Schedule and the Cure Schedule and the Bankruptcy Court will determine any disputes related thereto.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumption or rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption or rejection is in the best interests of the Debtor, the Reorganized Debtor, the Estate, and all parties in interest in the Chapter 11 Case.**

**(ii)    Bar to Claims Arising from Rejection, Termination or Expiration.**

**Claims created by the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the Debtor or Reorganized Debtor, as applicable, no later than thirty (30) days after the earlier of (a) the date of the entry of any order of the Bankruptcy Court authorizing rejection of any such executory contract or unexpired lease, or (b) the Confirmation Date with respect to any executory contract or unexpired lease that is deemed rejected pursuant to Article V.F.i hereof ("General Treatment; Rejected if not Previously Assumed").  Any rejection claim for which a Proof of Claim is not filed and served within the time provided herein will be forever barred and shall not be enforceable against the Debtor, or the Estate, or its respective assets, properties, or interests in property, or the Reorganized Debtor, or its assets, properties, or interests in property.  Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor or the Reorganized Debtor of any objections to such Claim if asserted.**

**G.    Conditions Precedent to the Effective Date**

**(i)    Conditions Precedent**

The following are conditions precedent to the Effective Date that must be satisfied or waived by the Debtor:

(a)      The Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor confirming and approving the Plan in all respects, and the Confirmation Order shall have become a Final Order.

(b)      The Sale Order shall have been entered and the Sale Closing Date shall have occurred.

(c)      There shall be no stay or injunction in effect with respect to the Confirmation Order.

(d)      The Plan Documents shall be in a form and substance reasonably acceptable to the Debtor, and have been duly executed and delivered; provided, however, that no party to any such agreements and instruments, may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

(ii)    **Waiver**

Notwithstanding the foregoing conditions, the Debtor reserves, in its sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth herein may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate any Plan.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## H.    **Effect of Confirmation, Indemnity, Discharge, Exculpation and Injunction**.

### (i)      **Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests.

### (ii)    **Vesting of Assets**

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code and except as provided for herein or in a Sale Order, all property of the Debtor shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests. From and after the Effective Date, the Reorganized Debtor may operate the Debtor's business, if any, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.  In the event that the Chapter 11 Case is converted to a case under chapter 7 for any reason, any property held by either the Debtor or the Reorganized Debtor at any time, other than property that already has been distributed under this Plan prior to conversion

of the case from chapter 11 to chapter 7, shall revest in the Debtor.

### (iii)    Title to Assets; Discharge of Liability

Except as otherwise provided in the Plan and the Sale Order, including, but not limited to any limitations set forth in the Plan and the Sale Order, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtor free and clear of all Claims, Equity Interests, Liens, encumbrances, charges, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtor arising prior to the Effective Date, except as may be otherwise provided in the Plan or the Sale Order.

### (iv)    Binding Effect

Subject to the occurrence of the Effective Date under the Plan, on and after the Confirmation Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, and any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under such Plan and whether or not such holder has accepted the Plan.

### (v)    Discharge of Claims

Except as provided herein, the rights afforded in the Plan and the payments and Distributions to be made thereunder shall discharge all existing debts and Claims, of any kind, nature, or description whatsoever against or in the Debtor or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided herein, upon the Effective Date of each Plan, all existing Claims against the Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtor, its respective successors or assignees, or any of its respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or proof of equity interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Reorganized Debtor any such discharged Claim against or Equity Interest in the Debtor.

### (vi)    Discharge of the Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan will be in complete satisfaction, discharge, and release, of any and all Claims, whether known or unknown, against the Debtor or Reorganized Debtor or any of its assets or properties, regardless of whether the property has been distributed or retained pursuant to the Plan.  Without limiting the generality of the foregoing, the Debtor or Reorganized Debtor will be discharged from any and all Claims and debts of the kind specified in sections 502(g), 502(h) of 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim is allowed under section 502 of the Bankruptcy

Code, or (c) the holder of such a Claim accepted the Plan.  Except as otherwise provided in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor arising before the Effective Date.  Under section 524 of the Bankruptcy Code, the discharge granted under this section shall avoid any judgment against the Debtor at any time obtained (to the extent it relates to a discharged Claim), and operates as an injunction against the prosecution of any action against the Debtor or its Estate (to the extent such action relates to a discharged claim). Nothing in this Article V.G.8 should be interpreted as a discharge of the Debtor's or Reorganized Debtor's rights or obligations under its Plan.

(vii)    **Exculpation by the Debtor and the Estate**

**Notwithstanding anything contained herein the contrary, the Exculpated Parties shall neither have nor incur any liability relating to the Chapter 11 Case to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan or distributing property thereunder, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Case; provided, however, that the foregoing provisions of this Article shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, fraud or willful misconduct.**

**For avoidance of doubt, the exculpation set forth herein (i) does not apply to any conduct of any of the Exculpated Parties that occurred prior to the Petition Date, (ii) is consistent with the standard exculpation provisions commonly used and approved by the Bankruptcy Courts in the Southern District of Florida and elsewhere, and (iii) does not constitute any type of injunction or "bar order" that would prohibit or preclude Sauer from pursuing its claims in Alachua County state court against Roger Development Group, Inc. and/or RDG Midtown, LLC and the Debtor and each of those two defendants retain all of their respective rights in that action.**

(viii)    **Limitations on Exculpation**

Nothing in the Plan shall be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or limit the liability of the professionals of the Debtor to the Debtor pursuant to Rule 4-1.8(h) of the Florida Rules of Professional Conduct ("Limiting Liability for Malpractice").

(ix)    **Injunction**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Reorganized Debtor, the Estate, and its successors and assigns, and its assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation,

debt, right, Cause of Action, interest or remedy released, discharged or satisfied or to be released, discharged or satisfied pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, the Estate, and its successors and assigns and its assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released, discharged or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtor or any of its assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

       (i)     commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, the Estate and their successors and assigns and their assets and properties;

       (ii)    enforcing, determining, attaching, collecting or recovering by any manner or means any liability, claim, judgment, award, decree or order against the Debtor, the Reorganized Debtor, the Estate and their successors and assigns and their assets and properties;

       (iii)   creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Reorganized Debtor, the Estate and their successors and assigns and their assets and properties; and

       (iv)   commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

       (x)    **Releases of Liens**

Except as otherwise provided in the Plan, in the Sale Order or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plan shall be fully released and discharged and all of the right, title and

interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the applicable Debtor.

## I.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, the Reorganized Debtor, and the Plan as is legally permissible, including, without limitation, jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim against or liability of the Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims, including pursuant to the Section 506(b) Pleadings, the Adversary and the Sauer Litigation;

(ii)    grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Case by the Debtor for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iii)    resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(iv)    ensure that Distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding, as applicable, the Debtor's or Reorganized Debtor's entitlement to recover assets held by third parties;

(v)    decide or resolve any motions, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date;

(vi)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

(vii)    issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

(viii) enforce Articles within the Plan;

(ix)    resolve any cases, controversies, suits or disputes with respect to the

releases, injunction and other provisions contained herein, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(x)    enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xi)    resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

(xii)    enter an order and a Final Decree closing the Chapter 11 Case.

### J.    Miscellaneous Provisions

#### (i)    Modification of Plan.

Subject to the limitations contained in the Plan, the Debtor reserves the right in its sole discretion, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify any Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; provided, however, that (1) any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under such Plan; and (2) after the entry of the Confirmation Order, any Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify a Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in such Plan in such manner as may be necessary to carry out the purpose and intent of such Plan.

#### (ii)    Revocation of Plan.

The Debtor reserves the right in its sole discretion to revoke or withdraw any Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 Plan.  If the Debtor revokes or withdraws a Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; and (2) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of  the Debtor or any other Entity; or (c) constitute an admission of any sort by such Debtor or any other Entity.

#### (iii)    Binding Effect.

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the applicable Plan, whether or not such holder has accepted the applicable Plan and whether or not such holder is entitled to a Distribution under such Plan.

#### (iv)    Successors and Assigns.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

      (v)      **Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

      (vi)      **Reservation of Rights.**

Each Plan shall have no force or effect unless and until the Effective Date thereunder occurs.  Neither the filing of a Plan, any statement or provision contained therein, nor the taking of any action by any Debtor or any Entity with respect to a Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) such Debtor with respect to the holders of Claims or Equity Interests or other parties in interest; or (2) any holder of a Claim or other party in interest prior to the Effective Date.

      (vii)      **Section 1125(e) Good Faith Compliance.**

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Debtor and its respective Representatives have acted in "good faith" under sections 1125(e) and 1129(a)(3) of the Bankruptcy Code.

      (viii)      **Further Assurances.**

The Debtor, all holders of Claims receiving Distributions hereunder, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

      (ix)      **Service of Documents.**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by both email and first class, certified U.S. mail, postage prepaid as follows:

      **To the Debtor:**      **MIDTOWN CAMPUS PROPERTIES, LLC**
c/o Oscar Roger, Sr., Manager
782 NW 42nd Avenue, Suite 550
Miami, Florida 33126Email: oroger@rogerdevelopment.com

With a copy  to (which shall not constitute notice)

**GENOVESE JOBLOVE & BATTISTA, P.A.**

Attn:  Paul J. Battista, Esq.
Attn:  Mariaelena Gayo-Guitian, Esq.
100 SE 2nd Street, 44th Floor
Miami, FL 33131Telephone: (305) 349-2300
Facsimile: (305) 349-2310
Email: pbattista@gjb-law.com
Email: mguitian@gjb-law.com

(x)     **Filing of Additional Documents.**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

(xi)    **No Stay of Confirmation Order.**

The Debtor shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

(xii)   **Bankruptcy Rule 9019 Request; Impact**

The Plan, including the Plan Supplement or other Plan Document, may provide for one or more compromises or settlements.  Pursuant to Bankruptcy Rule 9019, the Debtor hereby request approval of all compromises and settlements included in the Plan, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of any such compromise or settlement.

## VI.     RISK FACTORS IN CONNECTION WITH THE PLAN

The holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.     Business Risk

The holders of Claims should consider that the Debtor may not locate a buyer or consummate a sale of the Project for sufficient Net Sale Proceeds to pay in full all Allowed Claims. In addition, even if the Debtor is able to consummate  sale of the Project, the Debtor may not be successful in objecting to Claims and/or reducing Claims so as to be able to pay all Allowed Claims in full.  As set forth in the Liquidation Analysis attached hereto as Exhibit 3, there are several risks associated with the sale of the Project as well as the ultimate amount of Allowed Claims.  As set forth in the Liquidation Analysis attached hereto as Exhibit 3, the Distributions to holders of Allowed Claims will be partially dependent on the proposed purchase price obtained for the Project, and principally dependent on the ultimate amount of the Allowed Class 2 Secured Claim of U.S. Bank.  In addition, if and to the extent the Debtor is able to obtain affirmative net recoveries

from Sauer in respect of the Sauer Litigation, then such Distributions may increase accordingly. At this time, the Debtor is not in a position to estimate the amount of any affirmative net recoveries that may be obtained in the Sauer Litigation.

### B.    Bankruptcy Considerations.

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Equity Interests encompass Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtor believes that the holders of Claims in Classes 2 and 3 of the Plan are Unimpaired. As a result, Classes 2 and 3 under the Plan are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. There can be no assurance that the holders of Claims in Classes 2 and 3 of the Plan will agree with such designation and there can be no assurances that if so contested, the Bankruptcy Court will find that such Classes are Unimpaired. If either or both of such Classes are Impaired, and the holders therein vote to reject the Plan, then the Debtor may be required, among other things, to either (i) seek confirmation of the Plan under section 1129(b), (ii) modify the Plan, or (iii) withdraw the Plan.

### C.    No Duty to Update Disclosures.

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### D.    Representations outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by holders of Claims that are entitled to vote to accept or reject the applicable Plan.

### E.    No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or holders

of Claims and Equity Interests.

### F.    Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in Section IX hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Equity Interests should seek advice from its own independent tax, legal or other professional advisors based on its own individual circumstances.

## VII.    PLAN CONFIRMATION AND CONSUMMATION

### A.    The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "Confirmation Hearing"). Notice of the Confirmation Hearing through the order conditionally approving the Disclosure Statement (the "Confirmation Hearing Notice") will be provided to all known Creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon: (i) the Debtor's counsel, Genovese Joblove & Battista, P.A., 100 S.E. Second Street, 44th Floor, Miami, Florida 33131 (Attn: Paul J. Battista, Esq., pbattista@gjb-law.com and Mariaelena Gayo-Guitian, Esq mguitian@gjb-law.com) (ii) such other parties as the Bankruptcy Court may order, so as to be actually received no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN**.

### B.    Plan Confirmation Requirements under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability

that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors in the Chapter 11 Case (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

(i)    **Best Interests of Creditors.**

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor submits that a forced, fire sale of the Debtor's Project would result in a far lower recovery for Creditors than what is being proposed in the Plan. Attached hereto as Exhibit 3 is a liquidation analysis evidencing that the recoveries under the Plan are substantially higher for holders of Allowed Claims than in a liquidation in a case under Chapter 7.

Based upon the attached liquidation analysis, the Debtor believes that liquidation under chapter 7 would result in a substantially smaller distributions, if any, being made to Creditors than those provided for in the Plan because of (a) the value of the Debtor's assets in a case under Chapter 7 would be reduced, (b) the likelihood that the assets of the Debtor would have to be sold or otherwise disposed of in a less orderly, fire sale fashion; (c) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (d) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts. In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, holders of Claims would receive less than such holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(ii)    **Feasibility of the Plan.**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. Pursuant to the Plan, the Debtor is proposing to sell the Project in an orderly fashion so as to maximize value and to make

Distributions in accordance with the Plan. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

(iii)    **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation that, except as described below, each class of claims or equity interests that is impaired under the plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject a Plan are received with respect to a Class whose votes have been solicited under such Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept such Plan.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If a Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtor: (i) a liquidation of such Debtor's assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative or modified plan of reorganization or liquidation may be proposed by the Debtor and confirmed; or (iii) the Debtor's Chapter 11 Case may be dismissed.

### A.    Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth above and in the Liquidation Analysis attached hereto as Exhibit 3, the Debtor believes that such a liquidation would result in substantially smaller distributions being made to such Debtor's Creditors than those provided for in the Plan.

### B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor may propose a different plan or modify the Plan, which might involve an alternative means for the reorganization or liquidation of such Debtor's assets.

C.    **Dismissal of the Debtor's Chapter 11 Case**.

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions.  Most significantly, dismissal of the Debtor's Chapter 11 Case may mean a foreclosure by the Priming DIP Lender and/or the Indenture Trustee, resulting in little to no recovery for any other stakeholders.  Therefore, the Debtor believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

IX.    <u>CERTAIN FEDERAL TAX CONSEQUENCES</u>

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

**ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE  SERVICE  CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **General.**

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor and holders entitled to vote on the Plan.  This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of

the Internal Revenue Service (the "**Service**").  There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to holders of Claims or the Debtor.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  The tax treatment of a holder may vary depending upon such holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a holder, including any alternative minimum tax consequences and does not address the tax consequences to a holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, holders that have a "functional currency" other than the United States dollar and holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the holder in exchange for the Claim and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder.  Therefore, each holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

## X.    **RECOMMENDATION AND CONCLUSION**

Based on the current circumstances of this Chapter 11 Case, the Debtor believes that the

Plan is in the best interests of the Estate, all Creditors and other interested parties and urge the holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Respectfully submitted,

Dated: November 7, 2021


MIDTOWN CAMPUS PROPERTIES,
LLC.

By: /s/ *Oscar Roger, Sr.*
Name:  Oscar Roger, Sr.
Title:  Manager


GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for the Debtor-in-Possession*
100 SE 2nd Street, 44th Floor
Miami, FL 33131-2100
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By: : /s/ *Paul J. Battista*
        Paul J. Battista
        Florida Bar No. 884162
        pbattista@gjb-law.com
        Mariaelena Gayo-Guitian
        Florida Bar No. 813818
        mguitian@gjb-law.com
        John K. Olson
        Florida Bar No. 201634
        jolson@gjb-law.com
        Heather L. Harmon
        Florida Bar No. 013192
        hharmon@gjb-law.com

**EXHIBIT "1"**

**SECOND AMENDED PLAN OF REORGANIZATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

                                        Chapter 11

**MIDTOWN CAMPUS PROPERTIES, LLC,**      Case No. 20-15173-RAM

         Debtor.
_____/


**<u>SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION</u>**


                                           **GENOVESE JOBLOVE & BATTISTA, P.A**.
                                           Paul J. Battista, Esq.
                                           Florida Bar No. 884162
                                           Mariaelena Gayo-Guitian, Esq.
                                           Florida Bar No. 813818
                                           John K. Olson, Esq.
                                           Florida Bar No. 201634
                                           Heather L. Harmon, Esq.
                                           Florida Bar No. 013192
                                           100 SE 2nd Street, 44th Floor
                                           Miami, FL 33131
                                           Telephone: (305) 349-2300
                                           Facsimile: (305) 349-2310

                                           *Counsel for the Debtor-in-Possession*

Dated: November 7, 2021

TABLE OF CONTENTS

ARTICLE I.       DEFINED TERMS AND RULES OF INTERPRETATION ......................... 1

    A.      Defined Terms .................................................................................. 1

    B.      Rules of Interpretation ...................................................................... 13

    C.      Exhibits ........................................................................................ 13

ARTICLE II.      ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS,
               PRIORITY TAX CLAIMS, UNITED STATES TRUSTEE FEES
               AND DIP LOANS ......................................................................... 13

    A.      Administrative Claims ...................................................................... 13

    B.      Professional Compensation................................................................ 14

    C.      Priority Tax Claims.......................................................................... 14

    D.      Statutory Fees................................................................................. 14

    E.      DIP Loans ..................................................................................... 14

ARTICLE III.     CLASSIFICATION AND TREATMENT OF CLAIMS AND
               EQUITY INTERESTS.................................................................... 15

    A.      Summary ....................................................................................... 15

    B.      Classification and Treatment of Claims and Equity Interests............................. 16

        i.   Other Priority Claims (Class 1) .................................................... 16

        ii.  Allowed Secured Claim of Indenture Trustee (Class 2)................................. 16

        iii.  Allowed Other Secured Claims (Class 3)....................................... 17

        iv.  Allowed General Unsecured Claims (Class 4) ............................. 18

        v.  Equity Interests (Class 5)................................................................ 18

ARTICLE IV.     ACCEPTANCE, REJECTION, AMENDMENT AND
               REVOCATION OR WITHDRAWAL OF THE PLAN............................ 19

    A.      Classes Entitled to Vote ................................................................... 19

    B.      Acceptance by Class of Claims and Equity Interests.......................................... 19

    C.      Nonconsensual Confirmation.............................................................. 19

    D.      Revocation or Withdrawal; No Admissions ............................................ 19

    E.      Amendment of Plan and/or the Plan Documents.................................... 20

    F.      Special Provision Governing Unimpaired Claims............................. 20

ARTICLE V.      MEANS FOR IMPLEMENTATION OF THE PLAN................................. 20

    A.      Sale of Project – Net Sales Proceeds .................................................. 20

| | | | |
|---|---|---|---|
| B. | Section 1146(a) Exemption | | 21 |
| C. | Vesting of Property of the Estate in the Reorganized Debtor | | 21 |
| D. | Corporate Action | | 21 |
| E. | Distributions | | 22 |
| F. | Surrender and Cancellation of Notes, Instruments, Certificates and Other Documents Evidencing Claims | | 22 |
| G. | Continued Corporate Existence of the Reorganized Debtor | | 22 |
| H. | Post-Confirmation Accounts | | 22 |
| I. | Management of the Reorganized Debtor | | 22 |
| J. | Section 1145 Determination | | 23 |
| K. | Preservation of Causes of Action | | 23 |
| L. | Prosecution and Settlement of Causes of Action and Objections to Claims | | 24 |
| M. | Automatic Stay | | 24 |
| N. | Indemnification and Reimbursement | | 24 |
| O. | Closing of the Chapter 11 Case | | 25 |
| ARTICLE VI. | PROVISIONS GOVERNING DISTRIBUTIONS | | 25 |
| A. | Manner of Cash Payments Under the Plan | | 25 |
| B. | Entity Making Distributions | | 25 |
| C. | Distribution Dates | | 26 |
| D. | Record Date for Distributions | | 26 |
| E. | Delivery of Distributions | | 26 |
| F. | Undeliverable and Unclaimed Distributions | | 26 |
| G. | Compliance with Tax Requirements | | 27 |
| H. | No Payments of Fractional Dollars | | 27 |
| I. | Interest on Claims | | 27 |
| J. | No Distribution in Excess of Allowed Amount of Claim | | 28 |
| K. | Setoff and Recoupment | | 28 |
| L. | De Minimis Distributions | | 28 |
| M. | Distributions in Satisfaction; Allocation | | 28 |
| N. | No Distributions on Late-Filed Claims | | 28 |
| ARTICLE VII. | DISPUTED CLAIMS | | 29 |
| A. | Resolution of Disputed Claims | | 29 |

B.      Objection Deadline ........................................................................... 29

C.      Estimation of Claims......................................................................... 29

D.      No Distributions Pending Allowance; Disputed Claims Reserve....................... 29

ARTICLE VIII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
                 LEASES ........................................................................... 30

A.      General Treatment:  Rejected if not Previously Assumed................................. 30

B.      Bar to Claims Arising from Rejection, Termination or Expiration ................... 30

ARTICLE IX.      CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..................... 31

A.      Conditions Precedent ......................................................................... 31

B.      Waiver ............................................................................................. 31

ARTICLE X.       EFFECT OF CONFIRMATION; INDEMNIFICATION,
                 INJUNCTIVE AND RELATED PROVISIONS........................................... 31

A.      Compromise and Settlement ............................................................... 31

B.      Vesting of Assets .............................................................................. 32

C.      Title to Assets; Discharge of Liability ............................................... 32

D.      Binding Effect .................................................................................. 32

E.      Discharge of Claims.......................................................................... 32

F.      Discharge of the Debtor .................................................................... 33

G.      Exculpation ...................................................................................... 33

H.      Limitations on Exculpation............................................................... 33

I.      Injunction ......................................................................................... 34

J.      Release of Liens ............................................................................... 35

ARTICLE XI.      RETENTION OF JURISDICTION ................................................. 36

ARTICLE XII.     MISCELLANEOUS PROVISIONS................................................. 36

A.      Modification of Plan ......................................................................... 36

B.      Revocation of Plan............................................................................ 36

C.      Binding Effect .................................................................................. 37

D.      Successors and Assigns..................................................................... 37

E.      Governing Law ................................................................................. 37

F.      Reservation of Rights........................................................................ 37

G.      Section 1125(e) Good Faith Compliance........................................... 37

H.      Further Assurances............................................................................ 38

I.      Service of Documents ........................................................................... 38

J.      Filing of Additional Documents .......................................................... 38

K.      No Stay of Confirmation Order ............................................................ 38

L.      Bankruptcy Rule 9019 Request; Impact ............................................. 38

## SECOND AMENDED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Midtown Campus Properties, LLC, the debtor and debtor-in-possession herein (the "Debtor"), proposes this *Second Amended Chapter 11 Plan of Reorganization*[1] (and including all Plan Documents and other attachments hereto, as any of the same may be amended from time to time, all of which are incorporated herein by reference and are a part of, the "Plan"), pursuant to the provisions of chapter 11 of the Bankruptcy Code (as defined in Article I.A herein (the "Defined Terms")).

For a discussion of the Debtor's history, business, operations, assets and liabilities, for a summary and analysis of the Plan, preservation of Causes of Action, risk factors, liquidation analysis, tax implications and alternatives to the Plan, reference should be made to the *Second Amended Disclosure Statement for Second Amended Chapter 11 Plan of Reorganization*, dated November 7, 2021, as such disclosure statement may be amended, modified or supplemented (the "Disclosure Statement").

**ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3018 AND IN THIS PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I.
## DEFINED TERMS AND RULES OF INTERPRETATION

### A.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

(1)    "*Administrative Claim*" shall mean a Claim filed against the Debtor's Estate prior to the Administrative Claims Bar Date and allowed by order of the Bankruptcy Court pursuant to Section 503(b) and entitled to priority under Section 507(a)(1) or 507(b) of the Bankruptcy Code, including, without limitation: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtor's Estate and of operating the business of the Debtor; and (ii) any payment to be made under this Plan to cure a default on an executory contract or

---

[1]    All capitalized terms not otherwise defined herein shall be subject to the definition of such capitalized terms in Article I.A. hereof.

unexpired lease that is assumed pursuant to Section 365 of the Bankruptcy Code. Any fees or charges assessed against the Estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Claim and shall be paid in accordance with Article II.D of this Plan.   Any Claims for compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under Section 330(a) or Section 331 of the Bankruptcy Code are excluded from the definition of Administrative Claim and shall be paid in accordance with Article II.B of this Plan. Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

(2)     *"Administrative Claims Bar Date"* shall mean the date established by Final Order of the Bankruptcy Court as the last date to request payment of Administrative Claims, other than with respect to (a) Claims of Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including any compensation requested by any professional or any other Person for making a substantial contribution in the Chapter 11 Case), and (b) liabilities incurred by the Debtor other than in the ordinary course of business after the Administrative Claims Bar Date but before the Effective Date.  Unless otherwise ordered by the Bankruptcy Court, any holder of an Administrative Claim (including a holder of a Claim for postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Claim against the Debtor, the Estate, the Reorganized Debtor, or any of their respective assets, and such holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Claim.

(3)     *"Adversary"* means that certain adversary proceeding styled *Midtown Campus Properties, LLC v. U.S. Bank, National Association, as Indenture Trustee*, Adv. Proc. No. 21-01220-RAM.

(4)     "*Affiliate*" means, any Person that is an "affiliate" of the Debtor within the meaning of section 101(2) of the Bankruptcy Code.

(5)     "*Allowed*" means with respect to any Claim against the Debtor: (a) a Claim that has been scheduled by the Debtor in its Schedules filed in the Chapter 11 Case as other than disputed, contingent or unliquidated and as to which the Debtor or other party-in-interest has not filed an objection by the Claims Objection Bar Date; (b) a Claim filed in the Chapter 11 Case and that is not Disputed, (c) a Claim filed in the Chapter 11 Case that is Disputed and has been allowed by an order of the Bankruptcy Court, and then only to the extent of such allowance; (d) a Claim filed in the Chapter 11 Case that is allowed either: (i) in any stipulation or written agreement with the Debtor as to the amount and nature of Claim executed prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation or written agreement with the Reorganized Debtor as to the amount and nature of Claim executed on or after the Effective Date and approved by the Bankruptcy Court; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed by the Debtor or Reorganized Debtor, as applicable, in connection with the Plan; or (e) a Disputed Claim or any portion thereof that the Debtor

ultimately determines will not be objected to (such claim or portion thereof being deemed Allowed at the time such determination is made).

(6)    "*Available Cash*" means the sum of (i) the Cash (including Cash Collateral) in the Debtor's actual or constructive possession plus Cash that constitutes property of the Estate pursuant to section 541 of the Bankruptcy Code, in each case on the Effective Date, (ii) the net revenue and income from the continued operations of the Debtor's business, (iii) the Net Sales Proceeds, and (iv) the net proceeds from the prosecution of Causes of Action.

(7)    "*Assumption Schedule*" shall have the meaning set forth in Article VIII herein.

(8)    "*Avoidance Actions*" means a Cause of Action of the Debtor or the Estate to avoid a transfer of property or an obligation incurred by the Debtor and any recovery, subordination, or other remedies that may be brought by or on behalf of the Debtor and the Estate in connection therewith under the Bankruptcy Code or applicable non-bankruptcy law, including without limitation, under Chapter 5 of the Bankruptcy Code, including sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551 and/or 553, and/or section 724(a) of the Bankruptcy Code (other than those Causes of Action which are released or dismissed as part of and pursuant to the Plan or any previous Order of the Bankruptcy Court), including the Debtor's rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other direct or indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

(9)    "*Ballot*" means the form(s) distributed to holders of Claims entitled to vote on the Plan to indicate their acceptance or rejection of the Plan.

(10)    "*Bankruptcy Code*" means Articles 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

(11)    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Florida, Miami Division.

(12)    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of the Bankruptcy Court, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Case and as amended from time to time.

(13)    "*Bar Date Order*" means that certain *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines* dated as of May 12, 2020 [ECF No. 9], establishing July 17, 2020 as the general bar date for filing proofs of Claim in the Chapter 11 Case and November 4, 2020 as the bar date for governmental units to file a Proof of Claim.

(14)    "*Bidding Procedures Order*" means that certain order to be entered by the Bankruptcy Court in respect of the Sale Motion (i) establishing bidding procedures for the solicitation of higher and/or better offers for the sale of the Project, including setting an auction, if applicable, and a hearing on the approval of the sale thereof, (ii) approving the Purchase Agreement, and (iii) approving certain bid protections to the Stalking Horse Buyer.

(15)  "*Bonds*" shall mean those certain Student Housing Revenue Bonds in the aggregate amount of $77,820,000 that were issued by the Issuer under the Indenture.

(16)  "*Bondholder*" means any present or former holder and/or owner of a Bond.

(17)  "*B. Riley*" shall mean B. Riley Real Estate, LLC, the Debtor's real estate advisor, whose engagement was approved by Order of the Bankruptcy Court dated July 21, 2021 [ECF No. 416].

(18)  "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

(19)  "*Cash*" means cash and cash equivalents in certified or immediately available U.S. funds, including but not limited to bank deposits, checks and similar items.

(20)  "*Cash Collateral*" shall have the meaning set forth in Section 363(a) of the Bankruptcy Code, which is subject of a Lien securing an Allowed Secured Claim.

(21)  "*Cash Collateral Orders*" shall mean those certain interim cash collateral orders entered by the Bankruptcy Court [ECF Nos. 226, 255, 331, 391, 434, 461, 500].

(22)  "*Causes of Action*" means any and all claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to, any Avoidance Actions) whether known or unknown, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertible directly or derivatively in law, equity, or otherwise, that are or may be pending on the Effective Date or instituted after the Effective Date against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, and including, without limitation, those which are: (i) property of the bankruptcy estate under and pursuant to section 541 of the Bankruptcy Code; (ii) for subrogation and contribution; (iii) for turnover; (iv) for avoidable transfers and preferences under and pursuant to sections 542 through 550 and 553 of the Bankruptcy Code and applicable state law; (v) to determine the extent, validity and priority of liens and encumbrances; (vi) for surcharge under section 506(c) of the Bankruptcy Code; (vii) for subordination under section 510 of the Bankruptcy Code; (viii) related to federal or state securities laws; (ix) direct or derivative claims or causes of action of any type or kind; (x) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xi) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; (xii) which arise under or as a result of any section of the Bankruptcy Code; (xiii) for common law torts or aiding and abetting common law torts, (xiv) which arise under or as a result of any section of the Bankruptcy Code, including Section 362; (xv) for lender liability against the Indenture Trustee, any Bondholder or any lender of the Debtor, including but not limited to claims for exerting excessive or unreasonable control over the Debtor, for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate, for any breach of fiduciary duty, breach of any duty of fair dealing, breach of confidence, or any cause of action or

4

defense based on negligence, for any "lender liability" theories, breach of funding commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violations of the Racketeer Influenced and Corrupt Organizations Act, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate governance or prospective business advantage, breach of contract, fraud, mistake, deceptive trade practices, libel, slander, conspiracy, fraudulent conveyance, or any claim for wrongfully taking any action in connection with the foregoing, (xvi) any rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction), and (xvii) any other direct or indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

(23)    "*Chapter 11 Case*" means the above-referecned chapter 11 case commenced when the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date.

(24)    "*Claim*" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (c) any other claim, as such term is defined in section 101(5) of the Bankruptcy Code.

(25)    "*Claims Objection Bar Date*" means the bar date for objecting to Proofs of Claim as established by order of the Bankruptcy Court; provided, however, that the Debtor or the Reorganized Debtor, as applicable, may seek additional extensions of this date from the Bankruptcy Court, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002. A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

(26)    "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III herein and pursuant to section 1122(a) of the Bankruptcy Code.

(27)    "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

(28)    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(29)    "*Creditor*" shall have the meaning in section 101(10) of the Bankruptcy Code.

(30)    "*Cure*" means a Claim for all non-contingent, accrued and unpaid monetary obligations, or adequate assurance of cure or compensation, or other amounts as may be agreed upon by the parties, under an executory contract or unexpired lease (or assumed or assumed and assigned) by the Debtor pursuant to section 365 of the Bankruptcy Code or the Plan.

(31)    "*Cure Claim*" means a Claim for a Cure.

(32)    "*Cure Schedule*" shall have the meaning set forth in Article VIII herein.

(33)    "*Debtor*" shall mean Midtown Campus Properties, LLC, and where applicable, the Estate thereof.

(34)    "*Debtor in Possession*" means the Debtor in its capacity as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

(35)    "*Deficiency Claim*" means any the Allowed General Unsecured Claim for all, or any portion of, any Secured Claim that is determined to be unperfected or undersecured.

(36)    "*DIP Loans*" shall mean the Priming DIP Loan and the Junior DIP Loan.

(37)    "*Disallowed"* with respect to a Claim shall mean a Claim or any portion thereof that is not Allowed.

(38)    "*Disclosure Statement*" shall mean this Second Amended Disclosure Statement and exhibits thereto that relate to this Plan and prepared pursuant to Section 1125 of the Bankruptcy Code, as amended, modified or supplemented from time to time, which has been approved by the Bankruptcy Court and which is distributed to holders of Claims and Equity Interests with this Plan.

(39)    "*Disclosure Statement Order*" shall mean that certain order of the Bankruptcy Court, dated ____ __, 2021 [ECF No. ____] approving, among other things, the Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, and setting various deadlines in connection with Confirmation of the Plan.

(40)    "*Disputed*" means, with respect to any Claim: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a Proof of Claim has been filed in a liquidated, non-contingent amount; (b) as to which the Debtor or any other party in interest, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, in which case only that portion of the Claim that is subject of such objection or estimation shall be Disputed for purposes hereof; or (c) as otherwise disputed in accordance with applicable bankruptcy or insolvency law.

(41)    "*Disputed Claims Reserve*" means a reserve established pursuant to Article VII herein to receive and hold, in a segregated account in a domestic banking institution to be established by the Debtor or Reorganized Debtor, as applicable, Cash in an amount equal to the aggregate of those amounts that would have been distributed on the Effective Date on account of Disputed Claims against the Debtor or its property (had they been Allowed at that time thereof) or such other amounts as the parties may agree or the Bankruptcy Court may order.

(42)    "*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

(43)    "*Distribution Agent*" means the Debtor or the Reorganized Debtor, as applicable, who will be responsible for making Distributions under the Plan.

(44)    "*Effective Date*" means within ten (10) business days after the satisfaction or waiver as applicable of the conditions set forth in Article IX herein.  Within two (2) Business Days of the Effective Date, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Debtor reserves the right to waive the requirement of the Confirmation Order becoming a Final Order and shall have the right to proceed with the Effective Date despite the Confirmation Order not being a Final Order at such time.

(45)    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(46)    "*Equity Interest*" means the interests of any holder of an equity security of the Debtor represented by any issued and outstanding any membership interest, partnership interest, shares of common stock or preferred stock, or  other instrument evidencing a present ownership interest in the Debtor, including any option, warrant, or right, contractual or otherwise, to acquire any such interest.

(47)    "*Estate*" means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter11 Case.

(48)    "*Exculpated Parties*" shall mean collectively, Oscar Roger, Oscar Roger, Jr., Roger Development Group, Inc., RDG Midtown, LLC, Genovese Joblove & Battista, P.A., Becker & Poliakoff, KapilaMukamal, LLC, Garcia, Espinosa, Miyares, Rodriguez, Trueba & Company, LLP, the Priming DIP Lender, the Junior DIP Lender, and their respective managers, members, officers, directors, attorneys, partners, employees, associates and agents.

(49)    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

(50)    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired with no appeal, motion for reconsideration or rehearing, or request for a stay having been timely filed.

(51)    "*General Bar Date*" means July 17, 2020 as the general bar date for filing proofs of Claim in the Chapter 11 Case established in the Bar Date Order.

(52)    "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Professional Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, or Equity Interests.

(53)    "*Impaired*" means "*impaired*" within the meaning of section 1124 of the Bankruptcy Code and applicable decisional law, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

(54)    "*Indenture*" shall mean that certain Trust Indenture, dated January 31, 2019 between the Indenture Trustee and the Issuer pursuant to which the Issuer issued the Bonds.

(55)    "*Indenture Trustee*" shall mean U.S. Bank, N.A., in its capacity as the indenture trustee under the Indenture.

(56)    "*Issuer*" shall mean Florida Development Finance Corporation.

(57)    "*Junior DIP Lender*" shall mean BMI Financial Group, Inc.

(58)    "*Junior DIP Loan*" shall mean that certain debtor-in-possesion loan from the Junior DIP Lender to the Debtor in the amount of $5,200,000 pursuant to the terms of the Junior DIP Loan Order.

(59)    "*Junior DIP Loan Documents*" shall mean those certain documents evidencing the Junior DIP Loan, including, without limitation, the Junior DIP Loan Order, the Term Sheet [ECF No. 26, p. 44-54], and that certain Secured Promissory Note, dated May 26, 2020.

(60)    "*Junior DIP Loan Order*" shall mean that certain *Corrected Amended Final Order (I) Authorizing the Debtor to Obtain Postpetition Secured Financing from BMI Financial Group, Inc., Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (II) Granting Liens and Super-Priority Administrative Expense Claims; (III) Granting Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §§ 361 and 507 and (IV) Related Relief* [ECF No. 264], dated November 20, 2020.

(61)    "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

(62)    "*Loan Agreement*" shall mean that certain Loan Agreement between the Debtor and the Issuer, dated January 31, 2019, in connection with the issuance of the Bonds and pursuant to which amounts due and owing thereunder are payable to the Indenture Trustee under the Indenture.

(63)    "*Mortgage*" shall mean that certain Leasehold Mortgage, Assignment of Leases, Security Agreement and Fixture Filing dated as of January 1, 2019, given by the Debtor, as mortgagor, to the Indenture Trustee, as mortgagee, whereby the Indenture Trustee asserts that it holds a valid, enforceable, binding, non-avoidable and perfected Lien on the Project.

(64)    "*Net Sales Proceeds*" shall mean the proceeds from the sale of the Project, after (A) payment of (i) all closing costs and other obligations required to be paid by the Debtor under the terms of the Purchase Agreement, (ii) all prorations, including real estate taxes, required to be paid by the Debtor under the Purchase Agreement, and (ii) any break-up fees and/or expense reimbursements approved by the Bankruptcy Court and required to be paid from the proceeds of the sale of the Project, and (B) funding of any reserves or similar obligations required of the Debtor under the Purchase Agreement from the proceeds of the sale.

(65)    "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

(66)    "*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

(67)    "*Petition Date*" means May 8, 2020, the date on which the Debtor filed the Chapter 11 Case.

(68)    "*Plan*" has the meaning set forth in the preamble hereof.

(69)    "*Plan Documents*" means the documents, if any, that aid in effectuating the Plan, including, without limitation, all addenda, exhibits, schedules, which documents (as may be amended, modified or supplemented from time to time) shall be in form and substance reasonably acceptable to the Debtor and shall be filed no later than 10 days prior to the Confirmation Date.

(70)    "*Priming DIP Lender*"" shall mean Best Meridian International Insurance Company.

(71)    "*Priming DIP Loan*" shall mean that certain debtor-in-possesion loan from the Priming Lien Lender to the Debtor in the amount of $7,400,000 pursuant to the terms of the Priming DIP Loan Order.

(72)    "*Priming DIP Loan Documents*" shall mean those certain documents evidencing the Priming DIP Loan, including, without limitation, the Priming DIP Loan Order, the Amended and Restated Term Sheet, dated December 10, 2020 [ECF No. 288-1], and that certain Debtor-in-Possession Secured Promissory Note, dated December 16, 2020.

(73)    "*Priming DIP Loan Order*" shall mean that certain *Final Order Granting Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Priming, Senior Secured Postpetition Financing Pursuant to 11 U.S.C §§ 105, 361, 362, 364(c) and 364(d) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, (II) Granting Priming Liens and Super-Priority Administrative Claim Status, (III) Determining Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §361, And (IV) Granting Related Relief* [ECF No. 295], dated December 16, 2020.

(74)    "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

(75)    "*Project*" shall mean that certain 500,000 square foot mixed-use student housing project known as One College Park and located on a 2.0-acre site at 104 Northwest 17th Street, Gainesville, FL 32603, which Project (i) consists of a 6-story, multi-use building with a rectangular shape that wraps around a 7.5-level parking garage, and (ii) when complete will have 310 apartment units (589-beds consisting of studios, and each of one, two, three, and four bedrooms), 289 parking spaces for monthly rental for tenants and an additional 250 spaces used for public parking, 14 scooter spaces, 260 bicycle spaces, and 15,000 square feet of commercial retail space and related facilities on its bottom floor.

(76)    "*Professionals'*" means any Person employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code, including ordinary course professionals.

(77)    "*Professional Claim*" means a Claim of any Professional for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Section 330(a) or Section 331 of the Bankruptcy Code or otherwise.

(78)    "*Proof of Claim*" shall mean a proof of claim filed by a holder of a Claim in the Bankruptcy Court's claim register evidencing the basis and/or amount of a Claim.

(79)    "*Pro Rata*" shall mean the proportion (expressed as a percentage) that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

(80)    "*Purchase Agreement*" shall mean that certain *Purchase and Sale Agreement (Midtown Apartments – Gainesville, Florida)*, dated November 4, 2021 (the "Purchase Agreement") between the Debtor and CASL Holdings, LLC (the "Stalking Horse Buyer"), a fully executed copy of which is attached to the Sale Motion, as it may be amended or modified from time to time, provided however, that in the event the Stalking Horse Buyer is not the Successful Bidder for the Project, then for all purposes under the Plan, the "Purchase Agreement" shall refer to that certain Purchase and Sale Agreement between the Debtor and the Successful Bidder.

(81)    "*Qualified Bid*" shall have the meaning set forth in the Bidding Procedures Order and shall mean a bid for the purchase of the Project that meets the requirements therefor in the Bidding Procedures Order.

(82)    "*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

(83)    "*Reinstated*" or "*Reinstatement*" means, with respect to any Claim of Interest, the treatment provided for in section 1124 of the Bankruptcy Code.

(84)    "*Representatives*" means, with regard to an Entity (including the Debtor), any current or former manager, members, officers, directors, employees, attorneys, Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including its respective officers, directors, employees, independent contractors, managers, members and professionals).

(85)    "*Reserve Funds*" shall mean those monies in the aggregate on deposit in those certain sixteen (16) accounts established under the terms of the Indenture, including without limitation, the Debt Service Reserve Fund, the Construction Account and the Liquidity Subaccount.

(86)    "*Sale Closing Date*" shall mean the date of a closing on the sale of the Project by the Debtor pursuant to the Sale Motion, the Sale Order and the Purchase Agreement.

(87)    "*Sale Motion*" shall mean that certain *Debtor's Emergency Motion for Entry of an Order (1) Approving Stalking Horse Purchase and Sale Agreement and Related Bid Protections, (2) Approving Competitive Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (3) Scheduling Dates to Conduct an Auction and Sale Hearing, (4) Approving the Form and Manner of Notices, (5) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (6) Approving Assumption and Assignment Procedures for Executory Contracts, and (7) Granting Related Relief* [ECF No. 510] seeking an order of the Bankruptcy Court approving, among other things, (i) certain bidding procedures for the solicitation of higher and/or better offers for the sale of the Project, including setting an auction, if applicable, and a hearing on the approval of the sale thereof, (ii) the Purchase Agreement, (iii) certain bid protections to the Stalking Horse Buyer, and (iv) authorizing the sale of the Project free and clear of all liens, claims, encumbrances and interests under sections 363 and 365 of the Bankruptcy Code to the highest and/or best bidder therefor.

(88)    "*Sale Order*" shall mean that certain order of the Bankruptcy Court granting the Sale Motion and approving the sale of the Debtor's Project.

(89)    "*Sauer*" shall mean Sauer, Incorporated, as the Debtor's former general contractor.

(90)    "*Sauer Litigation*" shall mean collectively (i) that certain *Objection to Proof of Claim No. 7* [ECF No. 260] filed by the Debtor, and (ii) those certain Causes of Action asserted by the Debtor against Sauer in and related to that certain adversary proceeding styled *Sauer Incorporated v. Midtown Campus Properties, LLC and Fidelity National Title Insurance Company*, Adv. Proc. No. 20-01401-RAM, including specifically as set forth in that certain *Midtown Campus Properties, LLC's Answer and Affirmative Defenses to the Complaint of Sauer Incorporated and Counterclaim for Affirmative Relief and Restating its Objection to the Claim of Sauer Incorporated* [Adv. Proc. ECF No. 37].

(91)    "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

(92)    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule to be included in the Disclosure Statement or Plan Documents and identifying (i) the executory contracts and unexpired leases to be assumed and/or assigned by the Debtor; and (ii) the amount of Cure Claims with respect to each executory contract or unexpired lease proposed to be assumed.

(93)    "*Section 506(b) Pleadings*" means collectively the following: (i) the Debtor's *Motion to Limit Entitlement of U.S. Bank, as Indenture Trustee, Regarding Post-Petition Interest, Fees, Costs, and Other Charges Under 11 U.S.C. § 506(b) and Seeking Related Relief* [ECF No. 406](the "Section 506(b) Motion"), (ii) the Indenture Trustee's *Objection to the Section 506(b) Motion* [ECF No. 419], (iii) the Debtor's  *Reply to Objection to the Section*

*506(b) Motion* [ECF No. 437], and (iv) the Indenture Trustee's *Sur-Reply to section 506(b) Motion* [ECF No. 470] .

(94)   "*Secured Claims*" means Claim(s) against the Debtor that are secured by a Lien on property in which the Estate has an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

(95)   "*Stalking Horse Buyer*" shall mean CASL Holdings, LLC.

(96)   "*Successful Bidder*" shall have the meaning set forth in the Bidding Procedures Order and shall mean the Person who makes the highest and/or best bid for the Project in accordance with the requirements of the Bidding Procedures Order.

(97)   "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

(98)   "*Tax Returns*" means all tax returns, reports, certificates, forms or similar statements or documents, including amended tax returns or requests for refunds.

(99)   "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the Southern District of Florida.

(100)  "*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code and applicable decisional law, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

## B.   Rules of Interpretation

(i)     For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

(ii)    The provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

**C.    Exhibits**

All exhibits and schedules, if any, to the Plan are incorporated into and are part of the Plan as if set forth herein.  All exhibits and schedules to the Plan, have been filed with the Clerk of the Bankruptcy Court not later than three (3) days prior to the deadline set by the Bankruptcy Court to vote to accept or reject the Plan.  Such exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court.  Holders of Claims or Equity Interests may also obtain a copy of such exhibits, once filed, from the Debtor's counsel by a written request sent to the following address:

Genovese Joblove & Battista, P.A.
100 S.E. Second Street, 44th Floor
Miami, FL 33131,
Telephone: 305-349-2300
ATTN: Paul J. Battista, Esq. pbattista@gjb-law.com,
Mariaelena Gayo-Guitian, Esq., mguitian@gjb-law.com

**ARTICLE II**
**ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY TAX CLAIMS, UNITED STATES TRUSTEE FEES AND DIP LOANS**

**A.    Administrative Claims**

The Debtor shall pay each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Debtor; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that any Claim seeking administrative expense status included as a part of a Proof of Claim filed in this Chapter 11 Case shall not qualify as an Administrative Claim.

Unless otherwise ordered by the Bankruptcy Court, any holder of an Administrative Claim (including a holder of a Claim for postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Claim against the Debtor, the Estate, the Reorganized Debtor, or their respective assets, and such holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Claim.

### B.    Professional Claims

On or prior to the deadline set by the Bankruptcy Court for Professionals to file final fee applications, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Confirmation hearing.  The Debtor shall pay the Allowed Claims of each Professional from Available Cash in accordance with the Orders of the Bankruptcy Court.  From and after the Confirmation Date until the Effective Date, the Debtor, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period.

### C.    Priority Tax Claims

The Debtor shall pay each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

### D.    Statutory Fees

Notwithstanding any other provisions of the Plan to the contrary, the Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the entry of the order confirming the Plan, for pre-confirmation periods and simultaneously file all the monthly operating reports for the relevant periods, indicating the cash disbursements for the relevant period.  The Reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Reorganized Debtor, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the Bankruptcy Code, and the Reorganized Debtor shall provide to the United States Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, post-confirmation quarterly operating reports indicating all the cash disbursements for the relevant period.

### E.    The DIP Loans.

(i)    <u>Priming DIP Loan</u>.  Pursuant to the Priming DIP Loan Documents, the Bankruptcy Court has approved the Priming DIP Loan from the Priming DIP Lender to the Debtor in an amount up to $7,400,000, which Priming DIP Loan is secured by a first priority priming Lien in favor of the Priming DIP Lender on substantially all of the Debtor's assets, including specifically the Project.  Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the Priming DIP Lender shall receive Cash on the Sale Closing Date from a combination of the Cash Collateral and the Net Sales Proceeds, in each case which secure the Lien of the Priming DIP Loan, in full and final satisfaction, settlement, release, extinguishment, and discharge of the Priming DIP Loan, in an amount equal to the then outstanding balance of the Priming DIP Loan

14

in accordance with the terms thereof.  To the extent that any Liens to secure the Priming DIP Loan have been filed or recorded publicly, if requested by the Reorganized Debtor, the Priming DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

(ii)    Junior DIP Loan.  Pursuant to the Junior DIP Loan Documents, the Bankruptcy Court has approved the Junior DIP Loan from the Junior DIP Lender to the Debtor in an amount up to $5,200,000, which Junior DIP Loan is secured by a junior priority Lien in favor of the Junior DIP Lender on substantially all of the Debtor's assets, including specifically the Project. Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the Junior DIP Lender shall receive Cash on the Sale Closing Date from a combination of the Cash Collateral and the Net Sales Proceeds, in each case which secure the Lien of the Junior DIP Loan, in full and final satisfaction, settlement, release, extinguishment, and discharge of the Junior DIP Loan, in an amount equal to the then outstanding balance of the Junior DIP Loan in accordance with the terms thereof, provided however, that no such payment shall be made to the Junior DIP Lender unless and until the Priming DIP Loan, the Allowed Secured Claim in Class 2 (or if not then Allowed, the asserted Class 2 Secured Claim) and the Allowed Other Secured Claims in Class 3 (or if not then Allowed, the asserted Class 3 Other Secured Claims) that have priority over the Junior DIP Loan have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in connection therewith.  To the extent that any Liens to secure the Junior DIP Loan have been filed or recorded publicly, if requested by Reorganized Debtor, the Junior DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Summary

(i)    All Claims and Equity Interests, except for Administrative Claims, Professional Claims, Priority Tax Claims, Statutory Fees and the DIP Loans, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and Distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

(ii)    Summary of Classification and Treatment of Classified Claims and Equity Interests.

15

| Class | Claim | Status | Entitled to Vote? |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No, deemed to have accepted the Plan |
| 2 | Secured Claim of Indenture Trustee | Unimpaired | No, deemed to have accepted the Plan |
| 3 | Other Secured Claims | Unimpaired | No, deemed to have accepted the Plan |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Equity Interests | Unimpaired | No, deemed to have accepted the Plan |

**B.** **Classification and Treatment of Claims and Equity Interests**

(i) **Other Priority Claims (Class 1)**

(a) **Classification**: Class 1 consists of Other Priority Claims.

(b) **Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtor prior to the Effective Date or agrees to a different classification and treatment, each holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law. The treatment of each Allowed Other Priority Claim hereunder shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Other Priority Claim.

(c) **Voting**: Class 1 is Unimpaired, and therefore, the holders of Allowed Other Priority Claims in Class 1 are not entitled to vote to accept or reject the Plan, but rather are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

(ii) **Allowed Secured Claim of Indenture Trustee (Class 2)**

(a) **Classification**: Class 2 consists of the Allowed Secured Claim of the Indenture Trustee.

(b) **Treatment:** The Allowed Secured Claim of the Indenture Trustee in this Class 2 shall be satisfied and paid in full from a combination of the Cash Collateral, the Reserve Funds and the Net Sales Proceeds generated from the sale of the Project, in each case which secures the Lien of such Allowed Secured Claim, on the later of (i) the Sale Closing Date, or (ii) the date such Class 2 Secured Claim becomes an Allowed Secured Claim, provided however, that for avoidance of doubt, that portion of the Class 2 Secured Claim that is not Disputed shall be paid from the Net Sale Proceeds on the Sale Closing Date, and provided further, that no Distribution shall be made to the holder of the Allowed Secured Claim in this Class 2 unless and until the Priming DIP Loan has been paid in full, reserved or otherwise resolved, and/or included in or

accounted for in the Distribution at issue. Notwithstanding anything herein to the contrary, at such time as the Class 2 Secured Claim becomes an Allowed Claim by the Bankruptcy Court, then such Allowed Class 2 Secured Claim shall first be reduced by the Reserve Funds to the extent remaining at such time, which remaining amount shall be based on agreement between the Indenture Trustee and the Debtor or order of the Bankruptcy Court.  In the event that the Project is sold prior to the Class 2 Secured Claim being Allowed, then the Class 2 Secured Claim and any Lien related thereto shall transfer and attach to the Net Sales Proceeds pursuant to and in accordance with the Sale Order and section 363(f) of the Bankruptcy Code, which shall then be used to pay the Allowed Class 2 Secured Claim in accordance herewith.  The treatment of the Allowed Class 2 Secured Claim hereunder shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Class 2 Secured Claim.

(c)    **Voting**: Class 2 is Unimpaired and therefore, the holder of the Allowed Secured Claim in Class 2 is not entitled to vote to accept or reject the Plan, but rather is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

(iii)    <u>**Allowed Other Secured Claims (Class 3)**</u>

(a)    **Classification**: Class 3 consists of the Allowed Other Secured Claims, including (i) the Allowed Other Secured Claim of Sauer, and (ii) the Allowed Other Secured Claim of any Creditor who asserts a Lien on the Project.  Each Allowed Other Secured Claim shall be separately classified as a sub-class in this Class 3, each of which sub-class shall constitute a separate Class under this Plan.

(b)    **Treatment:**   Each Allowed Class 3 Other Secured Claim against the Estate shall be classified in a separate sub-class within this Class 3 and shall be satisfied and paid in full from the Net Sales Proceeds generated from the sale of the Project which secures the Lien of such Allowed Class 3 Other Secured Claim on the later of (i) the Sale Closing Date, or (ii) the date such Class 3 Other Secured Claim becomes an Allowed Secured Claim, provided however, that for avoidance of doubt, that portion of any Class 3 Other Secured Claim that is not Disputed shall be paid from the Net Sale Proceeds on the Sale Closing Date subject to the terms hereof, and provided further, that no Distribution shall be made to the holder of any Allowed Other Secured Claim in this Class 3 unless and until the Priming DIP Loan, the Allowed Secured Claim in Class 2 (or if not then Allowed, the asserted Class 2 Secured Claim) and all Allowed Other Secured Claims in this Class 3 (or if not then Allowed, the respective asserted Class 3 Other Secured Claims) with lien priority over the applicable Allowed Other Secured Claim in this Class 3 have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in the Distribution at issue.  In the event that the Project is sold prior to the allowance of any Class 3 Other Secured Claim, then each such Class 3 Other Secured Claim and any Lien related thereto shall transfer and attach to the Net Sales Proceeds pursuant to and in accordance with the Sale Order and section 363(f) of the Bankruptcy Code, which shall then be used to pay each such Allowed Class 3 Other Secured Claim in accordance herewith.  The treatment of each Allowed Class 3 Secured Claim hereunder shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Class 3 Other Secured Claim.  Any portion of an Allowed Class 3 Other Secured Claim that is not satisfied as part of its Allowed Class 3 Other Secured Claim shall be treated as an Allowed Class 4 General Unsecured Claim pursuant to the terms of this Plan.  For avoidance of

doubt, each Allowed Class 3 Other Secured Claim shall include post-petition interest, if applicable under section 506(b) of the Bankruptcy Code or otherwise, including as set forth in the documents establishing such Allowed Class 3 Other Secured Claim.

(c)     **Voting**: Class 3 is Unimpaired and therefore, the holder of each Allowed Other Secured Claim in Class 3 is not entitled to vote to accept or reject the Plan, but rather is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

(iv)     **Allowed General Unsecured Claims (Class 4)**

(a)     **Classification**: Class 4 consists of the Allowed General Unsecured Claims.

(b)     **Treatment:**   Each Allowed General Unsecured Claim in this Class 4 shall be satisfied and paid in full, without interest from and after the Petition Date, from the Available Cash, including the Net Sales Proceeds from the sale of the Project, on the later of (i) the Effective Date, or as soon as practicable thereafter, and (ii) the date such Class 4 General Unsecured Claim becomes an Allowed General Unsecured Claim, provided however, that no Distribution shall be made to holders of Allowed General Unsecured Claims in this Class 4 unless and until all Allowed Administrative Claims, all Professional Claims, all Allowed Priority Tax Claims, the DIP Loans and all Allowed Claims in Classes 1, 2 and 3 (or if any such Claims are not then Allowed, the respective asserted Claims) have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in the Distribution at issue.   Notwithstanding anything herein to the contrary, if and to the extent the Available Cash is not sufficient to pay all of the Allowed Class 4 General Unsecured Claims in full, then the Distribution to the holders of the Allowed Class 4 General Unsecured Claims shall be made on a Pro-Rata basis.   The treatment of each Allowed Class 4 General Unsecured Claim hereunder shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of such Allowed Class 4 General Unsecured Claim.

(c)     **Voting**: Class 4 is Impaired and therefore, the holder of each General Unsecured Claim in Class 4 is entitled to vote to accept or reject the Plan.

(v)     **Equity Interests (Class 5)**

(a)     **Classification**: Class 5 consists of the Equity Interests in the Debtor.

(b)     **Treatment**: Each holder of an Equity Interest in the Debtor as of the Petition Date shall retain its respective Equity Interest in the Reorganized Debtor from and after the Effective Date, provided however, that no Distribution shall be made to holders of the Equity Interests in this Class 5 unless and until all Allowed Administrative Claims, all Professional Claims, all Allowed Priority Tax Claims, the DIP Loans and all Allowed Claims in Classes 1, 2, 3 and 4 (or if any such Claims are not then Allowed, the respective asserted Claims) have been, as applicable, paid in full, reserved in the Disputed Claims Reserve or otherwise resolved, and/or included in or accounted for in the Distribution at issue.

(c)     **Voting**: Class 5 is Unimpaired and therefore, the holder of each Equity Interest in Class 5 is not entitled to vote to accept or reject the Plan, but rather is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

# ARTICLE IV
## ACCEPTANCE, REJECTION, AMENDMENT AND
## REVOCATION OR WITHDRAWAL OF THE PLAN

### A.    Classes Entitled to Vote

Each holder of a Claim or Equity Interest, as of the Record Date, in an Impaired Class shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.  Each of Class 1, 2, 3 and 5 are Unimpaired and therefore are deemed to have accepted the Plan.  Class 4 is Impaired and the holders of Claims therein are entitled to vote to accept or reject the Plan. As a result, the Debtor will only be soliciting votes from the holders of Claims in Class 4.

### B.    Acceptance by Class of Claims and Equity Interests

Under the Bankruptcy Code, Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class.  For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of such claim shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

Pursuant to Section 1126(f) of the Bankruptcy Code, holders of Allowed Claims and Equity Interests who are Unimpaired under the Plan are deemed to have accepted the Plan.  As set forth above, Classes 1, 2, 3 and 5 under the Plan are Unimpaired and therefore all such Classes are deemed to have voted in favor of the Plan.

### C.    Nonconsensual Confirmation

In the event that any Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Article XII.  The Debtor shall exercise the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

### D.    Revocation or Withdrawal; No Admissions

*Right to Revoke or Withdraw*.  The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor in its sole discretion.

19

*Effect of Withdrawal or Revocation; No Admissions.* If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

### E.    Amendment of the Plan and/or the Plan Documents

From and after the Effective Date, the Debtor shall have the authority to amend, modify, or supplement the Plan, the Exhibits to the Plan and any documents attached to such Plan and Exhibits to the Plan as provided in the Plan, the Exhibits to the Plan and the Bankruptcy Code.

### F.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### ARTICLE V
### MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Sale of Project – Net Sales Proceeds

The Debtor asserts that based on positions taken by the Indenture Trustee during the Chapter 11 Case, including the Indenture Trustee's demand for post-petition default rate interest which is the subject of the Section 506(b) Pleadings and the Adversary, the Debtor has been compelled to proceed with a sale of the Project as the means for implementation of the Plan in order to maximize the recovery to all stakeholders in this Chapter 11 Case. As a result, Distributions to the holders of Allowed Claims and Equity Interests under the Plan shall be made from Available Cash, including specifically the Net Sales Proceeds.

As a result of the above, the Debtor engaged, and the Bankruptcy Court approved, B. Riley to conduct a marketing and sale process for the Project. On or about July 22, 2021, B. Riley commenced and is continuing a marketing process for the sale of the Project. On or shortly after B. Riley established September 8, 2021 as a date for a "call for offers," the Debtor received at least four (4) offers for the purchase of the Project in excess of $100 million each. After evaluating such offers and negotiating with certain of the proposed purchasers, the Debtor ultimately selected the Stalking Horse Buyer as the "stalking horse" purchaser. On November 4, 2021, the Debtor entered into the Purchase Agreement with the Stalking Horse Buyer for the sale of the Project at a purchase price equal to $104,100,000. The due diligence period under the Purchase Agreement has expired and the Stalking Horse Buyer has made its good faith deposit thereunder. In connection therewith, on November 5, 2021, the Debtor filed the Sale Motion. In the event the Debtor receives any Qualified Bids by the Bid Deadline (each as defined in the Bidding Procedures Order), then the Debtor will conduct an auction for the Project. In the event the Debtor does not receive any Qualified Bids under the Bidding Procedures Order, then the Debtor will seek approval from the Bankruptcy Court for the sale of the Project to the Stalking Horse Buyer at the Sale Hearing (as defined in the Bidding Procedures Order) pursuant to the

Purchase Agreement.  In the event the Bankruptcy Court approves the sale of the Project to the Successful Bidder (as defined in the Bidding Procedures Order), then the Debtor will proceed to consummate the sale of the Project.

Notwithstanding anything herein to the contrary, the sale of the Project as set forth above shall be done in connection with and as part of the implementation of this Plan for all purposes, including specifically Section 1146(a) of the Bankruptcy Code.

### B.      Section 1146(a) Exemption

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the making, delivery, or recording of an instrument of transfer in connection with the sale by the Debtor or Reorganized Debtor of the Project pursuant to any Sale Motion and Sale Order (whether by auction or otherwise) shall not be taxed under any law imposing a stamp or similar tax, including but not limited to any recording fee, intangible taxes or documentary stamp taxes, whether on any deed, leasehold, assignment, promissory note, security agreement or mortgage.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  **For avoidance of doubt, the sale of the Project as contemplated under this Plan and the Sale Order shall have the full benefit of Section 1146(a) of the Bankruptcy Code**.

### C.      Vesting of Property of the Estate in the Reorganized Debtor

Except as provided for herein or in the Sale Order, pursuant to Sections 1123(a)(5), 1123(b)(3) and 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all property of the Estate not otherwise subject of Distributions under the Plan or required to be deposited into the Disputed Claims Reserve shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances.  As of the Effective Date, the Reorganized Debtor may operate its business, if any, and use, acquire, and dispose of its property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Sale Order, the Plan and the Confirmation Order.  All privileges with respect to the property of the Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may only be asserted by and/or waived on behalf of, the Reorganized Debtor.

### D.      Corporate Action

All actions contemplated to be performed by the Debtor or the Reorganized Debtor pursuant to the Plan, or any corporate action to be taken by or required of the Debtor or the Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, partners, members or managers of the Debtor or the

Reorganized Debtor.  All Persons, the Reorganized Debtor, governmental units, title agencies, licensing agencies and offices of recordation may rely upon the authority vested in the Debtor's officers, or managers to act on the Debtor's behalf in order to effectuate the Plan and the transactions contemplated herein.

### E.    Distributions

The Distributions will be made in accordance with the Plan by the Debtor and the Reorganized Debtor, as applicable and as set forth herein.

### F.    Surrender and Cancellation of Notes, Instruments, Certificates and Other Documents Evidencing Claims

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims will be cancelled and the obligations of the Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy Code.

### G.    Continued Corporate Existence of the Reorganized Debtor

The Reorganized Debtor will exist after the Effective Date with all of the powers of a limited liability company under applicable law in the state of Florida pursuant to its existing operating agreement or other organizational documents in effect before the Effective Date, except to the extent such operating agreement or other organizational documents are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.  Notwithstanding the above, the Debtor or the Reorganized Debtor may change its status of incorporation or alter its corporate structure or business form (either through a merger, consolidation, restructuring, conversion, disposition, liquidation, dissolution, or otherwise) on or after the Effective Date as may be determined by the Debtor or the Reorganized Debtor to be appropriate.

### H.    Post-Confirmation Accounts

From and after the Effective Date, the Reorganized Debtor will establish the Disputed Claims Reserve and may establish one or more other bank accounts as it determines may be necessary or appropriate to effectuate the provisions of the Plan.

### I.    Management of the Reorganized Debtor.

Existing management of the Debtor, including specifically Oscar Roger, Sr., shall continue to serve in their respective capacities through the Effective Date and shall serve in the same capacity for the Reorganized Debtor, as set forth in the applicable existing organizational or operational documents of the Debtor.  The management team shall be compensated in the same manner that it historically has been compensated.  On or before the Effective Date, and without the need for any further order or authority, the Debtor may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Debtor as may be necessary or appropriate to effectuate and further

evidence the terms and conditions of the Plan.  The Debtor, the Reorganized Debtor, and any other necessary party, as applicable, shall perform all actions reasonably contemplated regarding the implementation of the Plan.

Oscar Roger, Sr., as the manager of the Debtor and the Reorganized Debtor, is authorized, without the need for any further order or authority, (i) to execute, deliver, file, or record such deeds, contracts, instruments, and other agreements or documents and take such actions as may be necessary or appropriate to implement or consummate the Plan, to convey the Project pursuant to the Plan and the Sale Order, and to consummate the terms of the Purchase Agreement, and (ii) to undertake any other action on behalf of the Debtor to implement or consummate the Plan, the Sale Order and the transactions contemplated under the Purchase Agreement.  Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and (to the extent taken before the Effective Date) ratified in all respects without any requirement of further action by any officer, director or manager of the Debtor.

**J.      Section 1145 Determination**

The offer, purchase, sale, exchange and issuance of securities under the Plan, or in connection with the Plan, is exempt from the registration requirements under state and federal securities laws.

**K.      Preservation of Causes of Action**

The Debtor (prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date) shall retain and be authorized to prosecute all Causes of Action, except for those which are expressly released, settled or compromised prior to the Confirmation Date by separate Order of the Bankruptcy Court.

On the Effective Date, the Causes of Action, including specifically as set forth in the Section 506(b) Pleadings, the Adversary and the Sauer Litigation, shall be preserved and vested in the Reorganized Debtor for the benefit of the Reorganized Debtor and the holders of Allowed Claims and Allowed Equity Interests hereunder.  After the Effective Date, the Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, enforce, file, settle, compromise, release, withdraw, arbitrate or litigate any Cause of Action that vests in the Reorganized Debtor on the Effective Date.

**UNLESS SPECIFICALLY PROVIDED FOR HEREIN, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSE OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE DEBTOR AND THE REORGANIZED DEBTOR**.  Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtor to release such claims.  As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior

to the Effective Date of the Plan as any indication that the Debtor or Reorganized Debtor do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of Reorganized Debtor. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing any such Cause of Action. Nothing in the Plan operates as a release of any Cause of Action.

Other than in the Section 506(b) Pleadings, the Adversary and the Sauer Litigation, the Debtor does not presently know the full extent of the Causes of Action and, for purposes of the Plan, all Creditors are advised that the Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Confirmation Order or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Cause of Action following Confirmation of the Plan.

The Estate shall remain open, even if the Chapter 11 Case shall has been closed, as to any and all objections to Claims and Causes of Action until such time as all objections to Claims and the Causes of Action have been fully administered and the recoveries therefrom have been received.

### L.    Prosecution and Settlement of Causes of Action and Objections to Claims

The Debtor or Reorganized Debtor, as applicable, (a) may commence or continue in any appropriate court, tribunal or any other appropriate setting (e.g., American Arbitration Association or other arbitration association) any suit or other proceeding for the filing, prosecution and/or enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, including any objections to Claims and/or Cause of Action pending as of the Effective Date, and (b) may settle or adjust any Cause of Action or objection to Claim; provided, however, that from and after the Effective Date, the Reorganized Debtor shall be authorized to compromise and settle any Cause of Action or objection to a Claim upon approval by the Bankruptcy Court after notice and a hearing.

### M.    Automatic Stay

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Case until the Effective Date.

### N.    Indemnification and Reimbursement.

24

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtor for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtor against any Claims, costs, liabilities or causes of action as provided in the Debtor's operating agreement, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be paid only to the extent of any applicable insurance coverage. Nothing contained in the Plan shall affect the rights of managers, directors, officers or employees for indemnification, defense, or reimbursement under the Debtor's operating agreement, bylaws, other organizational documents, or applicable law, or such under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtor or the Debtor's Estate to object to or otherwise contest or challenge Claims or rights asserted by any current or former manager, officer, director or employee of the Debtor.

### O. Closing of the Chapter 11 Case

Notwithstanding anything to the contrary in the Bankruptcy Rules or Local Rules of the Bankruptcy Court providing for earlier closure of the Chapter 11 Case, when all Claims against the Debtor have become Allowed Claims or Disallowed Claims, and the Debtor's Available Cash has been distributed in accordance with the Plan, or at such earlier time as the Reorganized Debtor deems appropriate, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### ARTICLE VI
### PROVISIONS GOVERNING DISTRIBUTIONS

### A. Manner of Cash Payments Under the Plan

Any Distribution pursuant to the Plan, to the extent posted in the United States mail, shall be deemed made when deposited by the Debtor or the Reorganized Debtor (or its respective agent(s)), as applicable, into the United States mail, or paid by wire transfer. At the option of the Debtor or the Reorganized Debtor, as applicable, any Cash payment to be made pursuant to the Plan shall be made, at the election of the Debtor or the Reorganized Debtor, as applicable, by check drawn on a domestic bank, by wire transfer, or by ACH, from a domestic bank, or other method mutually agreed upon by the holder of the Allowed Claim or Allowed Equity Interest and the Debtor or the Reorganized Debtor. Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on that due date.

### B. Entity Making Distributions

Except as otherwise provided in the Plan, Distributions to holders of Allowed Claims and/or Allowed Equity Interests shall be made by the Debtor, if before the Effective Date, or the Reorganized Debtor if on or after the Effective Date. The Debtor and the Reorganized Debtor

shall not be required to give any bond or surety or other security for the performance of its duties, unless otherwise ordered by the Bankruptcy Court.

### C.    Distribution Dates

Distributions to holders of Claims and Equity Interests shall be made as provided in Articles II and III of this Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### D.    Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Debtor or Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Debtor or Reorganized Debtor, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the Proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date.

### E.    Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims and Equity Interests shall be made by the Debtor or Reorganized Debtor, as applicable, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no Proof of Claim is filed or if the Debtor or Reorganized Debtor, as applicable, have not been notified in writing of a change of address.

### F.    Undeliverable and Unclaimed Distributions

In the event that any Distribution to any holder of an Allowed Claim made by the Debtor or Reorganized Debtor, as applicable is returned as undeliverable, the Debtor or Reorganized Debtor, as applicable, shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Debtor or Reorganized Debtor, as applicable, has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by the Debtor or Reorganized Debtor, as applicable, that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtor or Reorganized Debtor, as applicable, or its property.  Any Distributions which are undeliverable or have not been negotiated within the time set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtor or

Reorganized Debtor, as applicable.  The Debtor or Reorganized Debtor, as applicable, shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred.

### G.    Compliance with Tax Requirements

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan.  The Debtor or Reorganized Debtor, as applicable, may withhold from any Distributions under and pursuant to the Plan to any Person or Entity any and all amounts, determined in the reasonable discretion of the Debtor or Reorganized Debtor, as applicable, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement; *provided*, *however*, that the Debtor or Reorganized Debtor, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Claims or Equity Interests without first filing a notice with the Court (and serving such notice on the holder of the Claim or Equity Interest) describing the nature and amount of the proposed withholding and providing such holder an opportunity to object.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims and/or Equity Interests.  The Debtor or Reorganized Debtor, as applicable, shall be authorized to collect such tax information from the holders of Claims and/or Equity Interests (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan.  In order to receive Distributions under the Plan, all holders of Claims and Equity Interests will need to identify themselves to the Debtor or Reorganized Debtor, as applicable, and provide all tax information the Debtor or Reorganized Debtor, as applicable, deem appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder).  The Debtor or Reorganized Debtor, as applicable, may refuse to make a Distribution to any holder of a Claim or Equity Interest that fails to furnish such information within the time period specified by the Debtor or Reorganized Debtor, as applicable, and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Debtor or Reorganized Debtor, as applicable, fails to withhold in respect of amounts received or distributable with respect to any such holder and the Debtor or the Reorganized Debtor are later held liable for the amount of such withholding, such holder shall reimburse the Debtor or Reorganized Debtor, as applicable, for such liability.  Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Allowed Equity Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit.

### H.    No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### I.    Interest on Claims

Except as specifically provided for in this Plan or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date. Except as expressly provided herein or in an order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or similar charges.

**J.      No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

**K.      Setoff and Recoupment**

The Debtor or Reorganized Debtor, as applicable, may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, Causes of Action or defenses of any nature whatsoever that the Debtor or Reorganized Debtor, as applicable, or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or Reorganized Debtor, as applicable, or the Estate of any right of setoff or recoupment that any of them may have against the holder of any Claim. Notwithstanding any provision in the Plan to the contrary, nothing herein shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; provided, however, that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtor or Reorganized Debtor, as applicable, and the Estate with respect thereto are reserved.

**L.      De Minimis Distributions**

Notwithstanding anything to the contrary in the Plan, the Debtor or Reorganized Debtor, as applicable, shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $10 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.

**M.      Distributions in Satisfaction; Allocation**

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Equity Interests in the Debtor and its Estate, whether known or unknown, that arose or existed prior to the Effective Date. Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest (if any).

**N.      No Distributions on Late-Filed Claims**

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a Proof of Claim was required to be filed and was first filed after the applicable bar date in

the Chapter 11 Case, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Case, without the need for (a) any further action by the Debtor or Reorganized Debtor, as applicable, (b) an order of the Bankruptcy Court.  Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

**ARTICLE VII**
**DISPUTED CLAIMS**

### A.    Resolution of Disputed Claims

The Debtor or the Reorganized Debtor, as applicable, shall have the right to make and file objections to Claims in the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

### B.    Objection Deadline

All objections to Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002.

### C.    Estimation of Claims

At any time, the Debtor or Reorganized Debtor, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor, as applicable, have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Debtor or Reorganized Debtor, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### D.    No Distributions Pending Allowance; Disputed Claims Reserve

Notwithstanding any other provision in the Plan, no Distributions shall be made under the Plan on account of any Disputed Claim until it becomes an Allowed Claim.  To protect the interests of holders of Disputed Claims, the Reorganized Debtor shall establish the Disputed Claims Reserve. The Reorganized Debtor shall fund the Disputed Claims Reserve with Cash in an amount that represents the Disputed Claim (or portion thereof) that would otherwise be

distributed to the holder of each Disputed Claim (or portion thereof) if such Disputed Claim was Allowed in the amount set forth on the holder's Proof of Claim or as estimated by the Bankruptcy Court.  As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive from the Disputed Claims Reserve a distribution in an amount equal to the Distribution that such holder would have received had such Disputed Claim been an Allowed Claim on the Effective Date. If and when a Disputed Claim or any portion thereof becomes a Disallowed Claim, the Distributions that would otherwise be made thereon shall be available for Distribution to holders of Allowed Claims or Equity Interests pursuant to the Plan.

**ARTICLE VIII**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A. **General Treatment: Rejected if not Previously Assumed.**

**If applicable, within fourteen (14) days prior to the Confirmation hearing, the Debtor shall file and serve a Notice of all contracts that it intends to assume (the "Assumption Schedule") that have not been previously assumed pursuant to separate Order of the Bankruptcy Court.  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed rejected, unless included on the Assumption Schedule or previously assumed by separate order of the Bankruptcy Court.  If applicable, within 14 days prior to the Confirmation Hearing, the Debtor shall file a proposed Schedule of Cure Amounts for any leases or contracts that will be assumed under the Plan  (the "Cure Schedule").  Any party objecting the proposed cure amount as set forth in the Cure Schedule shall file an objection within three (3) days prior to the Confirmation hearing.  If no objection is filed, then the proposed cure amount will be deemed approved.  The Debtor shall have forty-five (45) days from the Effective Date to supplement the Assumption Schedule and the Cure Schedule and the Bankruptcy Court will determine any disputes related thereto.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumption or rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption or rejection is in the best interests of the Debtor, the Reorganized Debtor, the Estate, and all parties in interest in the Chapter 11 Case.**

B. **Bar to Claims Arising from Rejection, Termination or Expiration**

**Claims created by the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the Debtor or Reorganized Debtor, as applicable, no later than thirty (30) days after the earlier of (a) the date of the entry of any order of the Bankruptcy Court authorizing rejection of any such executory contract or unexpired lease, or (b) the Confirmation Date with respect to any executory contract or unexpired lease that is deemed rejected pursuant to VIII A hereof ("General Treatment; Rejected if not Previously Assumed").  Any rejection claim for which a Proof of Claim is not filed and served within the time provided herein will be forever barred and shall not be enforceable against the Debtor, or the Estate, or its assets, properties, or interests in**

30

**property, or the Reorganized Debtor, or its assets, properties, or interests in property. Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor or the Reorganized Debtor of any objections to such Claim if asserted.**

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Conditions Precedent

The following are conditions precedent to the Effective Date that must be satisfied or waived by the Debtor:

(1)    The Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor confirming and approving the Plan in all respects, and the Confirmation Order shall have become a Final Order.

(2)    The Sale Order shall have been entered and the Sale Closing Date shall have occurred.

(3)    There shall be no stay or injunction in effect with respect to the Confirmation Order.

(4)    The Plan Documents shall be in a form and substance reasonably acceptable to the Debtor, and have been duly executed and delivered; provided, however, that no party to any such agreements and instruments, may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

### B.    Waiver

Notwithstanding the foregoing conditions, the Debtor reserves, in its sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.   Any such written waiver of a condition precedent set forth in this Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE X
## EFFECT OF CONFIRMATION; INDEMNIFICATION,
## INJUNCTIVE AND RELATED PROVISIONS

### A.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity

Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests.

## B.    Vesting of Assets

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code and except as provided for herein or in the Sale Order, all property of the Debtor shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  From and after the Effective Date and other than as specifically set forth herein, the Reorganized Debtor may operate the Debtor's business, if any, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.  In the event that the Chapter 11 Case is converted to a case under chapter 7 for any reason, any property held by either the Debtor or the Reorganized Debtor at any time, other than property that already has been distributed under this Plan prior to conversion of the case from chapter 11 to chapter 7, shall revest in the Debtor.

## C.    Title to Assets; Discharge of Liability

Except as otherwise provided in the Plan and the Sale Order, including, but not limited to any limitations set forth in the Plan and the Sale Order, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtor free and clear of all Claims, Equity Interests, Liens, encumbrances, charges, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtor arising prior to the Effective Date, except as may be otherwise provided in the Plan or the Sale Order.

## D.    Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, and any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

## E.    Discharge of Claims

Except as provided herein, the rights afforded in the Plan and the payments and Distributions to be made hereunder shall discharge all existing debts and Claims, of any kind, nature, or description whatsoever against or in the Debtor or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided herein, upon the Effective Date, all existing Claims against and Equity Interests in the Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtor, its successors or assignees, or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that

occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or proof of equity interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Reorganized Debtor any such discharged Claim against or Equity Interest in the Debtor.

### F.    Discharge of the Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan will be in complete satisfaction, discharge, and release, of any and all Claims, whether known or unknown, against the Debtor or Reorganized Debtor or any of its assets or properties, regardless of whether the property has been distributed or retained pursuant to the Plan. Without limiting the generality of the foregoing, the Debtor or Reorganized Debtor will be discharged from any and all Claims and debts of the kind specified in sections 502(g), 502(h) of 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim accepted the Plan. Except as otherwise provided in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor arising before the Effective Date. Under section 524 of the Bankruptcy Code, the discharge granted under this section shall avoid any judgment against the Debtor at any time obtained (to the extent it relates to a discharged Claim), and operates as an injunction against the prosecution of any action against the Debtor or the Estate (to the extent such action relates to a discharged claim). Nothing in this Article X should be interpreted as a discharge of the Debtor's or Reorganized Debtor's rights or obligations under the Plan.

### G.    Exculpation

**Notwithstanding anything contained herein the contrary, the Exculpated Parties shall neither have nor incur any liability relating to the Chapter 11 Case to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan or distributing property thereunder, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Case; provided, however, that the foregoing provisions of this Article shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, fraud or willful misconduct.**

### H.    Limitations on Exculpation

Nothing in this Plan shall be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or limit the liability of the

professionals of the Debtor to the Debtor pursuant to Rule 4-1.8(h) of the Florida Rules of Professional Conduct ("Limiting Liability for Malpractice").

I.    **Injunction**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Reorganized Debtor, the Estate, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released, discharged or satisfied or to be released, discharged or satisfied pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, the Estate, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released, discharged or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtor or any of its assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

(i)    commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, the Estate and their successors and assigns and its assets and properties;

(ii)    enforcing, determining, attaching, collecting or recovering by any manner or means any liability, claim, judgment, award, decree or order against the Debtor, the Reorganized Debtor, the Estate and their successors and assigns and their assets and properties;

(iii)    creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Reorganized Debtor, the Estate and their successors and assigns and their assets and properties; and

(iv)    commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

### J.    Release of Liens

Except as otherwise provided in the Plan, in the Sale Order or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtor.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, the Reorganized Debtor, and the Plan as is legally permissible, including, without limitation, jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim against or liability of the Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims, including pursuant to the Section 506(b) Pleadings, the Adversary and the Sauer Litigation;

(ii)    grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Case by the Debtor for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iii)    resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(iv)    ensure that Distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding, as applicable, the Debtor's or Reorganized Debtor's entitlement to recover assets held by third parties;

(v)    decide or resolve any motions, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date;

(vi)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

(vii)    issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

(viii)    enforce Articles within this Plan;

(ix)    resolve any cases, controversies, suits or disputes with respect to the exculpation, injunction and other provisions contained in Article X, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(x)    enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xi)    resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

(xii)    enter an order and a Final Decree closing the Chapter 11 Case.

### ARTICLE XII
### MISCELLANEOUS PROVISIONS

**A.    Modification of Plan**

Subject to the limitations contained in the Plan, the Debtor reserves the right in its sole discretion, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; provided, however, that (1) any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and (2) after the entry of the Confirmation Order, the Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**B.    Revocation of Plan**

The Debtor reserves the right in its sole discretion to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; and (2) nothing contained in

the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of either of the Debtor or any other Entity; or (c) constitute an admission of any sort by either of the Debtor or any other Entity.

### C.    Binding Effect

On the Effective Date, the provisions herein shall bind any holder of a Claim against, or present or former direct or indirect holder of an Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### D.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### E.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

### F.    Reservation of Rights

The Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### G.    Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Debtor and each of its Representatives have acted in "good faith" under sections 1125(e) and 1129(a)(3) of the Bankruptcy Code.

### H.    Further Assurances

The Debtor, all holders of Claims receiving Distributions hereunder, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### I.    Service of Documents

Any pleading, notice or other document required herein to be served on or delivered to the Debtor shall be sent by both email and first class, certified U.S. mail, postage prepaid as follows:

**To the Debtor:**    **MIDTOWN CAMPUS PROPERTIES, LLC**
c/o Oscar Roger, Sr.
782 42nd Avenue, Suite 550
Miami, FL 33126
Email: oroger@rogerdevelopment.com

With a copy to (which shall not constitute notice)

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Attn:  Paul J. Battista, Esq.
Attn:  Mariaelena Gayo-Guitian, Esq.
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Telephone: (305) 349-2300
Email: pbattista@gjb-law.com
Email:  mguitian@gjb-law.com

### J.    Filing of Additional Documents

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### K.    No Stay of Confirmation Order

The Debtor shall request that the Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

### L.    Bankruptcy Rule 9019 Request; Impact

The Plan, including the Plan Documents or other Plan Document, may provide for one or more compromises or settlements.  Pursuant to Bankruptcy Rule 9019, the Debtor hereby requests approval of all compromises and settlements included in the Plan, and entry of the

Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of any such compromise or settlement.

Dated: November 7, 2021

MIDTOWN CAMPUS PROPERTIES, LLC.

By: /s/ *Oscar Roger Sr*
Name:  Oscar Roger, Sr.
Title:  Manager


GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for the Debtor*
100 SE 2nd Street, 44th Floor
Miami, FL 33131-2100
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By: : /s/ *Paul J. Battista*
      Paul J. Battista
      Florida Bar No. 884162
      pbattista@gjb-law.com
      Mariaelena Gayo-Guitian
      Florida Bar No. 813818
      mguitian@gjb-law.com
      John K. Olson
      Florida Bar No. 201634
      jolson@gjb-law.com
      Heather L. Harmon
      Florida Bar No. 013192
      hharmon@gjb-law.com

**<u>EXHIBIT "2"</u>**

**CLAIMS REGISTER**

In re Midtown Campus Properties, LLC
Claims Register

| Creditor | Claim Number | Claim Type | Claim Amount | Notes |
|---|---|---|---|---|
| Internal Revenue Service | 1 | Secured | $ - | Amended claim shows a zero balance. |
| Johns Creek Remodeling, LLC | 2 | Secured | $ 102,169.02 | |
| U.S. Bank, N.A., as Indenture Trustee | 3 | Secured | $ 80,179,693.65 | Disputed.  Claim objection to be filed. |
| Gainesville Regional Utilities | 4 | Unsecured | $ 4,664.54 | |
| FCCI Insurance Company as assignee of LP Construction, Inc. | 5 | Secured | $ 346,967.61 | Disputed.  Claim objection to be filed. |
| Federal Insurance Company | 6 | Secured | $ 2,974,916.43 | Disputed.  Claim objection to be filed. |
| Federal Insurance Company | 6 | Unsecured | $ 60,948,703.57 | Disputed.  Claim objection to be filed. |
| Sauer Incorporated | 7 | Secured | $ 2,920,758.90 | Disputed.  Claim objection to be filed. |
| Sauer Incorporated | 7 | Unsecured | $ 3,633,794.78 | Disputed.  Claim objection to be filed. |
| Capital Steel, Inc. | 8 | Unsecured | $ 131,199.05 | Claim is covered by payment bond. |
| American Structural Concrete LLC | 9 | Unsecured | $ 255,517.47 | |
| Traffic2Revenue, Inc. | 10 | Unsecured | $ 5,037.00 | Paid in Full.  See ECF No. 385. |
| Sims Crane & Equipment Co. | 11 | Unsecured | $ 215,053.68 | |
| CRQ Florida, Inc. d/b/a Blue Furniture | Pending | Administrative | $ 217,102.11 | Critical Vendor Status pending. |

**<u>EXHIBIT "3"</u>**

**LIQUIDATION ANALYSIS**

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

**Liquidation Analysis - Recovery Percentage by Class of Claim**

The purpose of this analysis is to identify the percentage recovery for each class of claims by liquidation scenario.

| | Chapter 11 | | | Chapter 7 | | |
|---|---|---|---|---|---|---|
| **Waterfall Analysis Based on US Bank's Claim at Non-default Contract Rate** | | | | | | |
| Selling Price | $ 100,000,000 | $ 105,000,000 | $ 110,000,000 | $ 90,000,000 | $ 95,000,000 | $ 100,000,000 |
| Priming DIP loan and real estate taxes | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| U.S. Bank, N.A., as Indenture Trustee | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other secured claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Junior DIP Loan | 100.0% | 100.0% | 100.0% | 15.0% | 100.0% | 100.0% |
| Chapter 7 administrative claims | N/A | N/A | N/A | 0.0% | 17.6% | 100.0% |
| Chapter 11 administrative claims | 100.0% | 100.0% | 100.0% | 0.0% | 0.0% | 67.5% |
| General unsecured claims | 54.7% | 100.0% | 100.0% | 0.0% | 0.0% | 0.0% |

| | Chapter 11 | | | Chapter 7 | | |
|---|---|---|---|---|---|---|
| **Waterfall Analysis Based on US Bank's Claim at Default Contract Rate** | | | | | | |
| Selling Price | $ 100,000,000 | $ 105,000,000 | $ 110,000,000 | $ 90,000,000 | $ 95,000,000 | $ 100,000,000 |
| Priming DIP loan and real estate taxes | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| U.S. Bank, N.A., as Indenture Trustee | 94.0% | 99.0% | 100.0% | 83.9% | 89.0% | 94.0% |
| Other secured claims | 0.0% | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Junior DIP Loan | 0.0% | 0.0% | 7.7% | 0.0% | 0.0% | 0.0% |
| Chapter 7 administrative claims | N/A | N/A | N/A | 0.0% | 0.0% | 0.0% |
| Chapter 11 administrative claims | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| General unsecured claims | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

**SEE ACCOMPANYING NOTES**

Kapila|Mukamal
CPAs, Forensic and Insolvency Advisors

CH 11 Version 1 - Debtor's Calculation of US Bank's Claim

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

**Waterfall Analysis Based on US Bank's Claim at Non-default Contract Rate**

Source: Pleadings and claims.
Petition Date: 5/8/2020
Estimated Effective Date: 12/31/2021

| Description | Notes | Chapter 11 | | |
|---|---|---|---|---|
| | | Liquidation scenarios based on sales price | | |
| **Assets:** | | | | |
| Estimated gross sales price | 1 | $ 100,000,000 | $ 105,000,000 | $ 110,000,000 |
| Estimated cash as of the Effective Date | 2 | 1,000,000 | 1,000,000 | 1,000,000 |
| Recovery from litigation claims - Sauer | 3 | Unknown | Unknown | Unknown |
| **Total assets** | | 101,000,000 | 106,000,000 | 111,000,000 |
| **Claims** | | | | |
| Real estate taxes | 4 | 24,488 | 24,488 | 24,488 |
| Priming DIP Loan | 5 | 7,400,000 | 7,400,000 | 7,400,000 |
| *Assets available for remaining claims* | | 93,575,512 | 98,575,512 | 103,575,512 |
| *Secured claims:* | 6 | | | |
| U.S. Bank, N.A., as Indenture Trustee (Claim #3) | 7 | 79,198,122 | 79,198,122 | 79,198,122 |
| *Assets available for remaining claims* | | 14,377,391 | 19,377,391 | 24,377,391 |
| *Other secured claims:* | | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc. (Claim #7) | 9 | 3,149,958 | 3,149,958 | 3,149,958 |
| FCCI Ins Co (as assignee of LP Construction, Inc) (Claim #5) | 10 | 346,968 | 346,968 | 346,968 |
| Johns Creek Remodeling, LLC (Claim #2) | | 102,169 | 102,169 | 102,169 |
| *Other secured claims* | | 3,599,095 | 3,599,095 | 3,599,095 |
| *Assets available for remaining claims* | | 10,778,296 | 15,778,296 | 20,778,296 |
| Junior DIP Loan | 11 | 5,200,000 | 5,200,000 | 5,200,000 |
| *Assets available for remaining claims* | | 5,578,296 | 10,578,296 | 15,578,296 |
| Chapter 7 Trustee Fees (3%) | | | | |
| Chapter 7 Professional Fees | | | | |
| *Assets available for remaining claims* | | 5,578,296 | 10,578,296 | 15,578,296 |
| *Chapter 11 Administrative Claims:* | | | | |
| Bankruptcy related fees & expenses: | | | | |
| US Trustee fees | 12 | 250,000 | 250,000 | 250,000 |
| Debtor's professional fees - see attached breakdown | 13 | 1,577,423 | 1,577,423 | 1,577,423 |
| Post-petition admin claims: | | | | |
| CRQ Florida Inc., d/b/a Blue Furniture (Pending Claim) | 14 | 104,102 | 104,102 | 104,102 |
| Other construction claims | 15 | TBD | TBD | TBD |
| Other admin claims: | | | | |
| B. Riley (1.25% of est. gross sale price) | 16 | 1,250,000 | 1,312,500 | 1,375,000 |
| *Chapter 11 admin claims* | | 3,181,525 | 3,244,025 | 3,306,525 |
| *Assets available for remaining claims* | | 2,396,771 | 7,334,271 | 12,271,771 |
| *General Unsecured Claims:* | 17 | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc. (Claim #7) | | 3,663,795 | 3,663,795 | 3,663,795 |
| American Structural Concrete LLC (Claim #9) | | 255,517 | 255,517 | 255,517 |
| Sims Crane & Equipment Co. (Claim #11) | | 215,054 | 215,054 | 215,054 |
| Capital Steel, Inc. (Claim #8) | 18 | 131,199 | 131,199 | 131,199 |
| Gainesville Regional Utilities (Claim #4) | | 4,665 | 4,665 | 4,665 |
| Amounts asserted to be due to Asset Campus | 19 | 112,052 | 112,052 | 112,052 |
| *GUCs* | | 4,382,282 | 4,382,282 | 4,382,282 |
| *Total claims* | | 102,985,511 | 103,048,011 | 103,110,511 |
| **Estimated Distribution to Equity Interests** | | $ - | $ 2,951,989 | $ 7,889,489 |

**SEE ACCOMPANYING NOTES**

CH 11 Version 2 - US Bank's Calculation of its Claim

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

**Waterfall Analysis Based on US Bank's Claim at Default Contract Rate**

Source: Pleadings and claims.
Petition Date: 5/8/2020
Estimated Effective Date: 12/31/2021

| Description | Notes | Chapter 11 Liquidation scenarios based on sales price | | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Estimated gross sales price | 1 | $ 100,000,000 | $ 105,000,000 | $ 110,000,000 |
| Estimated cash as of the Effective Date | 2 | 1,000,000 | 1,000,000 | 1,000,000 |
| Recovery from litigation claims - Sauer | 3 | Unknown | Unknown | Unknown |
| **Total assets** | | 101,000,000 | 106,000,000 | 111,000,000 |
| **Claims** | | | | |
| Real estate taxes | 4 | 24,488 | 24,488 | 24,488 |
| Priming DIP Loan | 5 | 7,400,000 | 7,400,000 | 7,400,000 |
| *Assets available for remaining claims* | | 93,575,512 | 98,575,512 | 103,575,512 |
| *Secured claims:* | 6 | | | |
| U.S. Bank, N.A., as Indenture Trustee (Claim #3) | 7 | 99,575,260 | 99,575,260 | 99,575,260 |
| *Assets available for remaining claims* | | - | - | 4,000,253 |
| *Other secured claims:* | | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc. (Claim #7) | 9 | 3,149,958 | 3,149,958 | 3,149,958 |
| FCCI Ins Co (as assignee of LP Construction, Inc) (Claim #5) | 10 | 346,968 | 346,968 | 346,968 |
| Johns Creek Remodeling, LLC (Claim #2) | | 102,169 | 102,169 | 102,169 |
| *Other secured claims* | | 3,599,095 | 3,599,095 | 3,599,095 |
| *Assets available for remaining claims* | | - | - | 401,158 |
| Junior DIP Loan | 11 | 5,200,000 | 5,200,000 | 5,200,000 |
| *Assets available for remaining claims* | | - | - | - |
| Chapter 7 Trustee Fees (3%) | | | | |
| Chapter 7 Professional Fees | | | | |
| *Assets available for remaining claims* | | - | - | - |
| *Chapter 11 Administrative Claims:* | | | | |
| Bankruptcy related fees & expenses: | | | | |
| US Trustee fees | 12 | 250,000 | 250,000 | 250,000 |
| Debtor's professional fees - see attached breakdown | 13 | 1,577,423 | 1,577,423 | 1,577,423 |
| Post-petition admin claims: | | | | |
| CRQ Florida Inc., d/b/a Blue Furniture (Pending Claim) | 14 | 104,102 | 104,102 | 104,102 |
| Other construction claims | 15 | TBD | TBD | TBD |
| Other admin claims: | | | | |
| B. Riley (1.25% of est. gross sale price) | 16 | 1,250,000 | 1,312,500 | 1,375,000 |
| *Chapter 11 admin claims* | | 3,181,525 | 3,244,025 | 3,306,525 |
| *Assets available for remaining claims* | | - | - | - |
| *General Unsecured Claims:* | 17 | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc. (Claim #7) | | 3,663,795 | 3,663,795 | 3,663,795 |
| American Structural Concrete LLC (Claim #9) | | 255,517 | 255,517 | 255,517 |
| Sims Crane & Equipment Co. (Claim #11) | | 215,054 | 215,054 | 215,054 |
| Capital Steel, Inc. (Claim #8) | 18 | 131,199 | 131,199 | 131,199 |
| Gainesville Regional Utilities (Claim #4) | | 4,665 | 4,665 | 4,665 |
| Amounts asserted to be due to Asset Campus | 19 | 112,052 | 112,052 | 112,052 |
| *GUCs* | | 4,382,282 | 4,382,282 | 4,382,282 |
| *Total claims* | | 123,362,649 | 123,425,149 | 123,487,649 |
| **Estimated Distribution to Equity Interests** | | $ - | $ - | $ - |

**SEE ACCOMPANYING NOTES**

CH 7 Version 3 - Debtor's Calculation of US Bank's Claim

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

**Waterfall Analysis Based on US Bank's Claim at Non-default Contract Rate**

Source: Pleadings and claims.
Petition Date: 5/8/2020
Estimated Effective Date: 12/31/2021

| Description | Notes | Chapter 7 Liquidation scenarios based on sales price | | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Estimated gross sales price | 1 | $ 90,000,000 | $ 95,000,000 | $ 100,000,000 |
| Estimated cash as of the Effective Date | 2 | 1,000,000 | 1,000,000 | 1,000,000 |
| Recovery from litigation claims - Sauer | 3 | Unknown | Unknown | Unknown |
| **Total assets** | | **91,000,000** | **96,000,000** | **101,000,000** |
| **Claims** | | | | |
| Real estate taxes | 4 | 24,488 | 24,488 | 24,488 |
| Priming DIP Loan | 5 | 7,400,000 | 7,400,000 | 7,400,000 |
| *Assets available for remaining claims* | | **83,575,512** | **88,575,512** | **93,575,512** |
| *Secured claims:* | 6 | | | |
| U.S. Bank, N.A., as Indenture Trustee (Claim #3) | 7 | 79,198,122 | 79,198,122 | 79,198,122 |
| *Assets available for remaining claims* | | **4,377,391** | **9,377,391** | **14,377,391** |
| *Other secured claims:* | | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc.  (Claim #7) | 9 | 3,149,958 | 3,149,958 | 3,149,958 |
| FCCI Ins Co (as assignee of LP Construction, Inc) (Claim #5) | 10 | 346,968 | 346,968 | 346,968 |
| Johns Creek Remodeling, LLC (Claim #2) | | 102,169 | 102,169 | 102,169 |
| *Other secured claims* | | **3,599,095** | **3,599,095** | **3,599,095** |
| *Assets available for remaining claims* | | **778,296** | **5,778,296** | **10,778,296** |
| Junior DIP Loan | 11 | 5,200,000 | 5,200,000 | 5,200,000 |
| *Assets available for remaining claims* | | **-** | **578,296** | **5,578,296** |
| Chapter 7 Trustee Fees (3%) | | 2,730,000 | 2,880,000 | 3,030,000 |
| Chapter 7 Professional Fees | 20 | 400,000 | 400,000 | 400,000 |
| *Assets available for remaining claims* | | **-** | **-** | **2,148,296** |
| *Chapter 11 Administrative Claims:* | | | | |
| Bankruptcy related fees & expenses: | | | | |
| US Trustee fees | 12 | 250,000 | 250,000 | 250,000 |
| Debtor's professional fees - see attached breakdown | 13 | 1,577,423 | 1,577,423 | 1,577,423 |
| Post-petition admin claims: | | | | |
| CRQ Florida Inc., d/b/a Blue Furniture (Pending Claim) | 14 | 104,102 | 104,102 | 104,102 |
| Other construction claims | 15 | TBD | TBD | TBD |
| Other admin claims: | | | | |
| B. Riley (1.25% of est. gross sale price) | 16 | 1,125,000 | 1,187,500 | 1,250,000 |
| *Chapter 11 admin claims* | | **3,056,525** | **3,119,025** | **3,181,525** |
| *Assets available for remaining claims* | | **-** | **-** | **-** |
| *General Unsecured Claims:* | 17 | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc. (Claim #7) | | 3,663,795 | 3,663,795 | 3,663,795 |
| American Structural Concrete LLC (Claim #9) | | 255,517 | 255,517 | 255,517 |
| Sims Crane & Equipment Co. (Claim #11) | | 215,054 | 215,054 | 215,054 |
| Capital Steel, Inc. (Claim #8) | 18 | 131,199 | 131,199 | 131,199 |
| Gainesville Regional Utilities (Claim #4) | | 4,665 | 4,665 | 4,665 |
| Amounts asserted to be due to Asset Campus | 19 | 112,052 | 112,052 | 112,052 |
| *GUCs* | | **4,382,282** | **4,382,282** | **4,382,282** |
| *Total claims* | | **105,990,511** | **106,203,011** | **106,415,511** |
| **Estimated Distribution to Equity Interests** | | $ - | $ - | $ - |

**SEE ACCOMPANYING NOTES**

CH 7 Version 4 - US Bank's Calculation of its Claim

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

**Waterfall Analysis Based on US Bank's Claim at Default Contract Rate**

Source: Pleadings and claims.
Petition Date: 5/8/2020
Estimated Effective Date: 12/31/2021

| Description | Notes | Chapter 7 Liquidation scenarios based on sales price | | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Estimated gross sales price | 1 | $ 90,000,000 | $ 95,000,000 | $ 100,000,000 |
| Estimated cash as of the Effective Date | 2 | 1,000,000 | 1,000,000 | 1,000,000 |
| Recovery from litigation claims - Sauer | 3 | Unknown | Unknown | Unknown |
| **Total assets** | | **91,000,000** | **96,000,000** | **101,000,000** |
| **Claims** | | | | |
| Real estate taxes | 4 | 24,488 | 24,488 | 24,488 |
| Priming DIP Loan | 5 | 7,400,000 | 7,400,000 | 7,400,000 |
| *Assets available for remaining claims* | | **83,575,512** | **88,575,512** | **93,575,512** |
| *Secured claims:* | 6 | | | |
| U.S. Bank, N.A., as Indenture Trustee (Claim #3) | 7 | 99,575,260 | 99,575,260 | 99,575,260 |
| *Assets available for remaining claims* | | **-** | **-** | **-** |
| *Other secured claims:* | | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc.  (Claim #7) | 9 | 3,149,958 | 3,149,958 | 3,149,958 |
| FCCI Ins Co (as assignee of LP Construction, Inc) (Claim #5) | 10 | 346,968 | 346,968 | 346,968 |
| Johns Creek Remodeling, LLC (Claim #2) | | 102,169 | 102,169 | 102,169 |
| *Other secured claims* | | **3,599,095** | **3,599,095** | **3,599,095** |
| *Assets available for remaining claims* | | | | |
| Junior DIP Loan | 11 | 5,200,000 | 5,200,000 | 5,200,000 |
| *Assets available for remaining claims* | | **-** | **-** | **-** |
| Chapter 7 Trustee Fees (3%) | | 2,730,000 | 2,880,000 | 3,030,000 |
| Chapter 7 Professional Fees | 20 | 400,000 | 400,000 | 400,000 |
| *Assets available for remaining claims* | | **-** | **-** | **-** |
| *Chapter 11 Administrative Claims:* | | | | |
| Bankruptcy related fees & expenses: | | | | |
| US Trustee fees | 12 | 250,000 | 250,000 | 250,000 |
| Debtor's professional fees - see attached breakdown | 13 | 1,577,423 | 1,577,423 | 1,577,423 |
| Post-petition admin claims: | | | | |
| CRQ Florida Inc., d/b/a Blue Furniture (Pending Claim) | 14 | 104,102 | 104,102 | 104,102 |
| Other construction claims | 15 | TBD | TBD | TBD |
| Other admin claims: | | | | |
| B. Riley (1.25% of est. gross sale price) | 16 | 1,125,000 | 1,187,500 | 1,250,000 |
| *Chapter 11 admin claims* | | **3,056,525** | **3,119,025** | **3,181,525** |
| *Assets available for remaining claims* | | **-** | **-** | **-** |
| *General Unsecured Claims:* | 17 | | | |
| Federal Insurance Company (Claim #6) | 8 | | | |
| Sauer, Inc. (Claim #7) | | 3,663,795 | 3,663,795 | 3,663,795 |
| American Structural Concrete LLC (Claim #9) | | 255,517 | 255,517 | 255,517 |
| Sims Crane & Equipment Co. (Claim #11) | | 215,054 | 215,054 | 215,054 |
| Capital Steel, Inc. (Claim #8) | 18 | 131,199 | 131,199 | 131,199 |
| Gainesville Regional Utilities (Claim #4) | | 4,665 | 4,665 | 4,665 |
| Amounts asserted to be due to Asset Campus | 19 | 112,052 | 112,052 | 112,052 |
| *GUCs* | | **4,382,282** | **4,382,282** | **4,382,282** |
| *Total claims* | | **126,367,649** | **126,580,149** | **126,792,649** |
| **Estimated Distribution to Equity Interests** | | $ - | $ - | $ - |

**SEE ACCOMPANYING NOTES**

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

## Notes to Liquidation Analysis

| No. | Description |
|---|---|
| 1 | Potential purchase prices. |
| 2 | The estimated cash as of the Effective Date is net of construction costs and includes rents through collected December.  For purposes of this analysis, amounts in the Debt Service Fund ("DSR") have been excluded. |
| 3 | Litigation claims including any escrow recovery. |
| 4 | The current amount of real estate taxes due in November 2021. |
| 5 | Assumes the Priming DIP Loan will be drawn in the full amount of $7.4 million. |
| 6 | The Debtor is disputing  the Secured Claims and the actual amount owed is subject to resolution of the Debtor's objections. |
| 7 | V1 - The Debtor assumed the amount due to US Bank was calculated as follows: (i) Principal $77,820,000 less  discounts in the amount of $3,142,588, (these amounts have been allocated on a pro-rata basis to each bond) (ii) Plus amortization of the discounts for the period from January 1, 2019 though May 8, 2020 (19.9 year term) (iii) plus interest on  the principal less the credit as previously described at (ii) at the contract interest rate of 6.875% for the 2038 Bond and 7.00% for the 2048 Bond for 396 days (12/1/2020-12/31/2021)<br><br>V2 - The Debtor assumed the amounts due to US Bank was calculated as follows: (i) Principal, Redemption Premium, and interest through August 1, 2021 as calculated by the Bondholders total $95,465,695.57 plus interest at the default rates for the period from August 1, 2021 through December 31, 2021 totaling $5,530,116.88.<br><br>In both instances, the claims have been reduced by the cash available in the DSR in the amount of $2,911,586.16 as of September 30, 2021 less professional fees of US Bank in the amount of $616,033, less an estimate of US Bank's professional fees in the amount of $175,000 per month for the period from August through December 2021. |
| 8 | This is a duplicate of Sauer's claim #7. |
| 9 | The Debtor has objected to this claim filed by Sauer in the amount of $2,920,758.90 plus interest at the rate of 4.75% for the period from May 8, 2020 through December 31, 2021 totaling $229,199.55. |
| 10 | Subject to objection of claim and disputed in full.  Out of abundance of caution, this claim has been included in the analysis |
| 11 | The Junior DIP loan in the amount of $5.2 million will be paid after the Other Secured Claims. |
| 12 | Analysis assumes disbursements in excess of $31.5 million resulting from the sale of the property which will result in a UST fee of $250,000. |
| 13 | Estimated amounts due for Chapter 11 administrative claims including estimated amounts due to the bankruptcy professionals. |
| 14 | The Debtor is contesting the amount due to CRQ Florida Inc., d/b/a Blue Furniture. |
| 15 | The Debtor does not anticipate unpaid construction costs at this time |

**Kapila Mukamal**
CPAs, Forensic and Insolvency Advisors

**MIDTOWN CAMPUS PROPERTIES, LLC**
**CASE NO. 20-15173-RAM**
**UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA**

**Notes to Liquidation Analysis**

| No. | Description |
|---|---|
| 16 | B. Riley receives a fee in the amount of 1.25% of the gross closing price per order (DE416) dated July 22, 2021. Analysis assumes B. Reily's fee would carry over to Chapter 7 liquidation. |
| 17 | Estimated general unsecured claims subject to the dispute and objection of the Sauer, Inc. claim. |
| 18 | This claim may be covered by a payment bond |
| 19 | Amounts asserted to be due to vendors retained by Asset Campus. |
| 20 | Estimated Chapter 7 professional fees. |

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors
Page 8 of 8

## MIDTOWN CAMPUS PROPERTIES, LLC
### CASE NO. 20-15173-RAM
### UNITED STATES BANKRUPTCY COURT - SOUTHERN DISTRICT OF FLORIDA

## Liquidation Analysis
## Schedule of Debtor's Professional Fees

| Payee | Total Funds Escrowed for Professional | Payments for Professional Fees | Remaining Balance in GJB Escrow | Less: Carve Outs Applied to Construction | Updated Remaining Balance | Current WIP | WIP as of | Amounts Due After Escrow |
|---|---|---|---|---|---|---|---|---|
| Genovese, Joblove & Battista | $ 799,999 | $ (657,546) | $ 142,453 | $ (100,000) | $ 42,453 | $ 1,054,226 | 9/30/2021 | $ 1,011,773 |
| KapilaMukamal | 385,000 | (181,688) | 203,312 | (100,000) | 103,312 | 205,662 | 9/30/2021 | 102,350 |
| Becker & Poliakoff | 225,000 | (131,388) | 93,612 | | 93,612 | 365,000 | 12/31/21 Estimate | 271,388 |
| Expert | 150,000 | | 150,000 | (25,000) | 125,000 | 125,000 | Reserve | - |
| GEMRT | 60,000 | (19,991) | 40,008 | | 40,008 | 49,654 | 12/31/2021 Estimate | 9,646 |
| Salazar Law | 26,000 | (26,000) | - | | - | 50,000 | Estimate | 50,000 |
| Bosch Group | 10,000 | (10,000) | - | | - | | | |
| David Coffey, PA | 10,000 | | 10,000 | | 10,000 | 15,000 | Estimate | 5,000 |
| Greenberg Traug | - | | | | - | 102,625 | 8/10/2021 | 102,625 |
| Slider Engineering | - | (14,641) | (14,641) | | (14,641) | 10,000 | | 24,641 |
| Darlene Roman Rossy | | | | | | | | |
| **Total** | **$ 1,665,999** | **$ (1,041,255)** | **$ 624,744** | **$ (225,000)** | **$ 399,744** | **$ 1,977,167** | | **$ 1,577,423** |

Amounts are estimates and subject to court approval